**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **QUILL INK BOOKS LIMITED, a**<br>**foreign corporation,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**RACHELLE SOTO A/K/A ADDISON**<br>**CAIN, an individual,**<br><br>    **Defendant.** | **Civil Action No. 1:19-cv-00476 LO MSN**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff, Quill Ink Books Limited ("Quill"), by its undersigned counsel, states the following as its First Amended Complaint against Defendant, Rachelle Soto a/k/a Addison Cain ("Cain"), in accordance with the Orders entered by the Court on August 9, 2019 (order, *inter alia,* dismissing state-law claims based on activities in filing "take-down notices" under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, as pre-empted by the Copyright Act and permitting filing of Amended Complaint), August 15, 2019 (Amended Order permitting filing of Amended Complaint) and on August 19, 2019 (setting time for filing), reserving its exception to the Orders dismissing, in part, the original Complaint:

## NATURE OF THE ACTION

1.    This is a civil action brought by Quill, a foreign corporation and publisher, against Cain, an author of "Dark Romance" and other novels published under pseudonyms.

2.    These claims arise out of actions taken by Cain, alone and in conspiracy with her Virginia-based publisher ABCD Graphics and Design, Inc., d/b/a Blushing Books ("Blushing Books"), to defame Quill and its MYTH OF OMEGA series written under the "Zoey Ellis" brand of

books, and to interfere with Quill's business and profession by falsely claiming Quill's MYTH OF OMEGA series plagiarized Cain's book(s).  Pursuant to the Order of the Court dated August 9, 2019, as amended August 15, 2019, this First Amended Complaint bases all state-law claims (i.e., for defamation, for interference with business, and for statutory conspiracy) on actions other than the filing of any DMCA take-down notice.

3.     However, one principal vehicle of Cain's conspiracy with Blushing Books and her campaign to defame Quill was the filing of intentionally and materially false notices ("take-down notices") with a large number of Quill's online vendors under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.  This resulted in interference with Quill's distributor contract with Draft2Digitial and caused vendors such as Barnes & Noble, iBooks, and perhaps a dozen additional outlets to remove Quill's books from sale. Although the distributor and vendors eventually examined Cain's claims of copyright infringement and plagiarism and —realizing those claims were false—began to sell Quill's books again, Quill has been, and continues to be, damaged in its business and reputation. Cain's take-down notices themselves contained intentionally false statements, and also contained an intentionally and materially false "comparison" of the works. In addition, Cain filed a takedown notice against the third book of Quill's MYTH OF OMEGA series, claiming it plagiarized her book(s) and infringed her copyright, before Quill's third book was even published, made available to, or seen by Cain.

4.     Separate and apart from her actions in making intentionally and materially false statements in connection with the filing of the false DMCA take-down notices, Cain continued a campaign of online vilification against Quill and its MYTH OF OMEGA series written under the "Zoey Ellis" brand of books, making separate false and defamatory accusations of plagiarism and

copyright infringement, and posting those allegations on social media where they are likely to be, and are, shared and widely republished.

5.     This action states a federal claim under Section (f)(1) of the DMCA, which creates a cause of action in Quill's favor based on Cain's knowing and material misrepresentations in the take-down notices that Quill's books infringed Cain's copyright.   Quill also asserts state-law claims of defamation and defamation *per se*, intentional interference with prospective and actual business relations, and Virginia statutory conspiracy based on Cain's actions other than filing the false DMCA notices. Quill seeks compensatory and punitive damages, fees, and costs (as made available to Quill under the DMCA and Virginia statute), as well as injunctive and other relief.

## JURISDICTION AND VENUE

6.     Quill is incorporated under the laws of and has its principal place of business in London, England. For diversity of citizenship purposes, Quill is a citizen of a foreign state.

7.     Cain is a resident and citizen of Virginia.

8.     This Court has jurisdiction over the federal-law claim in this action under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*, and 28 U.S.C. § 1331.

9.     The parties are of diverse citizenship. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court has subject matter jurisdiction over the state-law claims in this case pursuant to 28 U.S.C. § 1332(a)(2). Alternatively, this court may exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), in that the state law claims form part of the same case or controversy as the federal claims.

10.     Personal jurisdiction over Cain exists, as Cain is a resident and citizen of the Commonwealth of Virginia, residing within the territorial bounds of the Alexandria Division of the Eastern District of Virginia.

11.     The activities underlying each of the claims in this action, while eventually being placed into cyberspace, were performed by Cain and Cain's co-conspirator Blushing Books in Virginia.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES AND THE TWO BOOK SERIES

13.     Quill publishes works both in print and electronic form. Quill's publications are sold internationally through its distributor (Draft2Digital), Amazon, and other online vendors, including Barnes and Noble, Apple iTunes, Rakuten-Kobo, and Google Play.

14.     "Zoey Ellis" is a pseudonym used by Quill for the identification of a principal author, a British subject resident in England, who is published by Quill, for the purposes of publishing certain books.

15.     This suit involves a fictional romance series, published by Quill, that draws influences from an alternative universe ("AU") known as "omegaverse."

16.     As described more fully below, the AU "omegaverse" evolved from fan fiction published online at the beginning of this decade. No one owns the "omegaverse" or the various tropes that define "omegaverse" stories, as Cain has admitted. There have been over sixty thousand stories written and published online, by a number of authors likely in the thousands, using the AU "omegaverse" since 2010.

17.     Rachelle Soto uses the name "Addison Cain" as a pseudonym to publish certain of her books, including books published by co-conspirator Blushing Books.

18.     Cain writes across several literary genres. One of her series, initially placed online and now available widely from online and other retailers as a hard-copy book, also takes place in

the AU "omegaverse." Cain has described her series as "dark romance without the romance," "suspense-filled omegaverse" and "mystery suspense thrillers."

## BACKGROUND

## THE E-BOOK INDUSTRY AND "INDIE" WRITERS IN ROMANCE

19.     Book publishing and distribution for years was dominated by the "Big 5" publishing houses *Macmillan, Hachette, HarperCollins, Penguin Random House Books* and *Simon & Schuster*. The advent of the Internet and development of small publishing houses and vanity presses have created new distribution opportunities for independent, or "indie" authors. Additionally, the availability of self-publishing software and related platforms gave "indie" authors the means to publish and profit from the delivery of their own works published in electronic format.

20.     According to the *Romance Writers of America*, the estimated annual total sales value of the romance market in 2013 was approximately $1.08 billion. In 2015, the romance novel share of the United States fiction market was roughly 34%.

21.     The surge of self- and small-press publishing has increased the number of self-publishing authors in the romance genre. Indeed, until the methods used to choose best-sellers were changed by the *New York Times*, its e-book bestseller list from 2014 to early 2017 was consistently dominated by "indie" authors, *i.e*, independent authors who do not have a "Big Five" publisher or self-publish their books.

22.     The opportunity created by self-publishing has changed the way romance readers buy books; their expectations about books, pricing and distribution; and the ways readers interact with authors. Author visibility, reputation, and credibility are critical to self-publishing or "indy"

success. An author's social media presence on Facebook, Instagram, Twitter, and other social media websites correlates directly with how well their books sell.

