UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| QUILL INK BOOKS LIMITED, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:19cv476-LO-MSN |
| | ) | |
| RACHELLE SOTO a/k/a Addison Cain, | ) | |
| Defendant. | ) | |
| | ) | |

## REPLY BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

Defendant, Rachelle Soto a/k/a Addison Cain ("Cain"), filed a motion to dismiss Counts II, III, and IV of the First Amended Complaint on various grounds (Dkt. No. 28). Plaintiff, Quill Ink Books Limited ("Quill"), filed an opposition to the motion (Dkt. No. 33) but fails to defeat Cain's arguments for dismissal. There are three principal reasons to dismiss these claims.

*First*, Quill concedes that "Zoey Ellis" is the pseudonym of a natural person, who "is a British subject," who "is not a party to this case," and who is the author of certain dark romance novels that Quill has published (Dkt. No. 33, *Quill Opp*. at 4). Nonetheless, in order to claim that Cain's allegedly defamatory statements directed towards "Zoey Ellis," the author, are instead directed towards Quill, the publisher, Quill makes the inherently contradictory assertions that "Zoey Ellis" also "is virtually synonymous with Quill" and that "Zoey Ellis" also is a "brand name for books published by Quill" (*Id*. at 3, 4). As explained in **Section I**, Quill should be judicially estopped from making these tactical, intentionally self-contradictory assertions.

*Second*, and in any event, under "the plain and natural meaning" of Cain's two allegedly defamatory statements (the third having been withdrawn), a reasonable reader could only understand that Cain's allegedly defamatory statements about "Zoey Ellis" are "of and

1

concerning" a ***natural person*** who Cain identifies by the feminine pronouns "she" and "her," or who Cain describes as "the individual," "an individual," "this person," or "one author" (Dkt. No. 27-3; Dkt. No. 29-3).   Quill is not mentioned by name in either of the allegedly defamatory statements, nor does Cain refer to a publisher or a corporate entity.   Likewise, the "small group" defamation theory does not apply.   Cain uses singular nouns and pronouns like "she," "one author," or "an individual" in the allegedly defamatory statements, and so under "the plain and natural meaning," the reader could only understand that Cain is referring to ***one person***, not a "small group" of persons that might include Quill.   Accordingly, as explained more fully in **Section II**, neither of the allegedly defamatory statements is "of or concerning" Quill.

***Third***, the two remaining state law counts fail because there is no underlying tort.   Quill's tortious interference claim depends upon there being a claim for defamation: "Cain intentionally interfered with Quill's existing business relations by causing a breach and termination of those relationships, through her continuing defamation of Quill."   (Dkt. No. 27, *First Amended Complaint*, ¶ 110.)   Similarly, Quill's statutory conspiracy claim depends upon Cain's "overt acts of defamation and the propagation of defamatory falsehoods."   (*Id.*, ¶ 128.)   Therefore, as explained in **Section III**, since Quill's defamation claim fails so do the two other state law claims.

***Fourth***, as shown in **Section IV**, Quill's other arguments lack merit.

Accordingly, Cain's motion to dismiss Counts II, III, and IV of the First Amended Complaint should be granted, and the Court should deny leave to replead.   This pleading is Quill's fourth attempt to assert claims against Cain—two attempts in Oklahoma (dismissed as against Cain for lack of personal jurisdiction) and two attempts here.   Enough is enough.   These claims should be dismissed with prejudice.

**REPLY ARGUMENT**

Quill attempts to establish this theme at the outset of its brief: "So much of Ms. Cain's argument, particularly on the defamation claim, relies on what she asserts she meant or did, that we are well-reminded this is a motion under Rule 12(b)(6), not Rule 56." (Dkt. No. 33, *Quill Opp.* at 1.) That contention is utterly baseless. Cain's motion to dismiss relies on the "plain and natural meaning" of the allegedly defamatory statements, which do not name or refer to Quill. Since Quill is not the target of either allegedly defamatory statement, Quill resorts to artful edits, insertions, and ellipses to add, substitute, or delete words so that the allegedly defamatory statements, ***as rewritten*** by Quill, fit its theory of the case. For example, Cain's statements that "***Zoey Ellis' book*** infringed" her works, and that "***she*** infringed" her works, which infringement constituted "theft of my work" (Dkt. No. 27-3 (emphasis added)), are rewritten by Quill as "***Quill's book*** constituted 'theft of my [Cain's] work'" (Dkt. No. 27, *First Amended Complaint*, ¶ 83(b) (emphasis added)). Quill's rewriting of the allegedly defamatory statements runs rampant through the First Amended Complaint and the opposition to the motion to dismiss. Quill is not mentioned by name in either allegedly defamatory statement, and neither is Quill brought within the "plain and natural meaning" of those statements by inference. Quill has no grounds to sue Cain for defamation. Thus, Quill's state law defamation, conspiracy, and interference claims all fail.

