**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **QUILL INK BOOKS LIMITED,** | ) |
| | ) |
| **Plaintiff/Counterclaim Defendant,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 1:19-cv-476-LO-MSN** |
| | ) |
| **RACHELLE SOTO a/k/a ADDISON CAIN,** | ) |
| | ) |
| **Defendant/Counterclaim Plaintiff.** | ) |

**PLAINTIFF QUILL INK BOOKS LIMITED'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION TO COMPEL**

Plaintiff Quill Ink Books Limited ("Quill" or "Plaintiff"), by counsel, responds in opposition to Defendant Rachelle Soto a/k/a Addison Cain's ("Cain" or "Defendant") motion to compel as follows:

**INTRODUCTION**

This discovery motion is an attempt to obfuscate what should now be a simple case. Plaintiff Quill, a small British publishing house, published a series of three books between January and May 2018, each written by an author writing under the trade name of Zoey Ellis. Cain, the defendant – apparently "pissed" that the books did not acknowledge her as an inspiration, Amended Complaint[1] at ¶ 42 – decided to do what she could to retaliate. Although Cain acknowledged that the Quill books did not plagiarize her own works, Amended Complaint ¶ 41, and that accordingly there was "probably nothing we can do," Amended Complaint at ¶ 42, Cain nevertheless decided to file, and have her publisher file, "take down" notices under the

---

[1]    Although these and subsequent citations are to the Amended Complaint's allegations, those allegations are in hac verba quotations from Ms. Cain's written e-mail communications.

Digital Millennium Copyright Act ("DMCA"), claiming that Quill's books infringed Cain's copyright in her own trilogy.

The DMCA provides immunity from liability for on-line sellers who "take down" works that are accused of copyright infringement by a DMCA take-down notice. Sellers, based on Cain's take-down filings, and retailers such as iBooks and Amazon stopped selling Quill's "Zoey Ellis" books. Quill was required to track down each retailer to which Cain or her publisher on her behalf sent a take-down notice; explain why there was no good-faith argument for copyright infringement; and ask for the Quill books to be reinstated. Even after retailers began selling Quill's "Zoey Ellis" books again, Cain and her publisher continued to file more take-down notices.

The DMCA provides a civil remedy for one damaged by the filing of a DMCA take-down notice which "knowingly and materially" misrepresents a copyright violation: a private right of action to recover all damages attributable to the notice. 17 U.S.C. § 512(f).

Now that the false DMCA claim is the only one remaining in this case on behalf of the plaintiff, Cain's liability is crystal clear:

- Cain knew that Quill's "Zoey Ellis" books did not plagiarize her work, and that there was nothing she could do to take them down – but directed her publisher to file take-down notices anyway.

- Cain based her copyright infringement claims in the take-down notices on an unknown third-party's materially incorrect evaluation of the first forty-four pages of the first book. *See generally* Amended Complaint ¶¶ 46, 54, 55, 67.

- Cain's take-down notices for the second Quill book, included as part of the notices for the first book, contained only the partial list of similarities relating to

the first book, and nothing at all about the second book itself.

- When sellers – such as Barnes & Noble and iBooks – stopped selling the first two books of Quill's "Zoey Ellis" trilogy, Cain directed her publisher to file take-down notices for the forthcoming third book of Quill's trilogy – even though it had not been published. "Book three needs to come down too. I don't want her to make any more money off this series. #AngryAddison LOL [*i.e., laughing out loud*]." Amended Complaint ¶ 59.

- Even Cain's publisher told her, "with book three not out yet, I didn't really see how we could 'claim' it was plagiarized and I didn't want to take a chance." Amended Complaint ¶¶ 60. But Cain said, "I want book three down too," Amended Complaint ¶ 61. And so another take-down notice was filed, against Quill's third "Zoey Ellis" book – basing its allegations of copyright infringement by the third book, again, largely on a third-party's analysis of the first forty-four pages of the first book, and filing the notice of copyright infringement before the book was even published!

When Quill sued both Cain and her publisher in federal court in Oklahoma, her publisher eventually accepted an Offer of Judgment (which has been entered as a judgment of that Court, Exhibit I), stating:[2]

---

[2] Ms. Cain successfully moved to dismiss the Oklahoma case based on lack of personal jurisdiction, arguing that she was not involved with the filing of the DMCAs. That is why we are here But see Amended Complaint ¶¶ 49-51 (Cain directing and then demanding the filing of the take-down notices, and discussing plan with her publisher to pretend she had nothing to do with it and "remain distant and naïve.") A motion for an order to show cause for contempt against Ms. Cain for her Oklahoma misrepresentations remains pending in that court and has never been answered by Cain.

> Zoey Ellis's Myth of Omega series **does not** plagiarize Addison
> Cain's Alpha's Claim series, and the take-down notices transmitted
> pursuant to the Digital Millennium Copyright Act are **invalid**.

