UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| QUILL INK BOOKS LIMITED, *Plaintiff*, | |
| v. | No. 1:19cv476-LO-MSN |
| RACHELLE SOTO *aka* Addison Cain, *Defendant*. | |

# REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

## I. QUILL'S FALLACIOUS ANALYSIS OF THE MERITS.

Quill begins with an analysis of the merits of its one remaining claim, claiming that Soto's "liability is crystal clear" (Doc. 48 at 1-4) (hereafter, *Br. Opp.*). Quill's syllogism is this:

*Major Premise:* A DMCA notice must be served in good faith.

*Minor Premise:* Soto "knew" that "Zoey Ellis'" books did not "plagiarize" her own works (*Id.* at 1-2, quoting Doc. 27, *First Amended Complaint* ¶¶ 41 & 42).

*Conclusion:* Therefore, Blushing Books' DMCA notices to online distributors were submitted in bad faith.

Quill's three-part syllogism might be formally correct, but Quill uses the wrong *Minor Premise*, and so Quill's *Conclusion* is fallacious.

Under the DMCA, a copyright owner may submit "a notification of claimed ***infringement***" to an online publisher requesting that the publisher take down content—a so-called "take-down notice." 17 U.S.C. § 512(c)(3)(A) (emphasis added). The take-down notice must include "a statement that the complaining party has ***a good faith belief*** that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." *Id.*, § 512(c)(3)(A)(v) (emphasis added). Thus, both sides agree on the *Major Premise*: A DMCA take-down notice must be served in good faith.

However, neither federal copyright law, in general, nor the DMCA, in particular, use the term "plagiarism." Rather, both use the term-of-art "infringement." When Blushing Books and Soto were discussing "plagiarism," it is self-evident that they were discussing ***literal infringement***: "Since ["Zoey Ellis' book is] not ***outright plagiarism***, I don't think there's anything than can be done. ... [S]he did not quote any of my ***exact phrasing***, so there really is probably nothing we can do" (Doc. 27, *First Amended Complaint* ¶¶ 41-42). Copyright infringement, however, is not limited to instances of exact word-for-word copying.

Although Soto and Blushing Books initially discussed "plagiarism," the DMCA take-down notices subsequently served by Soto's publisher after further analysis were not based on literal infringement. As the notices themselves state, the alleged infringement is based on "similarities," "paraphase[s]," "almost identical" scenes, and similarities in "plot" and "action":

> I am including a list of all of the similarities in plot, and actions that take place between the hero and the heroine. There are certain scenes in the book that are almost identical to Addison's book. The only thing different is the POV has changed from female to male. She has taken Addison's sentences and paraphrased them and written a book of her 'own.' I am including some of these sections as well. I am also including reviews, which state that the books by Zoey Ellis are very similar to Addison Cain's books and feel like a 'knock off.'

(Doc. 27-1, *First Amended Complaint*, Exh. A). The take-down notices then listed dozens of "plot similarities," as well as a dozen sentences and lines that are nearly identical or "paraphrased." The notices also included third-party reviews of "Zoey Ellis'" first book to the effect that "the similarities [to Soto's works] are uncanny," it was "the exact same story" as in Soto's works, and it appeared that "Zoey Ellis" was "robbing Addison Cain."

Courts have long held, and repeatedly reaffirmed, the breadth of federal copyright protection: "an infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy. Paraphrasing is copying and an infringement, if carried to a sufficient extent." *Eisenschiml v. Fawcett Publs., Inc.*, 246 F.2d 598, 603 (7th Cir. 1957); *accord Universal Pictures Co., Inc. v. Harold Lloyd Corp.*, 162 F.2d 354, 360 (9th Cir. 1947) (same); *National Risk Management, Inc. v. Bramwell*, 819 F. Supp. 417, 427 (E.D. Pa. 1993) (same). Therefore, "infringement" is not limited to acts of "outright plagiarism" or the "lifting" of "exact phrasing." The DMCA takedown

notices at issue are based on "infringement," as broadly recognized in federal copyright law, not "plagiarism," in the sense of literal infringement.

The test for infringement has two prongs: "To prove copyright infringement, a plaintiff must show first that she owned the copyright to the work that was allegedly copied, and second, that the defendant copied protected elements of that work." *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996) (citing *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991)). Pointing to the wrong facts and applying the wrong standards, Quill contests both prongs.