23.     Selling books in the romance genre, especially for "indie" authors or authors with small publishing houses such as Plaintiff, has become extremely competitive. This market generally is self-regulated through industry standards, peer review, and compliance with the terms of service given by book vendors.

## THE OMEGAVERSE LITERARY GENRE

24.     The AU omegaverse (or "Alpha/Beta/Omega," "A/B/O," or "Alpha/Beta/Omega Dynamics," as its slightly broader category is called) is a collection of related literary tropes that have tended to develop and evolve in fanfictions written over the course of many stories by many authors, including anonymous and pseudonymous authors.

25.     Frankly, omegaverse stories are not for everyone, although they are broadly popular and sold in major retail outlets. The overarching dynamic is that humans in the AU omegaverse are categorized not only by gender but also by a second dynamic: whether they present as Alphas (dominant, physically large, quick-tempered, natural leader) or Omegas (submissive, delicate, calm, peace maker), with an undetermined number of "humans" being default Betas.

26.     Omegaverse stories often involve romantic, sexual, or other pairings between males. However, male and female pairings have existed in the sub-genre for some time and, in particular, before publication of either of the series involved in this case.

27.     Omegaverse has been described as a "perfect storm" of several popular fan fiction (and romance) tropes,[1] often including form-shifters (especially werewolves), soulmates,

---

[1]     Dr. Kristina Busse. 2013. "Pon Farr, Mpreg, Bonds, and the Rise of the Omegaverse." in Anne Jamison, ed., *Fic: Why Fanfiction is Taking over the World,* 293. Dallas, TX: BenBella.

"breeding" and hypersexuality, empathic or telepathic bonds, and biologically deterministic hierarchical societies. As a term of folksonomy (rather than taxonomy), omegaverse is collectively created and used by its fans, who are at liberty to include or exclude any aspect they like. No one owns the omegaverse or its tropes.

28.     To be recognized as an omegaverse, at least several of a large number of the usually-recognized common omegaverse tropes need to be present. These include:

- Imprinting (the mythology within omegaverses often assumes there exist certain "true" Alpha/Omega mate pairings, a perfect match of eternal love, and the Alpha often "imprints" on his mate);

- Scenting (pheromones are excessive for Alphas and Omegas often displaying their moods and affection);

- "Omega Heat Cycles" and "Alpha Rut" (a biologic necessity to procreate);

- Mate Bonding (a permanent bond between the partners, often because of imprinting and claiming bite);

- "Claiming Bite" (the Alpha marks the Omega during mating);

- Knotting (a physiological condition experienced by the Alpha during mating to aid in impregnation);

- Pregnancy (on the part of males – often called mpreg – as well as females).

29.     Omegaverses share many other commonly used terms and ideas, such as "nesting" (the need to prepare a place for heat and conception), "heat suppressants" (often used to hide one's Omega status or simply not to experience heats), and Omega "sanctuaries" (a place where Omegas may experience their "heat" without the intrusion of Alphas).

30.     By most accounts, omegaverse arose as a specific sub-genre in 2010-2011 and acquired its name late in 2011. A/B/O started as an anonymous fan fiction community for the television show *Supernatural*, and quickly grew popular enough to become an identifiable genre

with its own recognizable tropes. Within two years, the sub-genre had spread to dozens of other fandoms. For example, on the multi-fandom collection, *Archive of Our Own*, about 2,000 stories were tagged A/B/O by 2013. The sub-genre's popularity grew exponentially; by 2018, more than 40,000 works had been tagged A/B/O.

31.    Although the majority of omegaverse stories employ a male-male sexual dynamic, by 2013, about 10% were labeled male/female. A June 13, 2011 story is recognized as the first male/female story that followed clear omegaverse tropes and terminology.[2] *Archive of Our Own* hosts several longer omegaverse stories about Alpha males and Omega females written in 2012,[3] including novel-length male/female stories from 2014.[4] In 2014, the mainstream feminist blogging site *Jezebel* featured an article explaining omegaverse to its readers.[5]

32.    The quick dissemination of omegaverse tropes across many popular fan fiction fandoms helped spread the popularity of omegaverse to male/male commercial romances (often written by fan fiction authors). Meanwhile, some established male/female commercial romance also grew in popularity in the 2000s, including that of the shifter (often werewolves, such as

---

[2]    Tebtosca. 2012. "Just Keep Breathing With Me." *Livejournal*. Available https://tebtosca.livejournal.com/20794.html.

[3]    Tristesses. 2012. "All Reason Aside, I Just Can't Deny." *Archive of Our Own*. https://archiveofourown.org/works/583600. Hotchoco195. 2013; "Strangers and Soulmates." *Archive of Our Own*. Available https://archiveofourown.org/works/605274.

[4]    Rector. 2014. The Encounter Series. *Archive of Our Own*. Available https://archiveofourown.org/series/106793. KristinStone. 2015–. Living and Breathing in Flint Series. Archive of Our Own.

[5]    Mark Shrayber. "'Knotting' Is the Weird Fanfic Sex Trend That Cannot Be Unseen." *Jezebel*. June 18. Available at https://jezebel.com/knotting-is-the-weird-fanfic-sex-trend-that-cannot-be-u-1606931767.

Patricia Briggs' ALPHA AND OMEGA Series [2007–15]) and that of the hyper-masculine Alpha hero, which romance writer Doreen Owens Malek describes as a "strong, dominant, aggressive male brought to the point of surrender by a woman."[6]

## FACTUAL ALLEGATIONS

33.     On January 18, 2018, Quill published *Crave to Conquer*, the first book in Quill's omegaverse series under the Zoey Ellis brand of books collectively titled MYTH OF OMEGA. The series is set in an imaginary land where magic is potent. The series is predicated on the use of shifting-viewpoint narration, so that the reader successively is made privy to each main character's thoughts, feelings, and perspectives. *Crave to Conquer* chronicles a fantasy romance between a female heroine (an Omega) and a male anti-hero (an Alpha). Quill's fantasy romance eventually results, in the third book, in a classically "happily ever after" ending.

34.     Each of these characteristics distinguish Plaintiff's initial book, as well as the second and third books in Plaintiff's series, sharply from Defendant's earlier-published three-book series ALPHA'S CLAIM, which is a dark work, dystopian, future-earth, domed-society, science-fiction series, which ends in the presumed deaths of both lovers and which does not shift the internal narrative viewpoint.

35.     On March 20, 2018, Quill published *Crave to Capture*, the second book in the MYTH OF OMEGA series, which is a continuation of the first book that further chronicles the Omega and Alpha's journey together.

---

[6]     Doreen Owens Malek. 1992. "Mad, Bad, and Dangerous to Know: The Hero as Challenge." In Jayne Ann Krentz, ed. *Dangerous Men and Adventurous Women: Romance Writers on the Appeal of the Romance.* University of Pennsylvania Press. 74.

36.     On May 23, 2018, the third book in Quill's series, *Crave to Claim*, was published, and happily concluded the Omega and Alpha's romance.