**I.      QUILL SHOULD BE JUDICIALLY ESTOPPED FROM CLAIMING THAT "ZOEY ELLIS" IS A "BRAND USED BY QUILL," A "PSUEDONYM USED BY QUILL," OR THAT "ZOEY ELLIS" IS "VIRTUALLY SYNONYMOUS WITH QUILL."**

Despite conceding that "Zoey Ellis" is natural person—that is, "a British subject" who "is not a party to this case" (Dkt. No. 33, *Quill Opp.* at 4)—Quill still argues that "Zoey Ellis" is a "brand used by Quill," or a "pseudonym used by Quill," or is "virtually synonymous with Quill" (*Id*. at 3-4). Quill also argues that judicial estoppel does not apply because there has not been "any

inconsistency at all" in the positions it took in its **amended pleading** in Oklahoma and those it is taking now (*Id.*).  Yet, in the **original complaint** in Oklahoma, Quill made truthful allegations about "Zoey Ellis" that are quite different from the misleading representations on which Quill now relies.

It the original Oklahoma complaint, Quill and "Zoey Ellis" (then proceeding pseudonymously) did not allege that "Zoey Ellis" was a "brand used by Quill," or a "pseudonym used by Quill," or that "Zoey Ellis" was "virtually synonymous with Quill."  Instead, it was expressly pleaded that Quill was "a foreign, international corporation," and that "Zoey Ellis" was a natural person—*i.e.*, "an author residing in London, England" who wrote under that pseudonym. Therefore, Quill and "Zoey Ellis" are separate persons.

That differentiation was confirmed when "Zoey Ellis" filed a motion to proceed pseudonymously in Oklahoma.  *Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al.*, No. CIV-18-920-G (W.D. Okla. filed Sept. 19, 2018) (Doc. 4, *Plaintiffs' Motion for Leave to Proceed Under Pseudonym*).  Asserting her specific, individual, and personal stake in the lawsuit, as well as the individualized harm to "***her*** reputation" that she would suffer were "***her*** real name" disclosed, "Zoey Ellis" argued as follows:

> ***Ellis writes across several genres under different pseudonyms*** ranging from romance novels to young adult adventure stories. ***Ellis has a good faith belief that disclosure of her real name or other associated pseudonyms will undoubtedly bring about the harm that this lawsuit seeks to prevent—namely the destruction of her reputation as an independent author and member of the community.*** If ***Ellis's identity*** is made public, and that identity is connected to the other stories written by Ellis outside the dark erotic romance fictionalized in the subject genre, it would cast a negative light on ***her*** other works.

*Id*. at 3 (emphasis added).  When the Oklahoma court denied "Zoey Ellis's" motion, "Zoey Ellis" was abruptly dropped from the Oklahoma action.  Rather than having "Zoey Ellis" pursue the defamation claims in her own name, Quill tried to adopt "Zoey Ellis's" identity.

Quill then the concocted the self-contradictory position that "Zoey Ellis" is both a pseudonym for a natural person *and* Quill's "brand," or is "a pseudonym used by Quill," the corporate publisher.  Here is how Quill rewrote pertinent elements of the first three paragraphs in the amended Oklahoma claims—departing from the truth and resorting to an obvious fiction:

| *Original Oklahoma Allegations*[1] | *Amended Oklahoma Allegations*[2] |
|---|---|
| 3.  ***This case is about protecting a promising new author*** [*i.e.*, "Zoey Ellis," the woman author] from Defendant Blushing and Cain's deliberate misuse of copyright law to inflict harm to Plaintiffs' reputation and livelihood. Blushing and Cain's efforts to destroy Plaintiffs include **the publication of false claims of plagiarism against Ellis** … | 3.  ***This case is about protecting Plaintiff's publications*** [*i.e.*, Quill the corporate publisher] from Defendant Blushing and Cain's deliberate misuse of copyright law to inflict harm to Plaintiff's reputation and economic interests**.**  Blushing and Cain's efforts to destroy Plaintiff's publications include **the publication of false claims of plagiarism against those works** … |
| 8.  Quill is a foreign, international corporation organized and existing under the laws of England with its principal place of business in London, England. | 8.  Quill is a foreign, international corporation organized and existing under the laws of England with its principal place of business in London, England. |
| 9.  ***Ellis is an author residing in London, England***.  ***The name "Zoey Ellis" is a pseudonym used in the publication of her books.*** | 9.  ***The name "Zoey Ellis" is a pseudonym used by Plaintiff in the publication of certain books it publishes.*** |

Through this verbal sleight-of-hand, Quill attempted to substitute itself for "Zoey Ellis" in order to pursue "Zoey Ellis's" defamation claims in Oklahoma.

Yet, when it came time to tell the truth under oath in interrogatory responses, Quill objected that an interrogatory seeking discovery about "Zoey Ellis" "is directed to a third-party individual who is not a named party in the [Oklahoma] action."  (Dkt. No. 29-1 at 5.)  Based on the distinction

---

[1]  *Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al.*, No. CIV-18-920-G (W.D. Okla., filed Sept. 18, 2018) (Doc. 1, *Complaint*).

[2]  *Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al.*, No. CIV-18-920-G (W.D. Okla. filed Oct. 17, 2018) (Doc. 6, *Amended Complaint*) (emphasis added).

between itself and "Zoey Ellis" as "a third-party individual who is not named in the [Oklahoma] action," Quill avoided producing any discovery about "Zoey Ellis."

Quill is using the same verbal trick here. Just as Quill has rewritten the allegedly defamatory statements to try to make them directed towards itself, so too has Quill rewritten the facts to try to make "Zoey Ellis" its own pseudonym. Neither rewrite is allowed.

Although judicial estoppel is "generally" applied when a party has "prevailed" on an issue, the doctrine is "not necessarily confined to situations where the party asserting the earlier contrary position there prevailed;" rather, judicial estoppel may be invoked in other circumstances "to prevent the party from 'playing fast and loose' with the courts, and to protect the essential integrity of the judicial process." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166, 1167 (4th Cir. 1982). At bottom, the "essential function and justification [of judicial estoppel] is to prevent the use of 'intentional self-contradiction … as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" *Id*. at 1167 (citation omitted). To protect the essential integrity of the judicial process in this action, the Court should apply judicial estoppel to prevent Quill from asserting defamation claims (if any there are) that can only be asserted by the non-party, woman author residing in England who uses the pseudonym "Zoey Ellis."[3]

---

[3]  Quill also contends that Cain has failed to show that "non-mutual offensive collateral estoppel" applies (Dkt. No. 33, *Quill Opp*. at 8-10) even though Cain made no argument for application of that doctrine. Apparently, Quill made this irrelevant argument for the sole purpose of attaching and citing to the "judgment" it obtained in Oklahoma, in which Cain's publisher "admitted" that Cain made misrepresentations (*Id*. at 8, n.5 & Exhs. 1, 2 & 3). Omitted from Quill's exposition, however, are these crucial facts:  First, Quill was (and still is) utterly unable to prove any damages, lost sales, or lost revenue, and so had to settle on non-monetary grounds. Second, during the pendency of the Oklahoma litigation, Cain and her publisher parted ways after an acrimonious dispute, and the publisher apparently decided to take revenge on Cain by offering to settle with Quill by "admitting" to wrongdoing by Cain (*Id*., Exh. 2). That sham settlement, in which Cain's publisher "stipulates that Zoey Ellis's Myth of Omega series does not plagiarize Addison Cain's Alpha Claim series, and the take-down notices transmitted pursuant to the Digital Millennium Copyright Act are invalid" (*Id*., Exh. 2 & 3) is not binding on Cain.