Given this course of action, this Court or a jury would not have the slightest hesitation in finding that the many take-down notices filed by Cain, and by her publisher on her behalf, contained knowing and material misrepresentations of copyright infringement.

Cain has no defense to the remaining claim against her. Under the circumstances, generating discovery disputes is an obfuscatory tactic designed to increase Quill's costs and deflect the Court.

Cain conflates multiple discovery issues that are not grounded in fact, but rather in Cain's own false assumptions. Quill has never – and could never have -- prevented Cain from issuing a notice of deposition to any of its witnesses as listed in its interrogatory responses, including Zoey Ellis; Cain need not know her real identity to proceed. Quill has listed many witnesses, but no intentional attempts have been made to thwart Cain's discovery of relevant information therefrom; the names of witnesses have been thoughtfully organized, and all listed individuals, though with ranges of knowledge, have all expressed having such knowledge or have directly participated in furthering Cain's manipulative and anti-competitive behavior. Quill has produced all responsive, non-privileged documents it has in its possession, and will supplement accordingly, if and when additional documents are discovered. The argument regarding the format of the documents is a make-weight: by far the largest single tranche of documents produced by Quill, is the re-production of documents given to Quill by Cain and her publisher in the Oklahoma case! The documents have been produced in a searchable format and in the manner in which they have been kept in the usual course of business. Though documents have not been maintained in a perfectly organized fashion, which is not required by the federal rules,

this does not suggest that the documents were intentionally "shuffled" prior to production (they were not), or obligate Quill to completely re-organize its documents for Cain's benefit.  Cain's unrelenting spinning of facts and fabrications of Quill's so-called intentional efforts to subvert its discovery obligations is tiresome and intended only to misdirect attention away from the issues at the heart of this dispute.

## STATEMENT OF THE CASE

<u>Oklahoma Litigation</u>.  A previous case, styled *Quill Ink Books Limited v. ABCD Graphics and Design, Inc., d/b/a Blushing Books Publishing, et al.*, was litigated between Quill and Cain's publisher, ABCD Graphics and Design, Inc. d/b/a Blushing Books Publishing ("Blushing Books"), in Oklahoma regarding Cain and Blushing Book's deliberately falsified Digital Millennium Copyright Act ("DMCA") take-down notices and dishonest claims of plagiarism against Quill's published works, among other claims.  *Quill Ink Books Limited v. ABCD Graphics and Design, Inc., d/b/a Blushing Books Publishing, et al.*, No. 5:18-cv-00920-G (W.D. Okla. Sept. 9, 2019) (the "Oklahoma Litigation").  Both Zoey Ellis, an author whose works are published by Quill, and Cain were initially named as parties in the Oklahoma Litigation.

The Oklahoma court ruled that "Zoey Ellis" was unable to proceed pseudonymously and that Ms. Cain must be sued in her true name.  Quill then proceeded as sole plaintiff.  After deceiving the Oklahoma court regarding her involvement in both directing her publisher to file and in the filing themselves of false DMCA take-down notices—which is evidenced by Cain's own communications and Cain's publisher even admitting in its responses to Quill's requests for admission that Cain misrepresented her involvement—Cain was dismissed from the Oklahoma Litigation for a lack of personal jurisdiction.  *Id.* (ECF No. 31, Order).

Upon Blushing Books' identification of Cain as a participant in the filing of the false

DMCA take-down notices, Quill issued a third-party subpoena to Cain and deposed her as a third-party witness in early 2019.  Quill subsequently filed a miscellaneous action in this Court to compel Cain to provide documentation and information regarding the individual on whom Cain relied heavily in making her false claim that her works were plagiarized by Quill's publications. *Quill Ink Books Limited v. ABCD Graphics and Design, Inc., d/b/a Blushing Books Publishing*, No. 1:19-mc-00013-LO-MSN (E.D. Va. Aug. 16, 2019) (ECF No. 1, Mot. to Compel).  The Court denied the motion, stating that "the information sought would [not] be ultimately in any way relevant to the resolution of the case in Oklahoma."  *Id.*  (ECF No. 17, Tr. p. 20).  Cain entirely mischaracterizes the quote taken from this hearing in her brief regarding the "intentional misuse of discovery materials by Quill"—the Court was referencing the posting of *public* court documents on a website ([https://www.omegaverselitigation.com/](https://www.omegaverselitigation.com/)),[3] and even specified, in the sentences immediately following Cain's extracted quote, that "[i]t is unclear how those [documents] were posted" and "no representation [is made] that counsel has done anything improper here or in Oklahoma…."  *Id.* (ECF No. 17, Tr. p. 21).