First, Quill contends that Soto had delayed two years before seeking to register copyrights for her works (Doc. 27, *First Amended Complaint* ¶ 37), suggesting that Soto fails to meet the ownership prong. That contention is wholly fallacious. Ownership of the copyright vests in the author upon creation of the work. The registration need not be sought immediately upon creation of the work, as Quill suggests; rather, the Copyright Act provides that a certificate of registration made "before or within five years after first publication of work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Moreover, registration of the copyright is merely a statutory, "nonjurisdictional" precondition to filing a copyright infringement action under 17 U.S.C. § 411(a). *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 (2010); *see also Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881 (2019) (owner must obtain certificate of registration prior to suit). Thus, Quill has no basis on which to dispute Soto's ownership of the *Alpha's Claim* trilogy (*Born to be Bound*, *Born to be Broken*, and *Reborn*), which were published in 2016, two years prior to Quill's publication of "Zoey Ellis'" *Myth of Omega* trilogy (*Crave to Conquer*, *Crave to Capture*, and *Crave to Claim*) in 2018. That Soto filed registrations in 2018 is irrelevant to the merits.

To prove the second prong, Soto must show that "Zoey Ellis," the accused infringer, "copied protected elements of [her] work." *Towler*, 76 F.3d at 581. Where, as "is often the case, direct evidence of copying is lacking," the copyright owner may introduce "circumstantial evidence" to prove infringement, which requires Soto to show that "Zoey Ellis" had "access" to Soto's works and that the works "are substantially similar." *Id*. at 581-82. Some of the discovery at issue is directed to obtaining this evidence.

To prove access, Soto "must show that ["Zoey Ellis"] had an opportunity to view or to copy her work"—that is, Soto must prove "that the paths of the infringer and the infringed work crossed." *Id*. at 582 (citations omitted). Moreover, the accused infringer may have had direct access or indirect access through "an intermediary." *Id*. at 582-83. Thus, Soto needs the identity of "Zoey Ellis" and the opportunity to depose both her and Quill's principal, Zuri Thompson (the likely intermediary), to prove access. To be sure, Soto's works were published online, and based on similarity alone one may infer that either "Zoey Ellis" herself or Zuri Thompson (as an intermediary) had purchased or otherwise acquired a copy of Soto's works, but Soto should not be forced to rely on inferences instead of facts. But, as shown below, proving access is just one reason for compelling Quill to identify "Zoey Ellis."

Further, Soto must only show "substantial similarity," not "outright plagiarism," or "lifting" of sentences, or copying of "exact phrasing." Here is the test:

> Proving substantial similarity requires a two-part analysis. First, a plaintiff must show — typically with the aid of expert testimony — that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection. Second, a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed. This portion of the test considers whether the intended audience could determine that the works are substantially similar, usually without the aid of expert testimony.

*Id*. at 583-84 (citations omitted). In assessing substantial similarity, the factfinder must analyze both works, "searching for extrinsic similarities such as those found in plot, theme, dialogue, mood, setting, pace, or sequence." *Id*. at 584. And when assessing intrinsic similarity from the point of view of readers, the factfinder would examine the "total concept and feel" of both works. *Id*. Thus, the infringement test is far more extensive and nuanced than Quill's superficial analysis, and the proper infringement analysis was used as the basis for the take-down notices.

Although the due date for Quill's expert disclosures in this case (April 13) has passed without it having served any, Quill may try to use a letter opinion it filed in the Oklahoma action, prepared by Kristina Busse, Ph.D., a college professor who studies "fan fiction," in which she analyzed "extrinsic" similarities and purported dissimilarities. *Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al.*, No. CIV-18-920-G (W.D. Okla. Oct. 17, 2018) (Doc. 6-13). But, as shown above, that is merely a piece of the puzzle. Moreover, "as so often happens," the parties in this case will present expert testimony expressing "diametrically opposed views" of the extrinsic similarities. *Eisenschiml, Inc*., 246 F.2d at 600. Prof. Busse's opinions, therefore, do not end the inquiry—they do not even address the entire analysis.

Thus, liability is far from "crystal clear," as Quill erroneously boasts (*Br. Opp*. at 2). Instead, Quill faces litigation on the merits with a determined opponent, who Quill has repeatedly denigrated and exposed to ridicule by the reading public.

Even Quill's opposition gratuitously attaches several exhibits (Exhibits A – F) that repeatedly display Soto's photograph; reveal details about her address, family life, and photos of her minor child; and recite statements by or about Soto that are irrelevant to this motion. Soto submits that Quill is abusing the public judicial record by including irrelevant exhibits that are solely intended to violate Soto's privacy and harm Soto's image—this is yet another example of

Quill's "intentional abuse" of court procedures. The Court should order that Exhibits A – F (Doc. 48-1 – 48-5 and 49) be removed from public access on PACER.

## II. THE OKLAHOMA LITIGATION.

Several incidents in the Oklahoma litigation are relevant to this motion, including Soto's Interrogatory No. 18 seeking information about the settlement of that action. Quill's characterizations of that action distort the events and obscure the meaning of the final judgment, and Quill, in fact, tries to re-write the public judicial record.