37.     Each of the three books in the MYTH OF OMEGA series were properly submitted for registration under the Copyright Act of 1976; the Copyright, Designs and Patents Act of 1988; and subject to the protection of the Berne Convention for the Protection of Literary and Artistic Works. In contrast, Cain's initial ALPHA'S CLAIM book first applied for registration two days before the false DMCA take-down notices were issued to sellers by Cain and her co-conspirator publisher— and two years after publication.

38.     Quill's MYTH OF OMEGA series has been released for sale through various online vendors, including Amazon, Barnes and Noble, iTunes, Apple, Rakuten-Kobo and Google Play.

## CAIN'S CONSPIRACY TO DESTROY QUILL'S MYTH OF OMEGA

### *Summary Allegations- Filing of False DMCA Take-Down Notices*

39.     Promptly upon Quill's release of the second book in the MYTH OF OMEGA series, Cain, acting and conspiring together with her publisher, prepared and sent a take-down notice under the DMCA to various online vendors, on or after April 19, 2018. These take-down notices were substantively identical, and those Quill has reviewed include the identical material misrepresentations, *in hac verba.* Quill does not know precisely how many take-down notices were sent after the publication of the second book of Quill's MYTH OF OMEGA series, but believes it to be over a dozen and perhaps as many as fifteen. Such notices were sent to Draft2Digital, Amazon, Barnes and Noble, iTunes, Apple, Rakuten-Kobo, Google Play, and others. A representative sample of Cain's April 2018 take-down notices, which this First Amended Complaint refers to as the "First Round" of notices, is included as Exhibit 1 to this First Amended Complaint and incorporated into it. The First Round of take-down notices knowingly and falsely claimed that the

first two books of Quill's series plagiarized and infringed the copyrights of the first two books of Cain's series, and maliciously defamed Quill.

40.     Under the DMCA, an online seller which receives a DMCA take-down notice alleging copyright infringement generally is immune from liability if it ceases selling the allegedly-infringing items. Accordingly, promptly upon their receipt of Cain's First Round of notices, certain resellers immediately stopped selling Quill's MYTH OF OMEGA series, more specifically the two books of the series available at that time.

### Cain's Actions with Blushing Books— Filing of First Round DMCA Notices

41.     On April 16, 2018, Quill's then recently-published second book came to the attention of Cain. Cain, in describing Quill's series to Cain's publisher Blushing Books on that date, admitted in writing, "**Since it's <u>not</u> outright plagiarism, I don't think there's <u>anything</u> than can be done. . ..**" (Emphasis added.)

42.     Later on April 16, 2018, Cain again wrote to her publisher, acknowledging that Quill's work was "not dystopian, but in a fantasy world with magic. . .." Cain noted that Quill's book "did not acknowledge me. If she had, I would not have been so pissed." Cain particularly suggested several "similarit[ies] in plot" including "Omegas are disappearing = Omegas are starving," and Cain concluded, "**she did <u>not</u> quote any of my exact phrasing, so there really is probably <u>nothing we can do</u>**." (Emphasis added.)

43.     Nevertheless, and despite her recognition that Quill's works did not plagiarize Cain's work, on April 17, 2018, Cain instructed her publisher to "send a DMCA [take-down notice] to Amazon" regarding Quill's two books.

44.     Also on April 17, 2018, Cain's publisher advised her to file for a registered copyright on Cain's first book, which had never been done.

45.     On April 18, 2018, Cain's publisher told Cain that Blushing Books was working on the draft DMCA take-down notice. Her publisher warned Cain that Quill might file a counter-notice, and "[w]e may not be able to get yours [Cain's books] back up." Cain directed her publisher to proceed nevertheless, relying on Quill's assumed lack of sophistication: "**I don't think she'll know how to do that. And if she does, we'll sue.** I applied for the copyright last night. . .." (Emphasis added.)

46.     Later on April 18, 2018, Cain provided her publisher with a list of purported similarities between Quill's first book and Cain's first book. This list, drafted by Cain, from a list given to her by a "friend," was incorporated into the various First Round DMCA take-down notices essentially verbatim. Cain falsely asserted "I'm sure there are lifted lines, but I have not gone through it with a fine tooth comb." In fact, Cain cannot identify a single "lifted" or copied line in any of Quill's three books.

47.     The "similarities" identified by Cain in this communication and in the subsequent First Round April DMCA take-down notices (as well as incorporated in the Second Round May DMCA take-down notices filed against Plaintiff's third book) are either trivial (for example, in each story, the leader's men follow the leader without question), or a trope inherent to the omegaverse (all "Alphas" who smell an "Omega" during estrous seek to mate with her), or are simply false and out of context. Several of these "similarities" are discussed in detail below.

48.     None of the purported "similarities" are sufficient, standing alone or taken together, to assert a good-faith belief in copyright infringement. None of the similarities are evidence of plagiarism, or sufficient, standing alone or taken together, to assert a good-faith belief that Quill plagiarized Cain's works. None of the similarities asserted in either the First Round April DMCA notices or the Second Round May DMCA notices purport to pertain to the second book of Quill's

series, despite the demand in the First Round DMCA notices that sellers take-down both the first and second books.

49.     Still, later on April 18, 2018, Cain's publisher provided Cain a draft letter to Amazon for review, but cautioned, "I do believe that it's in our best interests not to rush into this and make what we're doing as strong and as 'right' as possible." Cain's publisher also advised Cain that, "for form's sake, I believe the initial correspondence should properly be with [Quill]," giving Quill 72 hours' notice prior to the filing of the DMCA take-down notice. Cain's publisher also advised Cain, "I'd like you to really think about whether you want to do this. . . . [D]oing nothing is an option that should be on the table. However, if you want to go ahead with it, [Cain's publisher] supports you 100%."

50.     Shortly after midnight, on April 19, 2018, Cain advised her publisher that she rejected her publisher's advice to send an initial warning letter to the Quill. "File the DMCAs **immediately** to Amazon, iTunes, and [Barnes & Noble] . . .. If you want to write her afterward with **demands to see her financials**, by all means go for it."  (Emphasis added.)  In that same communication, Cain advised her publisher that a "good friend" of hers had created the list of similarities after going "44% of the way through" Quill's first book.

51.     In that April 19, 2018 communication, Cain discussed her plan to conceal her role in pressing for the filing of the DMCAs. "I am prepared for the backlash. . .. To settle it down, I will deflect to [Cain's publisher] and remain distant and naïve." Cain stated that her response to inquiries would be that "[t]he publisher filed a DMCA. . .. This is out of my hands." Cain also stated that any public internet post by her would be "deflecting to the publisher." Later that same day, Cain's publisher responded to Cain by stating, "I think your decision to hide behind [us] and

paint us as the instigators is how it absolutely should be. . .. All you have to say is 'My publisher chose to take action. It was and continues to be out of my hands.' Let people get mad at us."

52.     Later on April 19, 2018, Cain provided her publisher with a draft Facebook post, which Cain intended to post on the Internet "when the books come down and the inevitable backlash begins." Cain asked her publisher to review that draft Facebook post and provide "any feedback."