## II.   THE ALLEGED DEFAMATORY STATEMENTS ARE NOT ACTIONABLE BY QUILL.

### A.   GOVERNING PRINCIPLES OF LAW.

The parties agree that Quill's state law claims are governed by Virginia law.   Under Virginia law, the Court "must decide as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." *Virginia Citizens Defense League v. Couric*, 910 F.3d 780, 784 (4th Cir. 2018) (citations omitted). Where, as here, the plaintiff is not identified by name in the allegedly defamatory statement, the Court must apply the "reasonable capability" test. *Id.* Under that test, "when determining whether the words and statements complained of … are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Id.* (citation omitted). "Although a defamatory statement may be inferred, a court may not 'extend the meaning of the words used beyond their ordinary and common acceptance.'" *Id.* (citations omitted).  The guiding principal is that "allegedly defamatory words are to be taken in their ***plain and natural meaning*** and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 591-92 (Va. 1954) (emphasis added). Under these principles of Virginia law, the Court must find that, when taken in their "plain and natural meaning," allegedly defamatory statements are not "of and concerning" Quill.  This is so even if the Court does not apply judicial estoppel.

Quill is not mentioned or identified in either statement.  Nonetheless, Quill contends that, as the publisher, any defamation directed towards "Zoey Ellis" or "her books" also is directed at Quill.  Virginia law does not support that contention.

B.     THE ALLEGEDLY DEFAMATORY STATEMENTS ARE NOT "OF AND
       CONCERNING" QUILL.

Although the two allegedly defamatory statements do not identify Quill by name, Quill

contends that it is a member of a "small group" targeted by the allegedly defamatory statements,

or that the words would cause a reader to "know" by inference that Quill was the intended target

(Dkt. No. 33, *Quill Opp*. at 5-7).  Neither argument has merit.

### 1.     The Defamatory Language Employed.

Before refuting Quill's contentions under either the small group or inference theories, the

actual language employed by Cain in the allegedly defamatory statements—as opposed to Quill's

artful edits, insertions, and ellipses that add, substitute, or delete words—should be analyzed.  Quill

asserts only two allegedly defamatory statements (Dkt. No. 27, *First Amended Complaint*, ¶¶ 80

& 83).[4]  Quill is not identified, named, or referred to in either statement; rather, Quill asserts

defamation by inference under two theories.  The "plain and natural meaning" of the language

employed by Cain in both does not implicate Quill.

### a.     The March 11, 2019 Website Post (Dkt. No. 27-3).

In this website post, Cain's allegedly defamatory statements about "Zoey Ellis" are "of and

concerning" a ***natural person***—a woman "author"—who Cain identifies by the feminine pronouns

"she" and "her," and who Cain describes as "the individual," "an individual," "the very same

author," "this person," and "one author."  There is no mention of Quill by name, nor any reference

to a publisher.  Furthermore, the "plain and natural meaning" of the words employed implicate a

particular "individual"—that is, a woman ("she" and "her") "author" who writes under the

---

[4] In the First Amended Complaint, Quill asserted three allegedly defamatory statements, including
one supposedly made on a Facebook post dated March 20, 2019 (Dkt. No. 27, *First Amended
Complaint*, ¶ 85).  Quill now concedes that that allegation was erroneous, and it has been
withdrawn (Dkt. No. 33, *Quill Opp*. at 15 n.8).

pseudonym "Zoey Ellis." Likewise, the words employed—*e.g.*, "individual," "she," "her," and "one author"—do not implicate a "foreign, international corporation," which is how Quill describes itself. Finally, Quill is not permitted to "extend or enlarge the libel" by its own averments—which it repeatedly tries to do by edits, ellipses, and substitutions. *Ewell v. Bouthwell*, 121 S.E. 912, 914 (Va. 1924). Rather, Quill's averments may only "show or elucidate [the] meaning" of the words Cain used, but "never to add thereto any additional meaning which is not found by fair interpretation included therein." *Id.* Accordingly, this allegedly defamatory statement is directed towards an "individual"—*i.e.*, a woman "author."

**b. The February 13, 2019 Facebook Post (Dkt. No. 29-3).**

This short post does not mention Quill; rather, it is directed towards "an individual," who Cain otherwise does not name or identify. The "plain and natural meaning," however, is unmistakable: Cain is referring to the author "Zoey Ellis," who, in other posts, she has identified as the "individual" who Cain accused of infringement and plagiarism.