The Oklahoma Litigation was ultimately resolved in Quill's favor in September 2019, and Cain's publisher admitted that "Zoey Ellis' Myth of Omega series does not plagiarize Addison Cain's Alpha Claim series, and the take-down notices transmitted pursuant to the Digital Millennium Copyright Act are invalid."  *Id.*  (ECF No. 89, Def.'s Offer of J.).

<u>Virginia Litigation</u>.  Quill filed this action against Cain in April 2019 prior to the statute of limitation running on one of its now-dismissed claims, and is Quill's only recourse against

---

[3]     Cain erroneously asserts that Margarita Coale was involved in "creating the website," when in fact Ms. Coale was never involved.  Again, Cain makes unsubstantiated statements that distort reality.  The absence of Quill's denial that Ms. Coale was involved is not conclusive that she was, especially when Quill admitted that, as Cain quotes (but mis-cites), "*Quill admits it created and maintains the [website] containing information and resources regarding DMCA abuse…*" *Id.* (ECF No. 37, Countercl. Answers and Aff. Defenses. ¶51).

Cain for the damage caused by Cain's continued campaign against Quill and the works it publishes under the Zoey Ellis tradename.

Quill initially alleged six counts; the state law claims were held to have been preempted and thus dismissed with prejudice (or being claims that could be pursued only by "Zoey Ellis," which the Court did not permit because she is not a party here) leaving only the federal claim— for intentional DMCA misrepresentation and misuse in violation of 17 U.S.C. § 512(f).  Based on the admissions and confessed judgment made by Cain's publisher in the Oklahoma Litigation, Cain's continued harassment campaign against Quill and its principal author Zoey Ellis, and the filing of a DMCA take-down notice for alleged plagiarism contained a book Quill had not yet even published—among other things—Quill understandably holds Cain responsible for its continued interference with book sales.  Ironically, Cain's counterclaim, which asserts *Quill* is "on a vendetta to ruin" *Cain's* reputation and disrupt *Cain's* book sales because of the actions of *third parties* is merely a continued effort to harass Quill—especially in light of evidence that shows Cain's boastfulness in having her books banned (Exhibit A).

<u>Discovery</u>.  Upon the filing of the parties' joint discovery plan (ECF No. 39) and the Court's adoption thereof (ECF No. 42), Quill has responded to Cain's fairly wide-ranging and extensive initial discovery requests, producing nearly 5,000 pages of responsive, non-privileged documents.  Ostensibly unhappy with what was produced, and due to her own imagined conclusions about what documents "should" exist, Cain assumes additional documents have failed to be produced.  However, Quill cannot produce documents it neither has in its possession nor those that simply do not exist.

<u>Zoey Ellis and Zuri Thompson</u>.  Cain has been on an endless crusade to not only make but also confirm a link between Quill's principal author writing under the tradename "Zoey

Ellis" and one of Quill's directors, Zuri Thompson.  Cain consistently conflates the identity of these individuals and confuses their roles with respect to not only Quill, but also this lawsuit. "Zoey Ellis" may be Quill's principal author, but she is not a party to this suit.  Any details about her true identity, which has been protected at great length and which Quill has instructed counsel constitute a client confidence, are simply irrelevant in any event.  Quill has not withheld from Cain the details of its formation, ownership or formation; numerous documents have been produced reflecting this information.  Further, Cain's memorandum clearly shows she has an understanding of Zuri's Thompson's role with Quill, and Cain herself has previously "denie[d] that 'Zoey Ellis' is a pseudonym for Quill" (ECF No. 36).  Despite all of this, and Quill naming both "Zoey Ellis" and Quill's Corporate Representative as its first individuals with knowledge of the allegations of this lawsuit, following only after Cain herself, in Quill's responses to Cain's initial discovery request, Cain alleges Quill is deviously thwarting her efforts to depose either party.  It should be noted that the withholding of the identity of "Zoey Ellis" in no way prevents Cain from deposing her, and certainly not Quill's corporate representative; notice of a deposition under Federal Rule of Civil Procedure 30(b)(1) must merely "state the time and place of the deposition and, if known, the deponent's name and address.  If the name is unknown, the notice must provide a general description sufficient to identify the person or the particular class or group to which the person belongs."  The only person frustrating Cain's ability to depose witnesses is Cain herself; if she believes she knows the identity of "Zoey Ellis," she is free to serve a deposition subpoena upon that author and depose her in the United Kingdom.