First, Blushing Books initially had vigorously defended the case on the merits. For example, in its response to Quill's complaint, Blushing Books firmly denied liability:

> Defendant Blushing does not dispute that Omegaverse is a popular, well established forum for fan fiction. Defendant maintains, however, that plagiarism, misappropriation, copyright infringement, and intellectual property theft can exist in this context, and Blushing firmly believes now (and when they filed the Takedown Notices) that Plaintiff Zoey Ellis unlawfully usurped Defendant Cain/Soto's material. Although there are tropes and conventions within Omegaverse, (just as there are conventions within "vampire" literature – e.g., vampires cannot come out during the day, they drink blood, they live forever, etc.), **Plaintiff Ellis went well beyond this point.** Plaintiff Ellis is writing in the shared literary tradition of Omegaverse, but in addition, she placed her story in a setting within the Omegaverse and then proceeded to appropriate dozens of plot points. [Quill's] argument almost seems to be the polar opposite of copyright: that because there is a shared literary meme or tradition here that cannot be copyrighted, ANY borrowing from another work is permissible.

*Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al.*, No. CIV-18-920-G (W.D. Okla. Nov. 26, 2018) (Doc. 19, *Response to Complaint* ¶ 20) (emphasis in original). Blushing Books also moved to compel Quill to provide evidence of damages, stating

> It is Defendant's position that Plaintiff has stonewalled on this discovery request because the numbers themselves will unequivocally prove Defendant's central position – that the loss of sales from these three minor vendor channels during the time the books were under review is an amount ***considerably less than $1000*** and that the temporary removal of books on B&N, Kobo, and Apple had no negative effect on Amazon sales whatsoever. Furthermore, Defendant believes that the sales records will prove that Quill Ink does not now and never has had any other author / clients other than possibly ["Zoey Ellis"].

*Id.* (Doc. 60, *Motion to Compel Br.*, ¶ 17) (emphasis added). The Oklahoma court found that "Quill's [discovery] responses were a little bit too cute at times, a little bit too engaged in the business of making objections rather than getting down to the meat of the issue and providing real information." (Quill Exhibit G, Doc. 48-6, Aug. 20, 2019 Tr. at 30:23 – 31:2.) Accordingly, the judge ordered Quill to supplement its damages information by September 3, 2019. *Id.* (Doc. 74, *Order*). Quill ***never*** produced any competent fact or expert evidence of its damages in the Oklahoma case prior to the settlement of that case on September 9, 2019.

During the pendency of the Oklahoma litigation, after Soto had been dismissed, Blushing Books and Soto terminated their business relationship. It was then that Blushing Books began to collude with Quill—essentially, rolling over on liability and blaming Soto. For example, in its August 2019 responses to Quill's Rule 36 requests for admission, Blushing Books "admitted" that "Cain misrepresented her involvement [in filing the DMCA notices]" (Exhibit H, Doc. 48-7). Of course, that "admission" by Blushing Books is not an admission by Soto, and under Rule 36(a)(1) is an admission by Blushing Books "for purposes of the pending action only,"—that is, the Oklahoma action. Thus, that "admission" is not relevant to, or admissible in, this action.

The settlement between Blushing Books and Quill is enigmatic. Whatever it is, it is not a "confessed judgment," as Quill now calls it (*Br. Opp*. at 7). Rather, in its offer of judgment, Blushing Books offered no money; rather, it merely "stipulates that Zoey Ellis's Myth of Omega series does not plagiarize Addison Cain's Alpha's Claim series, and the take-down notices transmitted pursuant to the Digital Millennium Copyright Act are invalid." (Doc. 44-5, Exhibit E.) At that time, however, Quill had asserted numerous claims: Misuse of Copyright, DMCA Misrepresentation, Negligence, Tortious Interference, Malicious Interference, Defamation, False Light, Civil Conspiracy, and a Declaratory Judgment. The offer of judgment mentions none of

those claims. Nonetheless, by operation of law, all those claims were merged into the judgment and dismissed with prejudice, without any compensatory damages awarded or findings of liability made—only Blushing Books' "stipulation."

But Quill apparently thinks it won a great victory, and that it can use Blushing Book's stipulation against Soto (*Br. Opp*. at 7). It cannot. As explained above, the stipulation of no "plagiarism" is meaningless to the infringement analysis at issue, and it was not even made by Soto. Moreover, the stipulation that the take-down notices are "invalid"—whatever that means—is not an admission, binding on Soto, that the DMCA notices are fraudulent.