53.     On information and belief, based on representations later made to Quill by certain resellers, Cain and her publisher issued the First Round take-down notices to a number of sellers on April 19, 2018.

54.     The First Round take-down notices, and in particular the Dispute Comment as reflected in Exhibit 1, state a number of falsehoods, attributable to Cain and made in the DMCA notices pursuant to the agreement between Cain and her publisher, which violate 17 U.S.C. § 512 as knowing and material misrepresentations by Cain and her publisher; the statements and "factual" analyses provided by Cain to her publisher also constitute knowing and material misrepresentations under that section:

a.     "This book is plagiarized" with respect to the first book of the series, which is false and which Cain previously admitted and recognized was false.

b.     "This [first] book is . . . a copy of a book written by Addison Cain entitled Born to be Bound [the first book of Cain's series]," which is false and which Cain knew was false, as even a cursory glance at the books would have disclosed. Quill is informed, and based on such information believes and alleges, that Cain was familiar generally with the contents of the first book of Quill's series and knew this material statement was false.

14

c.    "I have a list of sentences as well as plot line, story act [*sic,* probably "arc"], etc. that are taken from Ms. Cain's [first] book," which is false, and which Cain knew was false. The DMCA did not identify a single sentence taken from Cain's book; there are none, and Cain knew and has acknowledged this material statement to be false.

d.    "The only significant change we see is the POV has been changed from Female to Male" in the first book, which is false. Quill is informed, and based on such information believes and alleges, that Cain was familiar generally with the contents of the first book of Quill's series and knew this material statement was false.

e.    "This book is plagiarized" with respect to the second book of Quill's series, which is false and which Cain previously admitted and recognized was false. None of the listed references to similarities between the works relates to the second book of either series; all of the listed references to similarities relate solely to the first books of the series.

f.    "This [second] book is . . . a copy of a book written by Addison Cain entitled Born to be Broken [the second book of Cain's series]," which is false and which Cain knew was false, as even a cursory glance at the books would have disclosed.

g.    "I have a list of sentences [from Quill's second book] as well as plot line, story act [*sic,* probably "arc"], etc. that are taken from Ms. Cain's [second] book," which is false. The DMCA did not identify a single sentence taken from Cain's second book; there are none, and Cain knew and previously

15

acknowledged this. None of the references to "plot line" or "story arc" come from, or are related to, the second book of Quill's series; Cain knew this.

h. "The only significant change we see is the POV has been changed from Female to Male" in the second book, which is false. Quill is informed, and based on such information believes and alleges, that Cain was familiar generally with the contents of the second book of Quill's series and knew this material statement was false, or alternatively was not familiar with the contents of Quill's second book and therefore made this statement intentionally without any basis in fact or investigation.

55. The list of supposed similarities included in the First Round DMCA take-down notices, provided by Cain to her publisher and incorporated in the notices, are either false, misrepresented, or relate solely to common tropes in the omegaverse AU – or to common tropes in romance novels or other works dating to Shakespeare and earlier. These false statements and intentional misrepresentations, provided by Cain and made in the DMCA notices pursuant to the agreement between Cain and her publisher, violate 17 U.S.C. 512 as knowing and material misrepresentations; the statements and "factual" analyses provided by Cain to her publisher also constitute knowing and material misrepresentations under that section.  Some examples are set forth below. References below to BtBB refer to *Born to be Bound,* the first book in Cain's series, and references below to CtC refer to *Crave to Conquer*, the first book in Quill's series:

a. "BtBB - The villain who had the audacity to call himself 'The Shepherd' was massive, the largest Alpha she had ever seen. CtC - He was the largest Alpha known in the Eastern Lands, and while it was a petty reaction for him to have, he found it bothered something innate within him." The large size

of Alphas is an inherent part of the omegaverse trope, and appears in almost all omegaverse universes, guides, and wikis. The Alphas are built that way, which separates them from the Betas and Omegas. Furthermore, the Alpha in CtC is recognized as the largest Alpha in the land, but the Alpha in BtBB merely is the largest in the experience of the viewpoint character, who kept herself hidden from Alphas. This distinction does not imply the same meaning.

b.  "BtBB - Sucking in a ragged breath, swaying as if her legs could not decide which way to run, Claire whispered under her breath, "No... no, no, this can't be happening." CtC - "No," Cailyn whispered, taking a step back. "No. It can't . . .."" Failing suppressants is a common omegaverse trope. Shock and disbelief at this happening will likely include the word, "No." While Cain's character seeks the Alpha out to talk, her heat suppressants stop working. In chapter 1 of Cain's work, she is wearing clothing that interferes with her scent, she approaches him and waits. In contrast, Quill's character uses magical blocks, not chemical suppressants; Quill's character was not wearing Beta clothing, and her blocks stopped work due to magical interference in chapter 5, much later in the work.

c.  "BtBB - Omegas had become exceptionally rare since the plagues and the following Reformation Wars a century prior. That made them a valuable commodity which Alphas in power took as if it was their due. CtC - "The Omegas were dying," she said, bitterly. ... " The Omegas were dying at unnatural rates before their disappearance." "There was a serious decline in

Omegas from first count to the last. There were too many deaths for it to be a natural occurrence." This is an omegaverse trope. In many of these universes, Omegas are extremely rare. A standard element of omegaverse which has been included in many guides and wikis on the topic. Moreover, the "rarity" in the two AUs is not at all similar; in one of the series Omegas are truly rare, while in the other they are relatively plentiful, but simply in hiding.

d.     "BtBB: Protagonist is leader of a violent army that has taken over a city. His men follow without question." This 'army' is a violent band of criminals that came from the underground. They are not all [A]lphas. "CtC: Protagonist is leader of a violent army that has taken over a city. His men follow without question." The violent nature of an army in romance fiction is neither uncommon nor a concept relevant to copyright infringement. The army in Cain's world are all trained warrior Alphas and a few had been discovered to be spies, as shown as an example in the first scene (chapter 1). In Quill's world, the protagonist is not a criminal nor is his army a group of violent criminals that were trapped in an underground prison and escaped, as in Cain's world. And even in the real world, saying the men in an army follow their leaders without question is commonplace, hopefully not an element of a copyright claim.

e.     "BtBB: Omegas are dying off from attacks by Alphas. They go into hiding to survive." This is incorrect and a knowing misrepresentation of Cain's own book. Blushing Books has stated that Omegas became rare due to

18

plague and war, not due to attacks by Alphas. Page 10 from BtBB "We are starving. The Omegas need food." "CtC: Omegas are dying off from attacks by Alphas. They go into hiding to survive." This is misleading. This is not happening in the main plot of the book and is part of the deep background history of the world. By the time this story takes place, Omegas are thriving but hidden. They are stolen at a young age by Omega elders in order to protect them (chapters 1 and 8).