To be sure, Cain does not use feminine pronouns (*she* and *her*) in this post. Instead, Cain uses the gender-neutral pronouns "they" and "their" to refer to this "individual." In modern American language usage, writers often avoid using the conventional use of masculine pronouns (*he* and *his*) or the awkward *he or she* (or *he/she*) as a gender-neutral pronoun; instead, writers now use the "singular" form of *they* or *their*.[5] According to the *Oxford English Dictionary* ("OED") online, usage of the "[s]ingular *they* has become the pronoun of choice to replace *he* and *she* in cases where the gender of the antecedent—the word the pronoun refers to—is unknown, irrelevant, or nonbinary, or where gender needs to be concealed."[6] The OED also reports that "The

---

[5]   *See* Strunk & White, *The Elements of Style*, 60-61 (3rd ed. 1979) (use of *he* as pronoun "embracing both genders" is conventional; *he or she* is "awkward," and so some writers use *they*).

[6]   https://public.oed.com/blog/a-brief-history-of-singular-they/ (last visited 10/17/19).

*New Oxford Dictionary of English* (1998) not only accepts singular *they,* they also use the form in their definitions.  And the *New Oxford American Dictionary* (Third Edition, 2010)*,* calls singular *they* 'generally accepted' with indefinites, and 'now common but less widely accepted' with definite nouns, especially in formal contexts."[7]  Accordingly, Cain's use of the singular "they" and "their" would, in context, be read as referring to the antecedent subject identified in the statement—*i.e.*, "an individual"—and **would not** be read in a plural sense as embracing both "an individual" (meaning the author "Zoey Ellis") and Quill.

### 2.   Quill is not a Member of "a Comparatively Small Group of Persons."

Under the so-called "small group" exception, the Court must "determine whether the plaintiff belonged to the class or group which has been defamed."  *Ewell*, 121 S.E. at 914.  "Courts have distinguished between classes and groups, applying the word 'group' to a small number of persons, of whom the plaintiff is clearly one."  *Id*.  If the defamatory "language employed is directed towards a comparatively small or restricted group of persons, then any member thereof may sue."  *Id*.  But "[i]f the class or group involved is a very large one, and there is little or nothing which applies to the particular person who brings the action, his right of recovery will generally be denied."  *Id*.  For example, the statement that "the City of Alexandria police force is corrupt" would refer to a **large class**, and no one officer would be entitled to sue; whereas, the statement that "the City of Alexandria police officers who arrested me solicited a bribe to let me go" might be actionable by any one of the **small group** of arresting officers.

Although Quill cites and relies on *Ewell* (Dkt. No. 33, *Quill Opp*. at 6), that case does not help Quill.  The small group theory does not apply here for two reasons.

---

[7] *Id*.

*First*, both of Cain's allegedly defamatory statements are directed towards an "individual," not a group.  For example, an actionable statement towards a small group might be directed towards "a public board with a few members"—such as, "the zoning board engaged in self-dealing."  *See Ewell*, 121 S.E. at 914.  No such reference to a group is found in either statement, which both refer to an "individual."  Moreover, as explained above, even the pronouns *they* and *their* found in the February 13, 2019 post are used as singular, gender-neutral pronouns referring to the antecedent subject—"an individual"—who Cain did not want to identify further.  Therefore, the predicate for application of the small group theory—that is, the reference to a group—does not exist.

*Second*, to get around the lack of a reference to a group, Quill tries to rewrite the allegedly defamatory statements to insert itself as a target side-by-side with "Zoey Ellis."  Essentially, Quill tries to add itself to make a group that does not otherwise exist.  For example, Cain states that "Zoey Ellis' book infringed my copyright" and constitutes "theft of my work" (Dkt. No. 27-3), which Quill argues should be understood as "Zoey Ellis' book [***published by Quill***] infringed my copyright" and constitutes "theft of my work" (*see* Dkt. No. 33, *Quill Opp*. at 5).  But, as the Supreme Court of Virginia teaches*,* the plaintiff is not permitted to "extend or enlarge the libel" by its own allegations.  *Ewell*, 121 S.E. at 914.  Rather, Quill's allegations may not be used "to add thereto any additional meaning which is not found by fair interpretation included therein."  *Id*. Therefore, Quill cannot rewrite the allegedly defamatory statements, which are directed towards an "individual," to "extend or enlarge the libel" to refer to a group that includes Quill.