    <u>Cain's Assumption that the Actions of Others are Attributable to Quill</u>.  Both Cain's counterclaim and motion to compel are heavy handed in arguing that others, but specifically Margarita Coale—Quill's <u>outside</u> counsel—has always been an agent for Quill or certain actions

she has taken were on behalf of Quill.  As repeatedly made clear by Quill in its answer and affirmative defenses, this is simply not the case (ECF No. 37, ¶¶ 17, 37, 63) ("Quill denies…that the actions of Coale as an ARC reader were done in her capacity as an agent of Quill, or at the direction of Quill"; "Quill further denies…that Norah Ash is an agent of Quill, or has acted at the direction of Quill"; "Quill further denies…Quill has directed others, whether acting as agents on behalf of Quill or not, to campaign against Cain to harm her reputation or to thwart sales of her works").  Further, Cain repeatedly attributes unspecified "actions taken in [Ms. Coale's] role as a lawyer" as having caused her harm, yet provides no further details about these "certain actions that caused [Cain's] injury" and fails to recognize that the actions of Ms. Coale are not always, and certainly have not always been, taken as an agent of Quill.

_Cain's Relentless Harassment and Diversions from her Unsubstantiated Claims_. Throughout her motion to compel, Cain's misrepresentations of facts and self-serving assumptions made to the Court endure.  Cain's memorandum in support is littered with unfounded conclusions regarding court proceedings in a case in which Cain was no longer a party and therefore has no actual knowledge ("Quill, unable to prove any damages, later settled with Blushing Books in what appears to be a collusive settlement"), unsubstantiated speculations (Quill has named many witnesses "in bad faith, to obscure the identities of the important witnesses"), and untruths ("Quill served specious, boilerplate objections to [discovery requests], _which it later withdrew_") (emphasis added) (ECF No. 44).  At the heart of Cain's counterclaim are the actions taken by third parties who lacked agency with Quill, which clearly cannot be attributable to Quill, and allegations about her own victimization by readers and supporters of Quill because Cain's advertisements for her books were removed from Facebook and her books were removed for sale from Amazon.  However, Cain's belief "there is of some sort of

conspiracy against her because various online sites take down her ads" is "common knowledge among the writers in the omegaverse genre." *See Non-Party Kittie Brandt a/k/a Eva Dresden's Objections and Responses to Rachelle Soto a/k/a Addison Cain's Subpoena Duces Tecum*, Resp. to Req. for Produc. No. 10 (Exhibit B). Similarly, "it is common knowledge among writers in the [omegaverse] genre that [] Cain regularly pushes the envelope on what she can do with her materials including the promotion of erotica or erotic horror" such as "pushing ads that violate Amazon or Facebook's sexual content policies and terms of service." *Id.* When, pursuant to Facebook's reporting policy, it is impossible for Cain to know who, if anyone, reported her advertisements on Facebook prior to their removal, it is clear that her counterclaim is merely a tit-for-tat retaliation against Quill to draw attention away from the true claims at issue in this lawsuit, and a means to paint a false narrative of Cain's reprehensible conduct.

## ARGUMENT AND AUTHORITY

Cain's allegations that Quill has utterly failed to comply with not only Cain's discovery requests, but also has "thumbed its nose" at the discovery rules in general solely because Cain did not find the documents or information she "wants" to see is a disingenuous portrayal of Quill's efforts. Some of the shortcomings Cain has identified are either unfounded, disproportionately presented or reciprocated by Cain herself.

## A.  QUILL'S ALLEGED DISCOVERY DEFICIENCIES

The issues Cain has raised in her motion to compel are individually addressed in the order as presented therein.

## I.   THE IDENTITY OF "ZOEY ELLIS"

The identity of "Zoey Ellis" is indeed irrelevant to the remaining claims of this lawsuit for several reasons. First, withholding Zoey Ellis' identity has not hindered or rendered useless

Quill's response to Cain's Interrogatory No. 5.  As previously explained, Quill has not withheld from Cain the details of its formation, ownership or operation.  Cain has identified Zuri Thompson's role in Quill from the documents Quill has already produced.  Revealing Zoey Ellis' identity is neither a condition precedent to depose her, nor does withholding it in any way limit Cain's ability to depose, as even admitted by Cain, the presumably more relevant individual, Zuri Thompson.  In fact, Cain has already sent a notice of deposition for Zuri Thompson.

Second, it is not clear how Cain's knowledge of Zoey Ellis' identity would enhance Cain's ability to prove her counterclaim, or, in the alternative, how maintaining Zoey Ellis' confidentiality disproportionally benefits Quill.  Any assumptions or connections Cain wants to make between Zoey Ellis, Quill and Zuri Thompson is immaterial to the remaining issues of this case.  "Zoey Ellis" is about the <u>only</u> person Cain does not claim to be an agent of Quill in the Counterclaim.