Furthermore, in its answer to Interrogatory No. 18, Quill ***falsely*** stated that "the information [about the settlement] is contained in business records maintained by Quill, which are being provided pursuant to Fed. R. Civ. P. 33(d)." Now, however, Quill acknowledges that it produced no documents in response to Interrogatory No. 18 (*Br. Opp*. at 18-19). The Court should order Quill to produce a copy of any written settlement agreement, term sheet, or other documentation explaining this largely inscrutable "settlement." Although Soto does not seek any "statement made during compromise negotiations," FED.R.EVID. 408(a)(2), Quill alao should be ordered to give a narrative answer to Interrogatory No. 18 explaining the terms of settlement.

Quill alternatively claims that all settlement documents and communications are privileged (*Br. Opp*. at 18-19). If so, then Quill should serve a privilege log forthwith describing all such documents and substantiating its claim of privilege. Accordingly, the Court should order Quill to supplement its response to Interrogatory No. 18, to produce any non-privileged documents related to the Oklahoma settlement, and to serve a privilege log.[1]

---

[1] Finally, Quill contends that a show cause proceeding against Soto remains pending in Oklahoma (*Br. Opp*. at 3 n.2). Quill filed a motion for a rule to show cause in Oklahoma on September 6, 2019. *Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al*., No. CIV-18-920-

## III. "ZOEY ELLIS," "ZURI AMARCYA," AND ZURI THOMPSON.

***Zoey Ellis:*** Quill's position on the identity of "Zoey Ellis" is incoherent. Quill acknowledges that this person is its "principal author;" is an individual with relevant knowledge, who should be deposed, if at all, in England; but because she "is not a party to this suit," her actual name is "irrelevant." Quill also contends that her name is a "client confidence" that counsel may not disclose under VSB Rule 1.6. Finally, Quill contends that "Zoey Ellis" would be harassed online even if her name were treated as "highly confidential" information under the protective order. None of those contentions justifies Quill's refusal to disclose "Zoey Ellis'" identity.

First, even if her identity were a client confidence under VSB Rule 1.6(a), the attorney may disclose that confidence under VSB Rule 1:6(b) "if necessary to comply with … a court order." In another case, that was exactly the ruling made to require a law firm to provide unredacted documents in response to a Rule 45 subpoena, even though those redactions had been made under ethics rule 1.6 to protect non-party client names and confidences. *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, 2019 U.S. Dist. LEXIS 228367; 2019 WL 8107922 (E.D. Va. May 28, 2019) (law firm responding to Rule 45 subpoena not permitted to redact non-party client names and confidences under Rule 1.6 because "[a]ny obligations that Rosette, LLP has under the ethics rule can be protected by the provisions of the Protective Order"). As in *Williams*, the Court should order Quill to provide this information because the protective order already in place is adequate.

Second, Soto is willing to treat "Zoey Ellis'" identity as "highly confidential" information during the discovery phase. Therefore, there will be no online harassment by Soto and Soto's fans

G (W.D. Okla. Sept. 6, 2019) (Doc. 88). No order to show cause was ever issued, and the case was settled and terminated on September 9, 2019. Whether that meritless motion is still pending after judgment was entered and the case was terminated by settlement, this Court has no jurisdiction to consider that motion or rule on it. Quill's only motive in citing it was to try to poison the well. The Court should disregard Quill's contentions about that proceeding.

because only counsel of record or experts who are bound by the protective order will learn her identity.

Third, even when a non-party witness like "Zoey Ellis" seeks to shield her identity to protect her own interests, the Court may order disclosure of the name to counsel in a civil case. *See Lefkoe v. Jos. A. Bank Clothiers, Inc.*, 577 F.3d 240 (4th Cir. 2009). In *Lefkoe*, a non-party witness ("Doe Client") sought anonymity to protect himself from repercussions, but the defendant sought further discovery from him. The Fourth Circuit affirmed the trial court's order that Doe Client's name be disclosed to the parties and outside counsel to allow further discovery because:

> Once it is recognized that the deposition of the Doe Client and information that it could present could be relevant and useful to Jos. A. Bank's defense of the litigation, the substantial governmental interest in providing Jos. A. Bank a fair opportunity to defend itself in court is served by requiring the Doe Client to reveal its identity and provide the relevant information.

*Id*. at 249. The same reasoning applies here, requiring that "Zoey Ellis'" identity be revealed.

Fourth, "Zoey Ellis" is a nonparty residing in England. Unless Quill is now offering that she will voluntarily appear for a deposition in the United States upon a Rule 30(a)(1) notice served on Quill, Soto must know her name to serve international legal process compelling her deposition.