f.      "BtBB: Protagonist has Beta confidant as second in command. It is the only Beta in the army. CtC: Protagonist has Beta confidant as second in command. It is the only Beta in the army." The relationship between the Alpha and Beta in each story is vastly different. The Beta in CtC is the protagonist's childhood friend (revealed in book 2), whereas the Beta in BtBB simply is a member of the army. In general, Betas tend to take subordinate roles in an omegaverse as they do not have the temperament of Alphas. In particular, in Quill's universe, the male protagonist has a history with the Beta from childhood. If there were no second in command of an army of the size depicted at all, it would be illogical.

g.      "BtBB: Claire (an Omega) approaches protagonist disguised as a Beta in order to help the Omegas." This is a knowing mischaracterization. In Cain's first book, Claire approaches the protagonist for food, shelter, and support for her Omega friends by suppressing her Omega scent by use of clothes and suppressants. She is discovered to be an Omega soon after her approach in chapter 1. Forced sex between the couple happens very early in the story

arc—in chapter 1—as does the forced bonding by the Alpha. In Cain's world an Alpha has to bite the Omega and the bond is forced (another omegaverse trope). In Cain's work an Alpha and Omega pairing is guaranteed to produce a pregnancy and a child. "CtC: Cailyn (an Omega) approaches protagonist disguised as a Beta in order to help the Omegas." This is a misstatement of fact. In Quill's works, the Alpha protagonist approaches the Omega Cailyn in chapter 1 while she is disguised as a Beta through use of magic. Cailyn is spying on him to gain intelligence and information for the Omega cause; she is one of many spies. This is preemptive action to find out what he knows about Omegas (since the Alpha is looking for them), but she never expected to work with him or even speak to him (chapter 3). She is not seeking him out. She is hired by him and works with him (at his insistence) in an undercover role for a period of three months before she is discovered as an Omega in chapter 5. Sex between the couple first happens in chapter 7. No bonding happens in the first two books of Quill's series. No biting or bond is established, unlike the other series. The story arcs are entirely disparate.

h.    "BtBB: Shepherd takes advantage of the situation to make the Omega his mate." This takes place in chapter 1 and its forced by the Alpha. "CtC: Drocco takes advantage of the situation to make the Omega his mate." This is flatly incorrect. In Quill's world, the Alpha cannot initiate a mate pairing (as revealed in chapter 8 of book 1). The Alpha does not make the Omega his mate. No bonding happens until Book 3 (when it was initiated by Cailyn

the Omega heroine). And, book three was not available for publication when

the First Round DMCA take-down notices were filed. This particularity of

the bond is unique to Quill's world and discussed at length in books 1, 2,

and 3. Any person actually reading at least the first book in its entirety

would have immediately known this.

***The "Second Round" Take-Down Notices—Third Book Not Even Published Yet***

56.     After the First Round take-down notices were sent, and from April 24, 2018, to

May 16, 2018, Quill received multiple inquiries from its readers stating the MYTH OF OMEGA books

were missing from online vendors. Because of these communications, Quill eventually learned of

Cain's highly-successful efforts to disrupt Quill's book sales by filing the First Round DMCA

take-down notice.

57.     On April 26, 2018, Cain was informed that the seller iBooks had received Cain's

First Round DMCA take-down notice and was removing Quill's two books from sale.

58.     Later on April 26, 2018, after Cain had been advised that Barnes & Noble had also

ceased sales of Quill's first and second books, Cain complained to her publisher, "The preorder

for book three is still up, though."

59.     Later on April 26, 2018, Cain directed her publisher and co-conspirator, "When

they [sellers] do respond, let them know that **book three needs to come down too. I don't want

her to make any more money off this series. #AngryAddison LOL** [*i.e.,* laughing out loud]."

(Emphasis added.)

60.     Later on April 26, 2018, Cain's publisher responded, "Yea, **I didn't file anything

on book three because I didn't have proof to give them.** I put what you gave me and the reviews

all into one e-mail and complaint for books one and two, but **with book three not out yet, I didn't**

**really see how we could 'claim' it was plagiarized** and I didn't want to take a chance." (Emphasis added.)

61.     Later on April 26, 2018, Cain directed her publisher and co-conspirator, "**I want book three down too.** Do you think we could make the argument that she cannot profit off of a story she already plagiarized? Does that make sense. She should [not] be allowed to keep writing in that universe at all." (Emphasis added.) This argument, however, was never made, and Cain's Second Round DMCA notice against Quill's third book relied in no part whatsoever on any asserted similarities of Quill's third book with any of Cain's work – although it falsely misrepresented that it did.

62.     On May 16, 2018, Cain, obviously frustrated and angered by a lack of action by sellers on Quill's third book, provided a contact telephone number for Amazon to her publisher and directed her co-conspirator publisher, **"Can we call them [Amazon]? Book three is going to go live soon, and I don't want it being released."** (Emphasis added.)

63.     At some time between April 26, 2018 and May 15, 2018, Cain combined with her publisher to generate and send to retailers another DMCA notice for Quill's third book, *Crave to Claim*. An example of that "Second Round" notice is appended to this Complaint as Exhibit 2 and is incorporated herein by reference.

64.     Cain's Second Round DMCA notice asked sellers to cease selling the third book in Quill's series. The Second Round notices prepared by Cain and her publisher knowingly and falsely misrepresented that the third book infringed Cain's copyright; was sent to retailers, and resulted in the elimination pre-orders and the regular sale of Quill's third book as infringing Cain's copyright, **all before** **Quill's third book was <u>even</u> published** or reviewed by Cain or her publisher.

65.     Cain's Second Round DMCA notice contains the same list of purported, but intentionally misleading and false, "similarities" as the First Round notices. These false statements and intentional misrepresentations, provided by Cain and made in the DMCA notices pursuant to the agreement between Cain and her publisher, violate 17 U.S.C. § 512 as knowing and material misrepresentations; the statements and "factual" analyses provided by Cain to her publisher also constitute knowing and material misrepresentations under that section. While all of these statements of purported copyright infringement are materially false and misleading – and incorporated in this Complaint as part of Exhibit 2 *verbatim* – they also make the Second Round DMCA notices materially and intentionally misleading.

66.     Without identifying whether they are drawn from the first, second, or yet-unpublished third book, Cain's Second Round DMCA notice contains a handful of additional purported, but intentionally misleading and false, "similarities" as compared to the First Round notices. These additional false statements and intentional misrepresentations, provided by Cain and made in the DMCA notices by the agreement between Cain and her publisher, violate 17 U.S.C. 512 as knowing and material misrepresentations; the statements and "factual" analyses provided by Cain to her publisher also constitute knowing and material misrepresentations under that section.  While all of these statements of purported copyright infringement are materially false and misleading – and incorporated in Quill's Complaint as part of Exhibit 2 *verbatim* – they also make the Second Round DMCA materially and intentionally misleading.