Quill's other small group defamation case does not apply, either.  In *General Products Co. v. Meredith*, 526 F. Supp. 546 (E.D. Va. 1981), the allegedly defamatory statements in a magazine article were directed towards "triple-wall chimneys," including four identified by brand name, which were described as "the more commonly used brands."  *Id*. at 548-49.  The plaintiff

manufacturer who sued for product disparagement was not named in the article but alleged that the manufacturers "who make and sell air-insulated triple-wall chimneys, is a comparatively small group." *Id*. at 550. The trial judge found that the record "does not reflect the size of this class of manufacturers," but "that the group appears to be a relatively small one." *Id*. No such facts are found here. Neither statement refers to a group of any size, only to an "individual."

Accordingly, Quill cannot fit its claims under the small group theory.

### 3. The "Plain and Natural Meaning" of the Words Used by Cain Does Not Implicate Quill.

The general rules for determining whether a plaintiff who has not been mentioned by name may still sue for defamation by inference is as follows:

> In Virginia, a libel plaintiff must show that the alleged libel was published "of or concerning" him. He need not show that he was mentioned by name in the publication. Instead, the plaintiff satisfies the "of or concerning" test if he shows that the publication was intended to refer to him and would be so understood by persons reading it who knew him. In other words, the test is met if the plaintiff shows that the publication was "in its description or identification such as to lead those who knew or knew of the plaintiff to believe that the article was intended to refer to [him]." But if the publication on its face does not show that it applies to the plaintiff, the publication is not actionable, unless the allegations and supporting contemporaneous facts connect the libelous words to the plaintiff. If the rule were otherwise, any plaintiff could adopt and apply to himself any libelous matter and obtain a recovery.

*The Gazette v. Harris*, 325 S.E.2d 713, 738 (Va. 1985) (citations omitted). Quill fails to meet this test. Under the "plain and natural meaning" of the words of the allegedly defamatory statements, it is indisputable that the words were "[not] intended to refer to [Quill] and would [not] be so understood by persons reading it who knew [Quill]."

***First***, both allegedly defamatory statements are directed towards the "individual" author of the MYTH OF OMEGA series, not the corporate publisher of the books. As with its arguments under the small group theory, Quill's arguments fail at the most basic level.

***Second***, Quill alleges no facts showing that readers of the allegedly defamatory statements "believe that [they were] intended to refer to" Quill.  Instead, the feedback to Cain's statements show support for Cain and absolutely no mention of Quill (Dkt. No. 27-3 at pages 5-8; Dkt. No. 29-3).  This is yet another fatal deficiency under Quill's defamation by inference theory.

***Third***, Quill argues that Cain's statements defame "Zoey Ellis's ***book***," by claiming "plagiarism "and "infringement," which implicates Quill as the book's publisher (Dkt. No. 33, *Quill Opp*. at 5).  That is untenable.  Plagiarism and infringement are acts committed by the author, not by the book.  Thus, the statement that a book is a "plagiarism" or an "infringement" is an accusation against the author who wrote the book.  To paraphrase the NRA bumper sticker, "Books don't plagiarize works.  Authors plagiarize works."  Moreover, the alleged defamatory statements say nothing about the publisher, who may not have known about, nor participated in, the author's alleged copying.  And Quill cites no words in the allegedly defamatory statements that would lead a reasonable reader to understand that Quill, the publisher, was complicit in the alleged infringement or plagiarism of Cain's works.

Indeed, the limitation specified by the Supreme Court of Virginia applies here:  An allegedly defamatory statement "is not actionable, unless the allegations and supporting contemporaneous facts connect the libelous words to the plaintiff.  If the rule were otherwise, any plaintiff could adopt and apply to himself any libelous matter and obtain a recovery." *Gazette*, 325 S.E.2d at 738.  Here, Quill, a corporate publisher, is trying to "adopt and apply to [itself]" allegedly libelous matter that is directed towards an "individual" "author."  Thus, the *Gazette* decision does not support Quill; rather, it defeats Quill's arguments.

Quill's other defamation by implication cases similarly fail to support it.  In *WJLA-TV v. Levin*, 564 S.E.2d 383 (Va. 2002), a television station made allegedly defamatory statements in

promotional advertising for an upcoming investigative report of "sexual assaults" committed on patients by "their doctor," and in the investigative report itself. The advertisements featured the doctor's image, without naming him, but the investigative report identified the doctor by name when it aired. Even though "some" of the station's statements did not "clearly identify" the doctor by name, others did. So, taken together, all defamatory statements were actionable as "of and concerning" the doctor. No such facts are alleged here. Quill is not mentioned by name, image, or otherwise in either allegedly defamatory statement. Moreover, the words employed in both are directed towards an "individual" or an "author" and do not implicate Quill, the publisher.