Third, any continuing desire to require Zoey Ellis' identity be exposed is purely for Cain's personal exploitation.  Given the longstanding history of harassment of Zoey Ellis by Cain, and Cain's vendetta against her and the success of her books because of the alleged plagiarism of Cain's works, it is not unreasonable to assume this harassment will worsen, especially now, if Zoey Ellis' identity were to be revealed.[4]  Cain's pattern of harassment goes well beyond Quill and Zoey Ellis, too – Cain and her supporters have targeted other authors in the omegaverse genre, and used similar harrying tactics.  As recounted by Eva Dresden, another

---

[4]     For the past two years, Cain has not ceased her defamation of Zoey Ellis as having plagiarized her works, sharing false or misleading statements and posts to thousands of followers on social media about the Oklahoma Litigation and the Virginia Litigation, and even joining Zoey Ellis' newsletter, blog, and social media group to obtain information to further her efforts. Evidence of this incessant harassment has not only been produced to Cain in this lawsuit, but also been produced by Cain in the Oklahoma Litigation.  A sampling of this evidence is attached hereto as Exhibit C.

omegaverse author and unrelated third-party, responding to a subpoena in this case, characterizes

Ms. Cain's actions, as soon as she

> started having success in the genre, Addison Cain conjunction with Myra Danvers aka Amanda Ludlow and others, *took great effort to direct a campaign against her, banishing and blocking her from all group forums, allowing or directing [Cain's] own followers to harass and leave negative reviews on Ms. Dresden's own publications and now continuing to harass her as part of her misguided campaign against Quill Ink Books and Zoey Ellis* (Exhibit B, Resp. to Req. for Produc. No. 7) (emphasis added).

Quill does not find comfort in treating Zoey Ellis' identity as "highly confidential" under

the protective order (ECF No. 41) as a sufficient means to shield Zoey Ellis from Cain's

harassment; Cain has already demonstrated her cavalier attitude towards respecting the rule of

law by not only filing multiple falsified DMCA take-down notices against Quill, but also

thereafter deceiving the Oklahoma court about her involvement therewith.  And a "highly

confidential" disclosure to Cain's Oklahoma counsel does not address the fact that Quill has

instructed its counsel to treat that identity as a client confidence.

Fourth, this is not a case of tit-for-tat, or what's good for the goose is good for the gander.

Quill was <u>ordered</u> in Oklahoma not to sue Cain under her pseudonym "Cain," but to use her real

name.  And Quill was readily able to do that.  Ms. Cain has never taken any appreciable effort to

remain unknown by her real identity (and has even posted pictures of herself and her young child

on Facebook).  Unlike Cain, conscientious, deliberate and attentive efforts have been taken for

years to preserve Zoey Ellis' anonymity.  **An end needs to come to Cain's false narrative that

she was doxed or "outed" by Quill, or even Zoey Ellis—Cain's true identity was a matter of

public record before any lawsuit against her by Quill was ever filed**.  It is undisputable that

for years, Cain has repeatedly disclosed her own identity for the world to see. Cain has photos

and video of not only herself, but also her family, splashed over social media (Exhibit D); there

are no photos of Zoey Ellis.  As early as 2016, Cain has filed for publicly available copyright registration claims and trademarks, that list not only her real name, but also her personal address (Exhibit E); no such public documents exist for Zoey Ellis.  Unbelievably, Cain has even publicly stated her <u>indifference</u> to keeping her identity a secret (Exhibit F).  The only reason Cain's real name was disclosed in the Oklahoma Litigation was because the Oklahoma court ordered it to be a part of the proceedings (Exhibit G).

Fifth, Zoey Ellis' identity is a client confidence; revealing her identity would be a direct ethical violation of Rule 1.6 of the Virginia Rules of Professional Conduct.  Rule 1.6 makes clear that a "client's confidences must be protected from disclosure" and "observance of the ethical obligation of a lawyer to hold inviolate confidential information of the client…facilitates the full development of facts essential to proper representation of the client."  *Id*. at Comment [2].  The rules governing confidentiality do not simply bend or wash away merely because opposing counsel desires certain information, even if opposing counsel thinks it may somehow know it. Quill's counsel is required to safeguard information sheltered by the Rule by making "reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information [so] protected"—and will continue to do so.  *Id*. at (d).

Sixth, Cain's argument for the extension of the Oklahoma's court ruling that Zoey Ellis' identity would not be made subject to a protective order to be applied to this Court is without merit.  The circumstances of each lawsuit are in no way analogous; Zoey Ellis was a <u>party</u> to the Oklahoma Litigation when that ruling was made.  Here, she is neither a party, nor has she subjected herself to the Court's jurisdiction.  Cain can, and has, issued depositions to the persons she feels have knowledge of information to support her counterclaim without the identity of Zoey Ellis known to her (including a notice, absent subpoena, purporting to require Quill's

13

outside counsel Ms. Coale to travel from Texas to be deposed in Virginia on ten days' notice during the early pandemic).  Absent a strong showing as to precisely why Zoey Ellis' identity is fundamental or  necessary to bring Cain's counterclaim, her identity should continue to remain confidential.