Fifth, Soto has not "conflated" the identities of Zuri Thompson (Quill's sole owner, director, and only employee) with either "Zoey Ellis" or "Zuri Amarcya," which appears to be a pseudonym previously used by the person who now writes under the name "Zoey Ellis." (In the Oklahoma case, in fact, Blushing Books assumed that "Zoey Ellis" and "Zuri Amarcya" were the same individual.) Here, however, Soto's counsel has only an educated guess—but discovery is not a guessing game. Quill should be ordered to disclose "Zoey Ellis'" identity.

Moreover, when producing its business communications, Quill produced emails addressed to or sent by the authors "Zoey Ellis" and "Zuri Amarcya," suggesting a sufficiently close connection between those pseudonymous authors and Quill that both (if they are different

individuals) are "managing agents" for the purposes of discovery depositions. The concept of "managing agent" is "a functional one to be determined largely on a case-by-case basis." *E. I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 268 F.R.D. 45, 48 (E.D. Va. 2010). Usually, four factors are analyzed: (1) the nature and extent of "discretionary authority" invested in the individual by the organization; (2) the individual's "dependability in following" the organization's directions; (3) "whether the individual is more likely to identify with the [organization] or the adverse party in the litigation"; and (4) the nature and extent of the individual's "supervisory authority in areas pertinent to the litigation." *See id*.; *accord* 8A Wright, Miller & Marcus, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2103 at 480-81 (2010). A managing agent may be deposed on a Rule 30 notice served on the entity without any other process. *DuPont*, 268 F.R.D. at 48. And as explained in both *DuPont* and Wright & Miller, this test may be applied permissively at the time the deposition is noticed. So, it appears likely that both "Zoey Ellis" and "Zuri Amarcya" may be compelled to appear for a deposition in the United States based on a Rule 30 notice served on Quill without other process.

Finally, Quill seems to have "conflated" these identities, not Soto. Quill produced no emails or other communications between itself and its "principal author," "Zoey Ellis," which is suggestive that Quill has refused to produce them or that Quill's "principal author" works as part of Quill rather than independently from it.

Nor does Quill explain its business relationship with "Zoey Ellis" in its interrogatory answers or its brief. Accordingly, Quill's communications with "Zoey Ellis" also should be produced, or the absence of them explained, and Quill's business relationship with its "principal author" must be explained in a supplemental answer to Interrogatory No. 5.

***Zuri Thompson:*** While (finally) acknowledging that Zuri Thompson is the sole owner and director of Quill—and apparently its only employee, even though Quill now claims to have "none"—Quill does not explain why Zuri Thompson is not listed as an individual with knowledge of the facts in its answer to Interrogatory No. 2.

Instead, Quill lists "Corporate Representative for Quill Ink Books" as an individual with knowledge. Quill tried this same tactic in Oklahoma, using Prof. Busse as its purported "Rule 30(b)(6) designee" for all purposes, including providing affidavits to the court (Exhibit F). Unconstrained by either first-hand knowledge or expertise, Prof. Busse (who teaches literature and philosophy), proffered a free-wheeling recitation of "facts" of which she had been "advised" (*Id.*, ¶¶ 1-9), and then offered her ***legal opinion*** that "Blushing's 'take-down' notices violated the Copyright Act," and her ***expert damages opinion*** that the notices "damaged Plaintiff 's reputation and resulted in financial losses, including, but not limited to, pre-release and ordinary book sales in the United States and internationally" (*Id.*, ¶ 10). That second-hand testimony and those opinions are not competent evidence. Yet, Quill apparently plans to use Prof. Busse once again as it "corporate representative" for all issues in this case instead of allowing Zuri Thompson even to be deposed.

In any event, at this time, Quill has not explained the omission of Zuri Thompson from its answer to Interrogatory No. 2. Instead, Quill's responses (as they were in Oklahoma) have been "a little bit too cute at times, a little bit too engaged in the business of making objections rather than getting down to the meat of the issue and providing real information." As explained in Section V, Quill should be ordered to serve an amended response to Interrogatory No. 2, including the identification of Zuri Thompson as an individual with knowledge and providing an individualized description of her knowledge.