67.     Examples of the false and misleading nature of the added "similarities" – which do not relate to Quill's third book, the sole subject of the Second Round notice, but rather purport to compare the first book of each series – include the following:

a.     "BtBB: Once contacted, the other hidden Omegas betray Claire." The hidden Omegas in Cain's first book betray Claire by hurting her, locking her up, and giving her up to Shepherd, the Alpha. "CtC: Once contacted, the other hidden Omegas betray Cailyn." This is both misleading and mis-stated. In Quill's series, the hidden Omegas show Cailyn a mercy (as understood by them and their plans, explained over the next two books) by telling her to return to her Alpha, who is revealed to be her "true mate." Cailyn is shown to feel that it is a betrayal, but only because of the actions of her Alpha earlier in the book. She also considers whether the Omegas are right. But never in CtC did the Omegas contact the Alpha and betray her. It is indicated that if they had had a more positive relationship, this 'betrayal' by asking her to go back the her Alpha would be considered a kindness and even a preferred choice (as confirmed and shown in the as-yet unpublished third book of Quill's series).

b.     "BtBB: Omega begins to develop Stockholm syndrome, questions her reactions and is confused. CtC: Omega begins to develop Stockholm syndrome, questions her reactions and is confused." Both books do articulate logical and natural thoughts for someone to have while in captivity. However, the Omega in CTC does not develop Stockholm Syndrome. Rather, she hates the male protagonist and escapes as soon as she can. She does not want to be with the protagonist because she has been trained to believe that Alphas will hurt Omegas and make them breeding

24

machines. She doesn't develop emotional feelings for him until book 2, whereas the Omega in BtBB develops feelings in book 1.

68.     Cain's Second Round notices also state the intentionally false and defamatory material assertions that the yet-unpublished third book of Quill's series "are (*sic*) in violation of two books that we have published and are under copyright;" that the third book "concludes the with pilot (*sic*) and story arc that was stolen in book one and two;" that "I am including a list of all of the similarities in plot, and actions that take place between the hero and the heroine," while none of those asserted similarities come from the third book; that "There are certain scenes in the book that are almost identical to Addison's book," when that book had not yet been published; that "The only significant change we see is the POV has been changed from Female to Male," which is false; that Quill "has taken [Cain]'s sentences and paraphrased them and written a book of her 'own,'" which is false; and a statement implying that Quill's books "were a knock off" of Cain's books, which is false.

69.     These additional false statements and intentional misrepresentations, provided by Cain and made in the DMCA Second Round notices pursuant to the conspiracy between Cain and her publisher, violate 17 U.S.C. § 512 as knowing and material misrepresentations; the statements and "factual" analyses provided by Cain to her publisher also constitute knowing and material misrepresentations under that section. While all of these statements of purported copyright infringement are materially false and misleading – and incorporated in Cain's Complaint as part of Exhibit 2 *verbatim* – they also make the DMCA false and materially and intentionally misleading.

70.     On or about May 16, 2018, and thereafter, Quill was advised by various online vendors that take-down notices had been filed against all three books of the MYTH OF OMEGA

series, and accordingly, all three books had been removed from sale across their platforms. At this time, the third book of the MYTH OF OMEGA series, *Crave to Claim*, had not yet even been published.

71.     Cain's First and Second Round take-down notices only referenced the first book, *Crave to Conquer*, yet made allegations against the entire MYTH OF OMEGA series. No suggestion was made as to how the second book, *Crave to Capture*, infringed anything, and false claims were made that the third book, *Crave to Claim*, at that point unavailable, had been reviewed.

72.     In an effort to cause various online vendors to remove the MYTH OF OMEGA series from sale, Cain directed and otherwise caused the filing of twelve (12) to fifteen (15) or more Second Round take-down notices.

73.     Upon learning of the take-down notices, Quill promptly delivered counter-notices under Section 512(g) of the Copyright Act ("Counter-Notices").

74.     The Counter-Notices prompted the vendors to restore all of Quill's publications to sale; however, the restoration process took, in some circumstances, upwards of several months. Plaintiff has lost substantial sales revenue from the filing of the knowing and materially misleading DMCA notices.  Plaintiff's reputation as a publisher of quality and marketable books has been injured, and continues to be injured.

75.     On several occasions, business partners have informed Quill that the vendor refuses to work with Quill to sell Quill's challenged books while there remains a pending claim of plagiarism. Other vendors have indicated that they cannot proceed with planned sales of Quill's books while there is a pending claim Quill is a plagiarist.

26

76. Cain's take-down notices violated the Copyright Act, intentionally and maliciously damaged Quill's reputation and resulted in financial losses, including, but not limited to, pre-release and ordinary book sales throughout the United States and internationally.

77. Following Cain's take-down notices to various online vendors, Quill has been subjected to online harassment and defamation, including false and malicious claims of plagiarism. The forums in which the harassment and defamation occurred are both public and private online forums, and are all well-known within the dark romance fan faction communities.

### *Continuing Acts of Defamation*

78. Even after the Counter-Notices were filed and all three books in the MYTH OF OMEGA series were reinstated—Cain continued to defame Quill with accusations of plagarism.

79. Quill initially filed suit against Cain and her publisher in the United States District Court for the District of Oklahoma, the location of one of the distributors to whom Cain had sent a take-down notice. Although that Oklahoma-based company stated, "We've been contacted by [Cain] regarding an infringement on her titles," the Oklahoma federal court granted Cain's motion to dismiss her from that case on the grounds of lack of personal jurisdiction. Cain resides in Virginia. Cain's publisher remains a defendant in the Oklahoma case, which is scheduled for trial in September 2019.

80. In February 2019, on or about February 26, Cain published an online post on Facebook regarding the Oklahoma case. This post is directed to the thousands of "followers" for that page, and has been "shared" on hundreds of other pages unknown to the Quill.

81. The February 2019 Facebook post by Cain contained false and defamatory statements concerning the Quill, including that the Oklahoma lawsuit was "frivolous;" that "justice has prevailed . . . [because the Oklahoma law suit] has been rightfully dismissed;" that the

Oklahoma lawsuit was filed to "deflect criticism from the plagiarism of my work" and that Quill and Quill's principal author "have already stolen enough from me." These statements were placed on social media from a location in Virginia, where Cain and Cain's Facebook account reside.

82.     The statements in the February 2019 Facebook post by Cain constitute *per se* defamation under the common law of the Commonwealth of Virginia, were made with actual and legal malice, and constitute an overt act in furtherance of the continuing post-DMCA notice conspiracy between Cain and her publisher, in an effort by Cain to interfere with Quill's business.

83.     Cain posted an article on the Internet, dated March 11, 2019, titled "Nuisance Lawsuits, Bullying, and Lies. A Cautionary Tale." A copy of this post is included as Exhibit Three to this Complaint and incorporated by reference. This article contained a number of intentional, malicious, and defamatory falsehoods about Quill's trilogy, including:

a.      "Zoey Ellis' book infringed on my copyright of *Born to be Bound.*"

b.      That Quill's book constituted "theft of my [Cain's] work."

c.      That what Cain was attempting to do was simply "to try and prevent unauthorized uses of my works."

d.      That the Oklahoma lawsuit contained "every horrible lie one could think to say about me."

e.      That Cain was required to respond to a subpoena requesting "research for my book that she infringed."

f.      That Quill was "one bad player [trying] to change the rules of the game."

84.     The statements in the March 2019 online post by Cain constitute *per se* defamation under the common law of the Commonwealth of Virginia, were made with actual and legal malice,

28

and constitute a continuing act in furtherance of the conspiracy between Cain and her publisher, another effort by Cain to interfere with Quill's business.