And the decision in *Graham v. Young Broadcasting of Richmond, Inc.*, No. LP-1723, 60 Va. Cir. 376; 2002 Va. Cir. LEXIS 408 (Richmond Nov. 15, 2002), is factually inapposite. In that case, the plaintiffs were the Julian Graham Chevrolet, Inc., a car dealership, and Julian Graham, the owner. Although the alleged defamatory statement is not quoted, apparently the "statements regarding the corporation and Graham clearly identified Graham with the corporation and must be considered together," and so, the Circuit Court found that the allegedly defamatory statements could apply to either to the *Julian Graham* Chevrolet, Inc. car dealership *or* its eponymous owner, *Julian Graham*. No such facts are found here. Quill and "Zoey Ellis" do not have the same name or even a similar one. Likewise, since both allegedly defamatory statements are directed towards an "individual" and an "author," those statements could not possibly refer to both Quill, which is a corporation and a publisher.

Accordingly, Quill's defamation by implication arguments miss the mark.

## III.  WITHOUT A VIABLE DEFEMATION CLAIM, QUILL'S OTHER CLAIMS ALSO FAIL.

As pleaded, Quill's other state law claims rise or fall with the defamation claims. Quill's tortious interference claim depends upon there being a claim for defamation: "Cain intentionally

interfered with Quill's existing business relations by causing a breach and termination of those relationships, through her continuing defamation of Quill."   (Dkt. No. 27, *First Amended Complaint*, ¶ 110.)  Similarly, Quill's statutory conspiracy claim depends upon Cain's "overt acts of defamation and the propagation of defamatory falsehoods."  (*Id.*, ¶ 128.)  Since the defamation claims fail as a matter of law, so do the other claims.

When trying to salvage the tortious interference claim, Quill points to paragraph 75 of the First Amended Complaint, arguing that "business partners" and "vendors" refused to work with Quill while there was "a pending claim" of plagiarism (Dkt. No. 33, *Quill Opp.* at 17-18 (quoting pleading)).  Overlooked in Quill's analysis, however, is that the "pending claim" of plagiarism referenced in paragraph 75 are the DMCA notices (Dkt. No. 27, *First Amended Complaint*, ¶¶ 70-77), and that Quill's issuance of DMCA counter-notices "prompted vendors to restore all of Quill's publications to sale" (*Id.*, ¶ 74).  Thus, the alleged tortious interference injury in paragraph 75 is preempted by the DMCA, as the Court has previously ruled, and had already been cured prior to the making of either allegedly defamatory statement now at issue.  Accordingly, there being no defamation actionable by Quill under state law, there is no basis for the tortious interference claim.

When trying to salvage the statutory conspiracy claim, Quill argues that either defamation or tortious interference could serve as the underlying tort (Dkt. No. 33, *Quill Opp.* at 18-20).  But, as is shown above, neither the defamation nor the tortious interference counts have merit.  Thus, the statutory conspiracy count also fails.

Accordingly, both of Quill's other state law claims fail and should be dismissed.

## IV.    QUILL'S OTHER CONTENTIONS LACK MERIT.

Cain will not repeat all her prior arguments herein but still relies on them. She will, however, address two points: republication on the internet and whether her statements are non-actionable opinions. Quill's arguments on those issues must be rejected.

### A.    REPUBLICATION HAS NOT BEEN SUFFICIENTLY ALLEGED.

In the amended pleading, Quill alleges certain specific acts of "republication" of Cain's allegedly defamatory statements (Dkt. No. 27, *First Amended Complaint*, ¶¶ 87-92). These paragraphs merely repeat what was alleged in Quill's original pleading (Dkt. No. 1, *Complaint*, ¶¶ 87-92). And Cain has already shown why those allegations fail to sufficiently plead republication (Dkt. No. 29, *Cain Br.* at 18-19). Although the Court need not reach the issue of republication (because there is no defamatory statement actionable by Quill), Cain responds to several careless arguments now made by Quill regarding republication (Dkt. No. 33, *Quill Opp.* at 13-15). First, Paragraphs 87 and 88 of the First Amended Complaint allege republication of DMCA notices, and a state law claim based on those posts would be preempted. Second, the republication alleged in Paragraph 89 has been withdrawn (*Id.*, at 15 n.8). Third, Paragraphs 90 to 92 appear to allege online "links" or "shares" of Cain's statements, which are not actionable as republications of the original online statement. *See In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 173-75 (3d Cir. 2012) ("though a link and reference may bring readers' attention to the existence of an [online] article, they do not republish the article" under "single publication" rule).[8] Accordingly, Quill has not alleged actionable republication.