## II.     BAD FAITH OMISSION AND ANSWERS TO WITNESSES

Cain continues to make an invalid objection to not only Quill's listing of numerous individuals likely to have knowledge of or discoverable information, but also the absence of names, addresses and other contact information in response to Interrogatory No. 2.

The individuals listed, through various mediums, have communicated their knowledge of, or have participated in events that are directly related or relevant to, both parties' claims—and have been produced.  Further, there is no requirement in the Federal Rules of Civil Procedure, or the Local Civil Rules, that obligates Quill to explain why all of these individuals are listed.

Additionally, Federal Rule of Civil Procedure 26(a)(1)(A)(i) merely requires names be listed, and "*if known*, the address and telephone number of each individual" (emphasis added).  If and when Quill obtains more detailed information, such as addresses and other contact information, regarding the individuals listed, it will supplement its response to this interrogatory accordingly.   Otherwise, Quill has provided all detailed contact information of which it is currently in possession.

Furthermore, Quill's listing of "Zoey Ellis" and its corporate representative as its second and third fact witnesses, and general listing of individuals with knowledge of the claims of this suit in descending order of importance, profoundly dispel Cain's assertion that Quill has listed these individuals in bad faith or as an attempt to "obscure [their] identities."

Interestingly, Cain herself failed to either properly, or even at all, identify a number of

relevant individuals with knowledge related to her counterclaim.  For example, Cain failed to identify not only Myra Danvers by her true identity and provided an incorrect address, but also *any* individuals related to her counterclaim besides Zuri Thompson and Margarita Coale, such as a corporate representative for Facebook or other platforms from which her advertisements or books were directly removed, on her initial disclosure.  Unlike Cain, Quill does not immediately assume these omissions were done in bad faith or to mislead.

### III.     IMPROPER RELIANCE ON RULE 33(d)

Quill responds to Cain's concerns regarding its responses to Interrogatory Nos. 3, 4, 8, 9, 11, 12, 13, 14, 15 and 18 as follows:

*Interrogatory No. 3*:  Quill not only provided a direct link to a government website that maintains official documents for registered companies for its own corporate records, but also produced the individual documents from this webpage in its document production as Bates No. QUILL 004816–004858.  The information sought by Cain regarding Quill's corporate structure, and the identity of its employees, officers and shareholders, is fully identifiable from these pages, as Cain herself has already summarized in her motion to compel.  There are no other responsive documents, and a narrative form summarizing what is on these documents is completely redundant; nonetheless, Quill provides as follows to appease Cain:

Directors/Officers:     Zuri Thompson and Celestine Henry

Shareholders:            Zuri Thompson

Employees:               None

*Interrogatory No. 4*:  Quill produced several spreadsheets and other documents reflecting its lost revenues and other financial information as Bates No. QUILL 003960–003968, and QUILL 004312-004320.  Cain's demand for additional documentation or information regarding

other authors published by Quill is unnecessary, as Quill has never stated it is seeking recovery

for other authors' works, or that other authors' works were negatively impacted.

*Interrogatory No. 8 and 9:*   Cain's summarizations of her requests made in these

interrogatories are wholly incorrect; they sought communications between Quill and vendors

generally, as indicated below:

> INTERROGATORY NO. 8:  Identify each communication You have had
> with an actual or potential vendor, including but not limited to those identified in
> paragraph 38 of the Amended Complaint, regarding the Myth of Omega series
> from pre-publication to present, including the identities of the persons
> participating in the communication, the date of the communication, the method of
> the communication (e.g., written correspondence, telephone, e-mail, in person,
> etc.), and a description of the substance of the communication.

> INTERROGATORY NO. 9:  Identify each communication You have had
> with any vendor regarding a Take-Down Notice or a Counter-Notice regarding
> the Myth of Omega series, including the identities of the persons participating in
> the communication, the date of the communication, the method of the
> communication (e.g., written correspondence, telephone, e-mail, in person, etc.),
> and a description of the substance of the communication.

Furthermore, Quill has produced all non-privileged, responsive documents to these requests as

Bates No. QUILL 001328, QUILL 001338, QUILL 001344–001351, QUILL 001356–001357,

QUILL 004300–004302, QUILL 004506–004520, QUILL 004530–004543, QUILL 004549,

QUILL 004611–004620, QUILL 004697–004701, QUILL 004723–004729, and QUILL 004774,

and that "any non-privileged, verbal communications that may be responsive to this request"

cannot be recalled, but Quill "will promptly supplement its response in the event such

communications are identified."

The cover artist, voice talent and corresponding audio production company were not

included as individuals with knowledge of the Amended Complaint or Counterclaim because

they do not have discoverable information; they merely chose not to work with Quill in light of

Cain's smear campaign against Quill and Zoey Ellis across several social media platforms, but

especially postings made in the weeks prior to the termination of these engagements.  However, their identities are fully identifiable in the communications Quill has produced.