## IV. MARGARITA COALE AND THE PRIVILEGE LOG.

In ruling on this motion, it is important to understand how Margarita Coale fits into this case. As alleged in Soto's counterclaim (Doc. 36, *Counterclaim* ¶¶ 15 – 66), Ms. Coale once had been an approved advance reader of Blushing Books' publications, who read, praised, and avidly followed Soto's books. In 2016, after reading an advance copy of the third book in Soto's *Alpha's Claim* trilogy, "Coale contacted Blushing Books the night before the book's release, demanding that Blushing Books not publish the book as written, and insisting that [Soto] rewrite the end of the book as suggested by Coale" (*Id*., ¶ 22). Soto declined to follow Ms. Coale's suggestion, and "Blushing Books then published Book Three without Coale's requested modifications" (*Id*., ¶ 23). Apparently feeling scorned, Ms. Coale began trashing Soto's work in online reviews, prompting Blushing Books to remove Ms. Coale as one of their advance readers (*Id*., ¶¶ 24 – 30). It is believed that Ms. Coale continued to post negative reviews using fake accounts (*Id*., ¶ 31). Thereafter, she continued to engage in actions adverse to Soto that were undertaken with or on behalf of Quill and the fans of "Zoey Ellis'" books, and finally, in 2018, she even began writing demand letters to Blushing Books and Soto as "corporate counsel" for Quill (*Id*., ¶¶ 32 – 66). Plainly, between 2016 and 2018, Ms. Coale was not acting as a lawyer but was an actor in the underlying events. Furthermore, Ms. Coale is not counsel of record in either this case or the Oklahoma action.

The Court should order Quill to produce non-privileged information and documents concerning its dealings and communications with Coale prior to her engagement as Quill's "corporate counsel" that is responsive to Soto's discovery requests. Quill also should produce its engagement agreement(s) with Ms. Coale, which are not privileged. *National Labor Relations Board v. Harvey*, 349 F.2d 900, 904-05 (4th Cir. 1965) (the fact of retainer, client identity, and terms of employment ordinarily not privileged); *Behrens v. Hironimus*, 170 F.2d 627, 628 (4th

Cir. 1948) ("[T]he existence of the relation of attorney and client is not a privileged communication."). And the Court should order Quill to serve its privilege log forthwith so Soto may test the sufficiency and validity of Quill's privilege assertions.

## V. IDENTIFICATION OF INDIVIDUALS WITH KNOWLEDGE.

Quill contends that this is now a "simple case"—just Quill's DMCA claim and Soto's tortious interference counterclaim (*Br. Opp*. at 1). Nonetheless, in response to Interrogatory No. 2, Quill identified over 70 individuals with knowledge of the facts underlying this "simple case." Quill further contends that under the rules and local rules "there is no requirement … that obligates Quill to explain why all these individuals are listed" (*Br. Opp*. at 14-15). That is not so.

Under Rule 33(b)(1)(B), a corporate party "must furnish the information available to the party." Moreover, under Rule 33(b)(3), each question must be "answered separately and fully in writing under oath." Further, under Rule 33(b)(3), Zuri Thompson's signature under oath certifies that the information is true and correct. And under Rule 26(g)(1)(B)(ii), both her and Mr. Bredehoft's signatures certify that information was not included in the answers "for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Quill violated all those rules, which now requires an explanation.

The Court should require Quill to pare down this list to individuals now known to possess discoverable knowledge and to individually describe that scope of that knowledge for each. Quill should be ordered to eliminate the host of individuals for whom it has no verifiable information (such as only screen names) or for which it proffers only vague generic descriptions of knowledge. Alternatively, if the Court permits Quill to include all 70 individuals, the Court should order Quill to provide individualized descriptions of their knowledge and admonish Quill that it must update its answer in a timely manner as it learns additional information about each individual. Either

way, though, Quill should not be allowed to bury important witnesses within a lengthy list that resembles a phone directory more than it does a fair discovery response. The Court should find that Quill's answer was made for an improper purpose.

Nor does Quill explain why Zuri Thompson was omitted. As explained above, she is the individual with the most information about this case. Quill likewise does not include Ms. Coale, even though she is named in the counterclaim. Plainly, Quill's answer is not true and complete.

Therefore, the Court should order Quill to amend and supplement its answer to Interrogatory No. 2.

## VI. RULE 33(d) AND OTHER ISSUES WITH QUILL'S DOCUMENT PRODUCTION.

***Format:*** After indulging in a lot of self-justification, Quill finally acknowledges that it "is in the process of converting the documents it has previously produced into the single page TIFF file format requested by" Soto and will reproduce documents without redactions (*Br. Opp.* at 19-20). While that begrudging concession is appreciated, it comes very late in the day.

The requesting party is entitled to "prompt" discovery responses: "A party to an action has the right to have the benefits of discovery procedure promptly, not only in order that he may have ample time to prepare his case before scheduled trial, but also in order to bring to light facts which may entitle him to summary judgment or induce settlement prior to trial." *United States ex rel. Weston & Brooker Co. v. Continental Grain Cas. Co.*, 303 F.2d 91, 92 (4th Cir. 1962). Here, Soto served discovery requests on January 22; Quill's responses originally were due by February 21, which Soto agreed to extend to February 28; but as of today, nearly eight weeks after the original due date, Quill has yet to make a proper document production or complete interrogatory answers.