85.     On March 20, 2019, Cain issued a Facebook post which included defamatory accusations of plagiarism against Quill and the defamatory statement, "Do I believe she plagiarized my story? Yes."

86.     Cain's publisher has published another omegaverse series by Carolyn Faulkner called the ALPHA'S WOMAN Series (*The Alpha's Woman* (July 12, 2017), *Kosh's Omega* (Alpha's Woman Book 2) (Nov. 1, 2017), *Red's Mate* (Alpha's Woman Book 3) (July 4, 2018)). The same allegations of Alphas being big, Omegas being rare, Omegas fighting their heat, dystopian society, Omegas hiding from the Alphas and trying to escape are all in these later published books. However, Cain accuses only Quill of infringement.

### *Republication of Cain's Multiple Defamatory Statements*

87.     In March 2019, the DMCA take-down notice for the first two books of Quill's series, prepared by Cain and sent by Cain with the cooperation and agreement of her publisher, was re-published from the Oklahoma Complaint by a web site named "In Between the Pages," as part of an article titled, "DCMA [*sic*] and Ridiculous Lawsuits." This republication was a foreseeable consequence of the preparation of the original DMCA take-down notice by Cain, in cooperation with and by agreement with her publisher, and constitutes a republication of the defamatory falsehoods contained in that DMCA.

88.     On March 20, 2019, the DMCA take-down notice for the first two books of Quill's series, prepared by Cain and sent by Cain with the cooperation and agreement of her publisher, was re-published from the Oklahoma Complaint, and was re-published by a web site maintained by "Golden Angel" as part of an article titled, "Omegaverse Copyrights, DMCA Abuse, and

Lawsuits." This republication was a foreseeable consequence of the preparation of the original DMCA take-down notice by Cain in cooperation with and by agreement with her publisher, and constitutes a republication of the defamatory falsehoods contained in that DMCA notice.

89.     On March 20, 2019, Cain's Facebook post which included defamatory accusations of plagiarism against Quill and the defamatory statement, "Do I believe she plagiarized my story? Yes." was re-published by a web site maintained by "Golden Angel" as part of an article titled, "Omegaverse Copyrights, DMCA Abuse, and Lawsuits." This republication was a foreseeable consequence of Quill's original publication of these statements, and constitutes a republication of the defamatory falsehoods contained in that Facebook post.

90.     Cain's March 11, 2019 article was republished on March 17, 2019, by a web site named "In Between the Pages," as part of an article titled, "Addison Cain, Plagiarism, and Lawsuits." This republication was a foreseeable consequence of the publication of the original March 11, 2019 article by Cain, and constitutes a republication of the defamatory falsehoods contained in that article.

91.     Cain's March 11, 2019 article was republished on March 11, 2019, by a web site "Go Fund Me" post, which as of the date of the filing of this Complaint has received over 850 "shares." The "Go Fund Me" post also repeats, some essentially *pro hac verba*, the defamatory falsehoods that:

     a.     The Oklahoma litigation was a "nuisance law suit."

     b.     The DMCAs were "rightfully filed."

     c.     Quill "plagiarized [Cain's] work."

     d.     That Quill was "one bad player [trying] to change the rules of the game."

This republication, and the derivative defamatory statements on the "Go Fund Me" page, were a foreseeable consequence of the publication of the original March 11, 2019 article by Cain, and constitutes, as well, a republication of the defamatory falsehoods contained in that article.

92.     On March 11, 2019, the defamatory falsehood that Quill plagiarized Cain was republished

in a Tweet issued under the name of Jennifer Bene. The author described Cain as "[o]ne of my absolute besties" and stated that Cain "has been dealing with a [expletive deleted] nightmare" because Quill "filed lawsuits after she got caught #plagiarizing." This republication was a foreseeable consequence of the publication of the original article by Cain, and constitutes a republication of the defamatory falsehoods contained in that article.

93.     On May 21, 2018, Cain became aware of a forthcoming Quill series, also to be published under the "Zoey Ellis" brand.  Cain immediately wrote to her publisher to elicit further concerted action to interfere with Quill's business, saying, "What can we do to stop her spin off series?" [i.e., not the series that was the subject of the take-down notices.]

94.     Cain's publisher replied to her that same day (emphasis added):

The problem is - as you say - you do not own Omegaverse.

She's **lost her Apple account**, though **her other titles** are still on B&N and Kobo. I don't know what mechanism we can use to shut her down completely as an author, **unless YOU want to try to trademark Omegaverse. (Which we might be able to get…)**

I think our best strategy right now is to push Amazon HARD. **If she loses her account completely it will in effect shut her down.**

If you have a different / better plan or strategy please share it

95.     On May 31, 2018, Cain's publisher wrote to an employee to seek information. When the recipient of the e-mail asked what she could do to help, Cain's publisher directed her as follows, on June 3, 2018 (emphasis added):

> One thing you could do is buy **book one of Zoey's series, wait a few days, and then return it.** Give the reason for the return as plagiarism and name Addison [Cain]'s series by name. Do NOT leave a review or any public comment on Zoey's series, however. **We are actively working with Amazon to get Z.E.'s books taken down but a few customer returns listing plagiarism can only help.**

96.     On July 9, 2018, Cain reiterated her desire to have her publisher to take additional steps to have Quill banned from any sales on Amazon, referring to a letter sent to Amazon. Cain wrote, "I'm also eager to make another move on Amazon. The original letter Sarah sent did not mention the lifted lines from BTBB. Perhaps it's time to send another letter? Otherwise I'm pretty sure they have completely brushed us off."

## COUNT I – INTENTIONAL DMCA MISREPRESENTATION

97.     Quill adopts and re-alleges each and every paragraph and title above as if set forth verbatim herein.

98.     Cain prepared and filed two DMCA take-down notices, each of which contained knowingly false statements, and each of which materially misrepresented that Quill infringed Cain's valid copyright in her works.

99.     These DMCA notices were issued to Amazon, Barnes and Noble, iTunes-Apple and Rakuten-Kobo, and other parties, and resulted in the essential elimination of sales of each of the three volumes of Quill's series.

100.    Cain's Second Round take-down notices represented that Cain had conducted an independent review of a book that had not been published—even though established law requires

32

that for copyright violation to occur, there must be "text" or "work" that infringes the copyrighted work. Cain intentionally misrepresented that *Crave to Claim*, where the two main characters mate, have an infant daughter, rule their world together, and live happily ever after, violated the copyrighted text of Cain's series wherein the heroine gets raped as orchestrated by the male ex-lover of the anti-hero (with whom the anti-hero had cheated), loses her baby and is left for dead, and the anti-hero is presumed to be dead.

101.    Cain made all of these false and material allegations representing she had satisfied the requirements under the Copyright Act and that she was filing take-down notices in good faith.

102.    Pursuant to 17 U.S.C. § 512(f), "[a]ny person who knowingly and materially misrepresents under this section . . . that material or activity is infringing. . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing. . . ."