---

[8]  Virginia also applies the "single publication" rule. *See Semida v. Rice*, 863 F.2d 1156, 1161 n.2 (4th Cir. 1988). Virginia's "single publication" rule generally applies to "mass communications, *i.e.* the distribution of newspapers, books, ***internet posts***, etc." *Doe v. Roe*, 295 F. Supp. 3d 664, 671 n.8 (E.D. Va. 2018) (Ellis, J.) (emphasis added).

**B.     CAIN'S STATEMENTS ARE OPINIONS ABOUT "FULLY DISCLOSED" UNDERLYING FACTS.**

As previously shown, Quill's defamation claim also fails because the allegedly defamatory statements made by Cain are merely her subjective commentary—"opinions"—on underlying facts that have been "fully disclosed;" thus, those statements are shielded from defamation liability by the First Amendment under *Milkovich v. Loarin Journal Co.*, 497 U.S. 1 (1990) (Dkt. 29, *Cain Br.* at 16-19).  The case law squarely supports Cain's arguments.  *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) (holding that if the bases for a conclusion are "fully disclosed," then "no reasonable reader would consider the [conclusion] anything but the opinion of the author drawn from the circumstances related"); *accord Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 726, 730 (1st Cir. 1992) (a publication criticizing the "Phantom of the Opera" as "a rip-off, a fraud, a scandal, a snake-oil job" "could be understood only as [the author's] personal conclusion about the information presented, not as a statement of fact" where the underlying facts concerning the production's marketing were disclosed); *Levin v. McPhee*, 119 F.3d 189, 191-92 (2d Cir. 1997) ("if a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable").  This settled rule bars Quill's defamation allegations.

Nonetheless, Quill contends that Cain's statements are factual and "can be proven true or false," which means Cain's statements cannot be opinions (Dkt. No. 33, *Quill Opp.* at 10-13).  The Fourth Circuit long-ago rejected that simple test in *Potomac Valve & Fitting v. Crawford Fitting*, 829 F.2d 1280 (4th Cir. 1987).  In that case, the court held that:

> Even when a statement is subject to verification, however, it may still be protected if it can best be understood from its language and context to represent the personal view of the author or speaker who made it.  Thus we reject the suggestion, advanced by the plaintiffs in this case, that any "question of fact" which can be decided by a jury can be actionable as defamation.  Such a test ignores the underlying purposes

17

of the fact/opinion distinction, and would lead to results that could not be reconciled with the developing case law in other circuits.

*Id*. at 1288; *accord Chapin*, 993 F.2d at 1093 (citing and following *Potomac Valve*).  Therefore, the Court must reject Quill's keystone argument on the fact/opinion distinction, and without that, the remainder of Quill's contentions fall of their own weight.

## CONCLUSION

Quill fails to state a claim for defamation under Virginia law.  With the failure of that claim, Quill's other state law claims also fail.  For the reasons argued above and in Cain's opening brief, Counts II, III, and IV of the First Amended Complaint should be dismissed without leave to replead.

October 21, 2019

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com
*Counsel for Defendant*

Shawn M. Dellegar, OBA # 20973
Crowe & Dunlevy, P.C.
321 South Boston Avenue, Sutie 500
Tulsa, Oklahoma 74103
T: (918) 592-9800
E: shawn.dellegar@crowedunlevy.com
*Counsel for Defendant (Pro Hac Vice)*

Tynia A. Watson, OBA # 30765
Crowe & Dunlevy, P.C.
324 N. Robinson Ave., Suite 100
Oklahoma City, Oklahoma 73102
T: (405) 235-7500
E: tynia.watson@crowedunlevy.com
*Counsel for Defendant (Pro Hac Vice)*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically provide notice to all counsel of record.

/s/ Craig C. Reilly
Craig C. Reilly (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com
*Counsel for Defendant*