*Interrogatory No. 11*:   Again, Cain misconstrues the request that was made in the interrogatory; Cain requested communications from "readers" as referred to in paragraph 56 the Amended Complaint, which simply states:

> After the First Round take-down notices were sent, and from April 24, 2018, to May 16, 2018, *Quill received multiple inquiries from its readers* stating the MYTH OF OMEGA books were missing from online vendors. Because of these communications, Quill eventually learned of Cain's highly-successful efforts to disrupt Quill's book sales by filing the First Round DMCA take-down notice. (emphasis added.)

Cain has ascribed her own definition of what "readers" means that goes beyond the text of the complaint.  Nonetheless, Quill has produced all non-privileged, responsive documents to these requests, including Bates No. QUILL 004769.

*Interrogatory No. 12*:   Quill produced several spreadsheets and other documents reflecting its lost revenues and other financial information as Bates No. QUILL 003960–003968, and QUILL 004312-004320.  This includes the damage report produced by Quill's expert in the Oklahoma Litigation, who has also been identified in Quill's responses.  While sales records can be demonstrative of lost revenue, there are other means to calculate loss, including the loss of pre-orders, potential new readers, current readers, future publications, and so on.  The harm done to Quill goes beyond the interruption of the sales for three books—Quill would have undoubtedly earned more revenue across all of its publications than it actually did had Cain neither filed falsified DMCA take-down notices nor continued to publically harass Quill and Zoey Ellis.  Quill will produce additional non-privileged information and documentation as it becomes available.

*Interrogatory No. 13 and No. 14*:   Quill has produced all non-privileged, responsive

documents to these requests as Bates No. QUILL 004611–004620.   The communications with the voice talent and corresponding audio production company regarding their inability to continue doing work for Quill because of comments made and/or association with Cain were via e-mail, and these e-mails have been produced.

*Interrogatory No. 15*:   Quill has produced all non-privileged, responsive documents to these requests as Bates No. QUILL 000485–000493, QUILL 000682, QUILL 000685, QUILL 000688–000690, QUILL 000740–000797, and QUILL 000846–000855.   Cain's blog post and her GoFundMe fundraiser page name Quill as being the cause for "nuisance lawsuits" brought against her for "rightfully fil[ing] a DMCA…because someone else plagiarized [her] work." Quill was labelled as a "bully" who "manipulate[s]" others.   Cain's allegations that "Zoey Ellis' book infringed on [her] copyright" is yet another lie.   As Quill initially provided in its response, these statements and false accounts of what happened have been "published, re-published, and/or referenced on the Internet, in online book reviews, blogs, and other reader forums operated by Defendant and her various followers."   This endless perpetuation of false narratives and baseless accusations—and continued publication online—evidences Cain's harassment of Quill.

*Interrogatory No. 18*:   It is unbelievable that Cain continues to refer to the confessed judgment made by her publisher in the Oklahoma Litigation as an "obviously collusive statement."   The responses Cain's publisher made to Quill's discovery requests in the Oklahoma Litigation, especially its admissions, demonstrate why Cain's publisher was so willing to confess its involvement and be honest about Cain's role in the filing of the falsified DMCA take-down notices (Exhibit H).   Less than a *month* after these responses were given, Cain's publisher extended an offer of judgment to Quill, which it accepted and the Oklahoma court acknowledged (Exhibit I).   Finally, as Quill has repeatedly informed Cain, the transcript memorializing the

18

discussion between Quill and Cain's publisher at their settlement conference was sealed by the Court.  The Court requires filing a motion and providing notice to other interested parties to unseal the record.  Quill is in no way obligated to go to these great lengths to obtain a sealed transcript to prove to Cain that the settlement discussions were made confidential; Cain is free to file her own motion and posit the merits of her necessity to obtain a copy of it instead.

It should be noted that Cain's assumption that because she did not see documents she *expected* or *wanted* to see following Quill's production, this in no way necessitates the conclusion that Quill has not produced them, or that they even exist.  Of course, if and when Quill discovers additional non-privileged, responsive documents, Quill will supplement its answers and produce such documents.

## IV.  FORMAT OF DOCUMENTS PRODUCED

As permitted under Federal Rule of Civil Procedure 34(E)(i), documents were produced in the manner in which they have been kept in the usual course of business by Quill.  It is unreasonable for Cain to expect Quill to have maintained all of its records in the fashion that meets Cain's structural needs.  However, this does not warrant the accusation that Quill has in bad faith intentionally jumbled the documents to Cain's detriment; the documents were never shuffled.