Nor is Soto's motion to compel based on her "own false assumptions" about the documents that Quill possesses (*Br. Opp.* at 4, 19). Rather, for the purposes of discovery, "records which are

normally kept in the business of the party … are presumed to exist, absent a sworn denial." *E.g.*, *Norman v. Young*, 422 F.2d 470, 473 (10th Cir. 1970); *accord Goldman v. Checker Taxi*, 325 F.2d 853, 856 (7th Cir. 1963) (documents normally kept by a business are presumed to exist). The documents Soto has requested—*e.g.*, business communications, emails, and sales and financial records—are normal business records that are presumed exist. Yet, Quill has not produced many of them, nor has it explained why it does not have such documents.

Indeed, instead of denying the existence of documents in its interrogatory answers, Quill merely invoked Rule 33(d), implying that documents existed and were being produced even when, as it now admits, it was not producing any responsive documents. And, even when producing some documents, Quill did not identify which documents were responsive to that interrogatory. The Court should find that Quill did not invoke Rule 33(d) in good faith.

Finally, Soto should not have to piece together Quill's responses from the brief—which, as explained below, are inadequate and incomplete in any event. Soto submits that Quill should be required to amend and supplement its sworn interrogatory answers identifying the document numbers that contain the responsive information, or to state why it has no such documents.

***Interrogatory No. 3:*** The only documents regarding officers, directors, and employees that Quill identifies and has produced were the public filings that are available online, which only identify directors and shareholders (*Br. Opp*. at 15). Moreover, Quill claims it has no employees, even though Zuri Thompson, "Zuri Amarcya," and "Zoey Ellis" send and receive business emails at Quill. This answer is inadequate, incomplete, and obviously false, and additional business records (like stock subscriptions, directorship appointments, and employment agreements), which are presumed to exist, should be produced or their absence should be explained under oath.

***Interrogatory No. 4:*** The documents produced and identified in Quill's brief merely state unit sales per-month and revenues per-month for each publication (*Br. Opp*. 15-16). One cannot tell from these documents which retailers made the sales, which is critical to the damage analysis. Apparently, only Barnes & Noble, KOBO, and Apple responded to the take-down notices by removing "Zoey Ellis'" books for brief periods—and each apparently sold only a handful each month. Amazon, by far the largest retailer, ***did not take down*** "Zoey Ellis'" books. During the three-month period when the take-down notices were in effect, it appears that lost sales of the three books may have been (at most) a few hundred units, at about $2.00 to $3.00 per download—consistent with Blushing Books' estimate of ***considerably less than $1,000.00*** in damages, but nowhere near Quill's estimate of $735,000.00 (Doc. 44-3, Ans. to Int. No. 17). This question must be answered with per-vendor, per-book, per-month information, which Quill is presumed to have.

***Interrogatory Nos. 8 & 9:*** The only communications with vendors produced by Quill were those concerning the take-down notices—there were none regarding the alleged "refusals to deal" with Quill (*Br. Opp*. 16). Many these documents also were redacted to remove the name of the person at Quill who sent or received them. Since these would be routine communications that a publisher would have with distributors, they are presumed to exist. Quill should produce additional responsive documents or explain, under oath, why these documents do not exist.

Moreover, with respect to the "voice talent" and "cover artist," apparently Quill now concedes that they are not relevant, which Soto takes as Quill's concession that it suffered no loss or injury from their decisions not to work with Quill in the future. Quill should be held to that concession, and Quill should be precluded from advancing that claim or proffering evidence of it.

***Interrogatory No. 11:*** Although Quill alleges that it received "***multiple*** inquiries from its readers" about the books not being available, Quill identifies only a single document, from a single

reader, regarding a single inquiry seeking to obtain a book from KOBO (*Br. Opp*. at 17). This answer must be supplemented to identify any other readers who made these "multiple inquiries," and any such emails, texts, Facebook posts, or other inquiries should be produced. If there was just this single inquiry, Quill should say so under oath.

***Interrogatory No. 12:*** Like the answer to Interrogatory No. 4 discussed above, Quill has only provided spreadsheets showing units sold and revenues for each book per-month, but not per-vendor. And Quill's assertion that its production contains "the damages report produced by Quill's expert in the Oklahoma Litigation" is ***false*** (*Br. Opp*. at 17). There was no such report produced in the Oklahoma case, nor is any such report included in Quill's production here. Moreover, as previously noted, the due date for Quill's expert reports in this action has come and gone, but no expert reports have been served.

***Interrogatory Nos. 13 & 14:*** Quill claims $250,000 in damages for "reputational harm" (Doc. 44-3, Exhibit C, at 22). The only communications produced regarding alleged "refusals to deal" with Quill as a result of the DMCA notices were communications with the "voice artist" (*Br. Opp*. at 17-18). As noted above, that contention has been withdrawn. If there are no other documents about this issue, and no other vendors who refused to deal with Quill, then Quill should say so under oath and entirely withdraw its contentions about alleged "refusals to deal" on which its claim for "reputational harm" is based (Doc. 27, *First Amended Complaint* ¶ 75).