103.    Cain has materially misrepresented that Quill's material infringed Cain's copyright. These multiple material misrepresentations were knowing.

104.    Cain's actions have caused Quill injury as set forth above and Cain is entitled to all relief afforded by law, including injunctive relief, damages, and costs and attorney's fees incurred.

## COUNT II - TORTIOUS INTERFERENCE
## WITH BUSINESS RELATIONSHIPS

105.    Quill adopts and re-alleges each and every paragraph and title above as if set forth verbatim herein.

106.    Quill had valid and protectable prospective business relations and expectancies involving the sale of the MYTH OF OMEGA series as distributed through the various vendors.

33

107.    Cain had knowledge of Quill's prospective business relations and expectancies.

108.    Cain intentionally interfered with Quill's prospective business relations and expectancies by causing a breach and termination of those relationships and expectancies, through her continuing defamation of Quill.

109.    Quill had existing business relations involving the sale of the MYTH OF OMEGA series as distributed through the various vendors.

110.    Cain intentionally interfered with Quill's existing business relations by causing a breach and termination of those relationships, through her continuing defamation of Quill.

111.    Cain's interference was intentional, wrongful, and neither justified, privileged, nor excusable.

112.    Cain's actions were malicious and accomplished by means that were independently unlawful.

113.    Cain's interference caused Quill to suffer economic losses and other damages as set forth herein.

114.    Quill is entitled to all relief afforded by law resulting from Cain's wrongful and intentional interference with Quill's prospective business relations and expectancies, including compensatory and punitive damages.

## COUNT III – DEFAMATION

115.    Quill adopts and re-alleges each and every paragraph and title above as if set forth verbatim herein.

116.    The claim for defamation is based on the statements pled in Paragraphs 80 through 92 of this First Amended Complaint.

34

117.    The factual allegations regarding defendant's participation in and preparation of the false DMCA notices are incorporated into this state-law claim not as the basis for substantive defamation liability, but rather as evidence of legal and common-law malice justifying an award of punitive damages.

118.    Pleading in the alternative, if for any reason defendant and her publisher are not determined to have been co-conspirators, plaintiff alleges the statements made by the plaintiff to her publisher constitute defamation, as set forth above and as shown *in haec verba* in Exhibit 1 and Exhibit 2.

119.    Cain repeatedly made false and defamatory statements concerning Quill and its publications, as set forth in detail above and, in addition, as described *in hac verba* in Exhibit 3 to this Complaint.

120.    Cain anonymously conspired and colluded with others to publish and communicate these false and defamatory statements concerning Quill and its publications to third parties without privilege or authorization, including accusations Quill's author is engaging in harassment, and are presently maintaining and continuing such tortious activities.

121.    Cain intentionally published these defamatory falsehoods in a manner and in a medium in which she could be certain that republication would occur.

122.    Cain published the false and defamatory statements concerning Quill with actual malice, spite, legal malice, with knowledge of the statements' falsity, or with reckless and negligent disregard for the falsity of the statements.

123.    Both Cain and her publisher's misconduct and unlawful activities caused, and continue to cause, Quill actual harm for which it is entitled to recover compensatory and punitive damages.

124.    Cain's continuing campaign of defamation, interference with business relationships, and the conspiracy between Cain and her publisher, threaten additional and imminent harm to Quill, including reputational and other injury that may not be remedied by money damages. Quill is entitled to injunctive relief against Cain on this and all counts in the Complaint.

## COUNT IV – STATUTORY CONSPIRACY

125.    Quill adopts and re-alleges each and every paragraph and title above as if set forth verbatim herein.

126.    Cain and her publisher, Blushing Books, acted as two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring Quill in its reputation, trade, business or profession, such conspiracy having as its purpose and effect injuring Quill in its reputation, trade, business and profession, in violation of Va. Code § 18.2-499.  Overt acts in furtherance of this conspiracy include, but are not limited to, those described in Paragraph 52 (Cain and her publisher coordinating Facebook post); those described in Paragraph 62 (Cain instructing her publisher to telephone Amazon to convince Amazon to cease selling Quill books); those described in Paragraph 93 (Cain asking publisher for assistance in stopping "spin-off" series); those described in Paragraph 94 (publisher suggesting that Cain copyright omegaverse, or completely eliminate Quill's ability to sell anything on Amazon), and those described in Paragraph 95 (publisher instructing reader to purchase Quill books, "wait a few days" and then return them to Amazon, claiming plagiarism: "We are actively working with Amazon to get Z.E.'s books taken down but a few customer returns listing plagiarism can only help.").

127.    The factual allegations regarding defendant's participation in and preparation of the false DMCA notices are incorporated into this state-law claim not as the basis for substantive defamation liability, but rather as evidence of legal and common-law malice justifying an award of punitive damages.

128.    Cain's conspiracy and her participation in this conspiracy, including overt acts of defamation and the propagation of defamatory falsehoods, have caused damage and injury to the Quill. Quill is entitled to recovery as provided by law, including compensatory damages, treble damages, punitive damages, costs and attorney's fees, pursuant to Va. Code § 18.2-500 (A).

129.    Cain's conspiracy and her participation in this conspiracy, and the continuing acts of defamation in furtherance of the aims of the conspiracy, warrant the award to Quill of temporary, preliminary, and permanent injunctive relief, pursuant to Va. Code § 18.2-500(B).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Quill Ink Books Limited, prays for the following relief:

1.    Injunctive relief restraining Cain, her agents, publishers, servants, employees, successors and assigns, and all others in concert and privity with them, from bringing any lawsuit or threat against Quill, its author, or any other person or entity for copyright infringement relating to publication of the MYTH OF OMEGA series, or from posting any allegation of copyright infringement or plagiarism against Quill and its MYTH OF OMEGA series written under the "Zoey Ellis" brand of books on any social media or in any other forum or manner;

2.    Compensatory damages in the amount of one million dollars on each count, or such other amount as the evidence at trial shall indicate;

3.    Punitive damages as allowable by law to the amount of $350,000;

4.    Treble damages on Count Four, pursuant to Va. Code § 18.2-500(A);

5.      Attorney's fees and expenses pursuant to 17 U.S.C. § 512(f), other portions of the

COPYRIGHT ACT, Va. Code 18.2-500, and as otherwise allowed by law;

6.      Quill's recoverable costs; and

7.      Any further relief as the Court deems just and equitable.

September 9, 2019                    Respectfully submitted,

**QUILL INK BOOKS LIMITED**

By:   /s/ John M. Bredehoft
      John M. Bredehoft
      Virginia State Bar No. 33602
      KAUFMAN & CANOLES, P.C.
      150 West Main Street, Suite 2100
      Norfolk, Virginia 23510
      757-624-3000
      757-624-3225 (direct)
      888-360-9092 (facsimile)
      jmbredehoft@kaufcan.com
      *Counsel for Plaintiff*
      *Quill Ink Books Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2019, I electronically filed the foregoing First Amended Complaint with the Clerk of Court using the CM/ECF system, which will automatically provide notice to all counsel of record.

/s/ John M. Bredehoft

38

17754017v2