Approximately one-quarter of the documents produced were documents previously produced by Cain's compliance with a third-party subpoena in the Oklahoma Litigation; all of these files are still clearly labeled as such, and no longer exist, at least in Quill's possession, in a format other than PDF files without metadata.  The overwhelming majority of the remaining documents were produced in PDF format without metadata because the native files simply do not exist in any other producible format.  These include screenshots from social media platforms

(Facebook pages and posts) and other websites (blog posts).  Concerted efforts were made to make all pages of the production searchable through the application of optical character recognition; the inability for Cain to search "some pages" out of thousands is an unfortunate result, but certainly not one due to calculated means by Quill.

The parties have not met and conferred to develop a protocol governing the production of electronically stored information.  Accordingly, Quill is in the process of converting the documents it has previously produced into the single page TIFF file format as requested by Cain, and will re-produce these files in a more organized fashion as a supplemental response.

## V.      REDACTION OF RELEVANT DOCUMENTS

Quill has produced thousands of pages of searchable documents, including some documents previously produced in the Oklahoma Litigation or by Cain as a result of her third-party subpoena from March 2019.  Some redacted documents were either previously given to Quill, or have been maintained, that way, or have been redacted to protect personally identifiable information.  Any redactions of non-protected personally identifiable information that can be removed will be done so in good faith, and the necessary documents will be re-produced.

## VI.     PRIVILEGE LOG

Furthermore, much to Cain's chagrin, the bulk of the documentation she seeks is indeed privileged, either due to work-product or attorney-client privilege; while normally a privilege log is required, the parties have previously agreed, per the Joint Discovery Plan (ECF No. 39), that no privilege log is required for documents dated September 18, 2018 (the initial filing date of the Oklahoma Litigation) or later.  Understandably, the existence of documents that are not only relevant, but also privileged that are still in Quill's possession that pre-date the beginning of the Oklahoma Litigation are limited in number, and more difficult to find given their age.  The fact

that a privilege log has not yet been produced does not necessitate the conclusion that it will never be produced.  To the extent a privilege log is required, in compliance with the timeframe specified in the parties' Joint Discovery Plan, it will be produced.

**B.      CAIN'S REQUEST FOR FEES AND COSTS IS UNREASONABLE**

The awarding of fees and costs may either be declined entirely by a court if the opposing party can show its responses were substantially justified, or be apportioned if the movant's motion is granted in part and denied in part.  FED. R. CIV. P. 34(a)(5).

An opposing party's response or nondisclosure is substantially justified if "a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact."  *Pierce v. Underwood*, 487 U.S. 552, 565–66 (1988).  The bulk of Quill's alleged discovery failings are demonstratively exaggerated or are misrepresentations or false assumptions made by Cain.  Quill has complied with all discovery deadlines.  Quill's withholding of non-party Zoey Ellis' identity has neither prevented Cain from issuing notices of depositions nor obstructed Cain's receipt of the information and documents she sought in the interrogatories regarding Quill's formation and operation.   Quill's comprehensive list of witnesses who possess knowledge of any of the allegations in either the Amended Complaint or Counterclaim meet the standards imposed by the federal rules, name Quill's corporate representative second only to Cain herself, and are organized in descending order of importance—and clearly was not generated in "bad faith" or for an "improper purpose."  A number of the responses provided for interrogatories invoking Rule 33(d) are comprehensively answered in the documents produced; Quill did not elaborate in narrative form as the documents spoke for themselves, or cannot produce additional documents Cain seeks because they do not exist.  A vast amount of the documents produced were not provided with metadata, in native format, or in TIFF format because they simply do not exist that

way; screenshots of social media posts do not possess metadata unique to Quill as the "capturer" or TIFF files made thereof will not reveal any additional information about the screenshots. These facts—these realities—put to rest the allegations made by Cain that Quill has egregiously abused the discovery process or willfully acted to deceive or hinder Cain.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Cain's motion to compel, and reduce or eliminate the award of fees and costs to Cain as necessary.

April 10, 2020                                  Respectfully submitted,

                                                **QUILL INK BOOKS LIMITED**

                                                By:   /s/ John M. Bredehoft
                                                      John M. Bredehoft
                                                      Virginia State Bar No. 33602
                                                      KAUFMAN & CANOLES, P.C.
                                                      150 West Main Street, Suite 2100
                                                      Norfolk, Virginia 23510
                                                      757-624-3000
                                                      757-624-3225 (direct)
                                                      888-360-9092 (facsimile)
                                                      jmbredehoft@kaufcan.com
                                                      *Counsel for Plaintiff*
                                                      *Quill Ink Books Limited*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically provide notice to all counsel of record.

/s/ John M. Bredehoft
John M. Bredehoft
Virginia State Bar No. 33602
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
757-624-3000
757-624-3225 (direct)
888-360-9092 (facsimile)
jmbredehoft@kaufcan.com
*Counsel for Plaintiff*
*Quill Ink Books Limited*

18311352v3