***Interrogatory No. 15:*** As pointed out in Quill's opening brief, this interrogatory cannot be answered using Rule 33(d) because Quill is not relying its business records. Moreover, the examples Quill provides—calling Quill a "bully," "infringer," or a filer of "nuisance lawsuits"—hardly amount to online harassment (*Br. Opp*. at 18). A sworn narrative answer is required, and Quill should therein identify (and then produce) responsive documents that refer, relate to, or

constitute instances of online harassment. If this is all, however, and there are no other instances, then Quill should say so under oath.

***Interrogatory No. 18:*** This interrogatory is directed at the Oklahoma settlement, which, as explained above, is inscrutable. Without revealing statements protected by Evidence Rule 408(a)(2), Quill should be ordered to produce the written settlement agreement, term sheet, or other memorialization, or explain why one does not exist and then give a narrative description of the settlement.

## VII. QUILL SHOULD SERVE A PRIVILEGE LOG FORTHWITH.

As explained above, Quill's nearly blanket assertion of privilege over all documents concerning Ms. Coale is dubious at best. Quill should be ordered to serve a privilege log immediately so Soto can test Quill's assertions of privilege.

## VII. THE COURT SHOULD AWARD FEES TO SOTO.

As shown above, Quill's failures, refusals, explanations, and objections are not "substantially justified." For example, Quill's argument that its "comprehensive list" of individuals with knowledge is "organized in descending order of importance" starting with Soto, is an obvious after-the-fact fabrication, and even if true was not so stated in the answer itself. Moreover, that doubtful explanation does not account for the omissions of Zuri Thompson and Margarita Coale. Quill's brief, like its responses are symptomatic of Quill's well documented attitude towards discovery as found by the Oklahoma judge: "Quill's [discovery] responses were a little bit too cute at times, a little bit too engaged in the business of making objections rather than getting down to the meat of the issue and providing real information." (Quill Exhibit G, Doc. 48-6, Aug. 20, 2019 Tr. at 30:23 – 31:2.) Quill did that here in Virginia, as well.

Moreover, as this Court previously found, Quill has "intentionally abused" the litigation and discovery process by posting materials on a website it created. Quill did more of that in this motion, deliberately and gratuitously filing irrelevant exhibits (Exhibits A- F, Doc. 48-1 – 48-5 and 49-1 – 49-4) in the public judicial record for the sole purpose of harming Soto, including filing her photo repeatedly and even filing photos of Soto's minor child. None of that conduct is "substantially justified," and those exhibits be removed from public access on PACER.

Whether the result of intentional misconduct, or merely unskillful litigation, Quill's deficient discovery responses and stridently self-righteous opposition have now forced Soto to incur far more than the $4,000 in fees it seeks to recover, and have delayed Soto's ability to obtain relevant evidence to defend herself by nearly eight weeks—about half the time allotted for discovery in this action. Significantly, none of Quill's delays or deficiencies appear to have been caused by the COVID-19 restrictions and disruptions, nor does Quill make that claim.

Rather, the delays and deficiencies are the result of Quill's deliberate games-playing, or at least, its culpable neglect. Either way, the result is the same: Soto's ability to defend herself in this litigation has been thwarted and delayed, and she has been forced to expend substantial legal fees to obtain the discovery responses that she should have received two months ago.

An award of $4,000 in fees is just and necessary to compensate Soto for the expenses she has incurred seeking to have the Court remedy Quill's deficient discovery responses.

**CONCLUSION**

For the reasons argued above the Court should grant this motion to compel in all respects and award $4,000 in fees to Soto.

April 16, 2020

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com
*Counsel for Defendant*

*Of Counsel for Defendant:*

Shawn M. Dellegar, OBA # 20973
Crowe & Dunlevy, P.C.
321 South Boston Avenue, Sutie 500
Tulsa, Oklahoma 74103
T: (918) 592-9800
E: shawn.dellegar@crowedunlevy.com
*Counsel for Defendant (Pro Hac Vice)*

Tynia A. Watson, OBA # 30765
Crowe & Dunlevy, P.C.
324 N. Robinson Ave., Suite 100
Oklahoma City, Oklahoma 73102
T: (405) 235-7500
E: tynia.watson@crowedunlevy.com
*Counsel for Defendant (Pro Hac Vice)*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically provide notice to all counsel of record.

/s/ Craig C. Reilly
Craig C. Reilly (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com
*Counsel for Defendant*