UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| QUILL INK BOOKS LIMITED,<br>*Plaintiff*,<br><br>v.<br><br>RACHELLE SOTO *aka* Addison Cain,<br>*Defendant*. | )<br>)<br>)<br>)<br>)  No. 1:19cv476-LO-MSN<br>)<br>)<br>)<br>) |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR LEAVE TO SERVED EXPERT DISCLOSURE OUT OF TIME**

Plaintiff, Quill Ink Books Limited ("Quill"), has moved for an extension of time in which to serve its three expert reports (Doc. 59 & 59-2): a fan fiction scholar who will opine on "Omegaverse tropes" (Prof. Kristina Busse); a "best-selling author"/retired consultant who will opine on damages (Payne Harrison); and a lawyer who will opine on legal issues (Steven Thrasher). That motion should be denied. The disclosures are untimely, and Quill's excuses are legally insufficient or outright falsehoods. Moreover, the damages and legal experts' disclosures are facially incomplete and proffer only conclusory assertions—they are mere placeholders devoid of substance. Furthermore, Mr. Harrison's damages opinions lack both factual support and economic analysis and are rank speculation, while Mr. Thrasher's opinions on legal issues are of the sort that are routinely excluded. Finally, Professor Busse's fan fiction opinions are off target. Once again, Quill has displayed its indifference to the rules and the orders of the Court—indeed, Quill again displays indifference to the truth.

**STATEMENT OF MATERIAL PROCEEDINGS**

Quill's ongoing vendetta against Soto did not begin with the filing of this action, and the Court's analysis of this motion should not start there, either. Instead, the Court should consider

1

Quill's actions and inactions over the last eighteen months as it has quixotically pursued extravagant claims, for unsubstantiated remedies, with unproven theories, in an obvious effort to punish Soto, a rival author in the literary market for dark romantic fiction, and inflict litigation expenses upon her.

Quill has been in litigation with Defendant, Rachelle Soto a/k/a Addison Cain ("Soto") and former her publisher, ABCD Graphics & Design d/b/a/ Blushing Books ("Blushing Books"), since September 18, 2018 on the same claims. *Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al.*, No. CIV-18-920-G (W.D. Okla., filed Sept. 18, 2018) (Doc. 1, *Complaint*). Expert disclosures in that case were due April 20, 2019, and the case was set for a jury trial commencing September 10, 2019. *Id.* (Doc. 30, *Scheduling Order*). In that action, Quill sought the same DMCA compensatory damages: "lost earnings," $135,000; "reputational harm," $250,000; "lost business opportunities," $250,000; an "interruption" of operations, $100,000. *Id.* (Doc. 87, *Final Pretrial Report*, at 14). Prof. Busse was identified as an expert on literary issues; Mr. Harrison was not identified as an expert, instead being identified as a "corporate representative" for Quill (even though he does not work for Quill), who would testify about "claims and defenses" and "damages"; and Mr. Thrasher was not identified as a fact or expert witness (*Id.*, at 41-42).

On the eve of trial in that action, Quill was chastised for having failed to adequately disclose the bases of its damages claims and ordered to supplement them—but never did. *Id.* (Doc. 74, *Order* at 2) ("Plaintiff shall supplement its Rule 26 disclosures regarding computation of damages on or before September 3, 2019."). Despite having been just one week from a jury trial in Oklahoma on, *inter alia*, the DMCA claim and the same damages, Quill had no factual or expert support for its claimed damages, and so settled for no compensatory relief. *Id.* (Doc. 89, 90 & 91).

Indeed, Quill merely obtained a stipulation, binding only on Blushing Books, that Zoey Ellis' works do not "plagiarize" Soto's and that the DMCA take-down notices were "invalid."

While the Oklahoma case was still pending, Quill filed a miscellaneous action to enforce a subpoena against Soto, and then filed this action against Soto, who had been dismissed from the Oklahoma case for lack of personal jurisdiction. Once again, Quill asserted numerous extravagant claims (Doc. 1 & 27) that were twice dismissed (Doc. 23 & 35), leaving only Quill's DMCA claim. The Court entered an initial *Order*, setting June 12, 2020 as the discovery cut-off (Doc. 38), and the parties incorporated the Local Civil Rules' schedule for expert disclosures in their joint discovery plan (Doc. 39, ¶ 6), which schedule was adopted by the Court in the *Rule 16(b) Scheduling Order* (Doc. 42, ¶ 1). Despite eighteen months of litigation with Soto, Quill implausibly submits that it "inadvertently" missed the expert disclosure deadline.

## ARGUMENT

The Court may deny Quill's motion on one or more of several grounds. First, as shown in **Section I**, all the disclosures are untimely, and Quill's arguments justifying these belated disclosures are legally insufficient or outright falsehoods. Second, as explained in **Section II**, each disclosure has procedural and substantive flaws that would justify striking them even if they were timely (which they are not). Third, as shown in **Section III**, allowing Quill's belated disclosures will cause substantial prejudice and disruption and will require, at a minimum, that the schedule be substantially enlarged so Soto can work with experts to prepare and serve rebuttal disclosures.

Quill's indifference to the Court's rules and orders reflects an arrogance and an unrepentant sense of entitlement that are wholly at odds with Quill's duty, under Rule 1, to ensure "the just, speedy, and inexpensive litigation" of this matter. Considering the long history of this litigation, Quill's failure to make timely expert disclosures is either the result of the culpable neglect by

counsel, or tactical stalling to prolong the litigation and doing just enough to keep from having the case dismissed for lack of prosecution. Either way, Quill attains its ulterior goal of inflicting litigation expenses on Soto. As in Oklahoma, Quill seems intent on stringing this case out to the end, without ever being called upon to present a live witness—be that Quill's director, Zuri Thompson or its principal author, Zoey Ellis—while making Soto incur enormous litigation expenses to pry every relevant fact from Quill during discovery.

**I.     QUILL'S EXPERT DISCLOSURES ARE UNTIMELY AND SHOULD BE EXCLUDED ON THIS GROUND ALONE.**

Generally, the "scope and conduct of discovery … are within the sound discretion of the district court." *Erdmann v. Preferred Research, Inc.*, 852 F.2d 788, 792 (4th Cir. 1988). Under Rules 16, 26, and 37, the Court also has "nearly unfettered discretion to control the timing and scope of discovery and to impose sanctions for failures to comply with its discovery orders." *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 426 (4th Cir. 1996) (affirming exclusion of belatedly disclosed evidence). This includes the authority to set and enforce a schedule for conducting discovery under Rule 16, and holding the plaintiff to that schedule by means of Rule 37 sanctions, including the preclusion of evidence, even if that preclusion order is effectively dispositive of the plaintiff's claims. *See Rabb v. Amatex Corp.*, 769 F.2d 996 (4th Cir. 1985) (enforcing discovery schedule and precluding plaintiff's evidence under Rules 16 and 37). Such authority should be used here.

**A.    THE EXPERT DISCLOSURE SCHEDULE SHOULD BE ENFORCED.**

As noted above, the parties expressly adopted the schedule for expert disclosures set forth in the Local Civil Rules. Under that rule, the plaintiff must serve its disclosure 60 days before the discovery cut-off, the defendant's disclosure is due 30 days thereafter, and plaintiff's rebuttal disclosure is due 15 days after that, and all expert discovery must be completed by the cut-off.

E.D.VA.CIV.R. 26(D)(2). Since the discovery cut-off is June 12, Quill's disclosures were due April 13. Neither of Quill's excuses for serving late disclosures hold water.

First, Quill argues that the Court's *General Order No. 2020-7* extended the disclosure deadline from April 13 to April 27 (Doc. 60, *Quill Br*. at 2). That is demonstrably wrong. That *General Order*, like *General Order No. 2020-3*, extended "***filing*** deadlines" by fourteen days. Expert disclosures are not "filed." FED.R.CIV.P. 5(d)(1)(A) (disclosures and discovery papers "must not be filed"). This also was plainly stated in the *Rule 16(b) Scheduling Order* (Doc. 42, ¶ 2) ("Rule 26(a) disclosures … shall not be filed"). Rather, Rule 26(a)(2) expert disclosures must be "***served***." FED.R.CIV.P. 5(a)(1)(C) ("a discovery paper" must be "served" as provided in the rules). The Court's *General Order No. 2020-7* did not extend any "***service*** deadlines" for discovery papers.

Second, Quill states that "On May 1, 2020, Quill's counsel became aware of its inadvertent failure to provide Defendant with Quill's expert disclosures …" (Doc. 60, *Quill Br*. at 2). That is an outright falsehood. On April 16, Soto's counsel pointed out "that the due date for Quill's expert disclosures in this case (April 13) has passed without it having served any" (Doc. 50, *Soto Reply Br*. at 5). The claim that "Quill's counsel became aware" of this issue on May 1 is a lie—indeed, the evidence disproving that lie is so plain and irrefutable, one wonders how Quill had the temerity to make it.

In short, neither of Quill's excuses are even true.

**B.     QUILL'S DELAY IS NOT THE RESULT OF "EXCUSABLE NEGLECT."**

Nor is Quill's delay the result of "excusable neglect." Under the rules, deadlines may be extended for "good cause." FED.R.CIV.P. 6(b)(1) & 16(b)(4); E.D.VA.CIV.R. 16(B). If, as here, a deadline has passed, the delinquent party also must show "excusable neglect." FED.R.CIV.P.

5

6(b)(1)(B).  Generally, "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect" under Rule 6(b).  *Pioneer Investment Servs. Co. v. Brunswick Assoc. L.P.*, 507 U.S. 380, 392 (1993).  To be sure, "excusable neglect" "is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant."  *Id*.  On the other hand, that standard is not so permissive as to excuse every failure; rather, the Court must examine "the danger of prejudice to the [other party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."  *Id*. at 395.  Quill cannot show "excusable neglect" under this standard.

None of the factors support Quill.  First, as shown above, the reasons for delay proffered for Quill's delay are wrong or false.  Second, the delay was not caused by forces outside Quill's control; rather, Quill attributes the delay to the "inadvertence" of its own counsel.  A party, however, cannot show excusable neglect by blaming the delay on its own counsel's inadvertence.  *Pioneer*, 504 U.S. at 396-97.  Third, Quill has not been acting in good faith.  Quill refused to make timely and adequate fact discovery, and stridently defended is grossly deficient responses as "good enough," necessitating that Soto file an extensive motion to compel—which was granted *in toto*.  Quill also made unnecessary filings of personal information and photographs to make extraneous rhetorical points, and dismissively blamed Soto for not being more careful with her image and identity, necessitating that Soto file two motions to seal—which were granted *in toto*.  And now, Quill shows casual indifference to the expert disclosure schedule, and its brief neither apologizes for the delay nor seriously addresses the issues.  Instead, Quill merely yawns with boredom and excuses its own delay as "harmless," as if serving the expert reports that were due several weeks ago was an unimportant detail that does not really matter.  As is shown next, it does matter.

Finally, there is "danger of prejudice." In a case like this one, "which turns upon expert testimony," a party's failure to provide "these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." *Carr v. Deeds*, 453 F.3d 593, 604 (4th Cir. 2006) (citations omitted). "For this reason, [the Fourth Circuit] give[s] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Id.* (citations omitted) (affirming exclusion of belatedly and inadequately disclosed expert opinions). Even a short delay may be sanctioned by exclusion. *Campbell v. United States*, 470 Fed. Appx. 153, *156-57; 2012 U.S. App. LEXIS 391, **4-8; 2012 WL 34445 (4th Cir. Jan. 9, 2012) (affirming district court's order excluding plaintiff's deficient expert disclosure that was filed five days after the deadline through plaintiff's own mistake). Thus, the Court's plenary authority to preclude Quill's experts would be properly exercised to disallow these expert disclosures solely because they are untimely.

Quill's excuses would not be legally sufficient even if they were true—which they are not. There will be prejudice visited upon Soto if these untimely disclosures are allowed. Accordingly, the Court should disallow Quill's untimely expert disclosures.

## II. EACH PROPOSED DISCLOSURE IS PROCEDURALLY OR SUBSTANTIVELY DEFICIENT, OR BOTH.

The proposed expert disclosures (Doc. 59-2) are not "complete," as Quill characterizes them. Rather, they are procedurally and substantively deficient, and obviously were hastily prepared by counsel, not the experts, as placeholder disclosures that Quill plans to supplement later. The deficiencies, moreover, are glaring, and no one can fairly describe them as "complete."

### A. THE HARRISON AND THRASHER DISCLOSURES ARE PROCEDURALLY DEFICIENT.

An expert disclosure "must be accompanied by a written report—prepared and signed by the witness"—which "must contain," *inter alia*, "(i) a complete statement of all opinions the

7

witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." As shown below, the Harrison and Thrasher disclosures do not comply with even the minimum requirements of Rule 26(a)(2)(B)—they obviously are not "reports" written by the expert, they do not disclose the facts and data relied upon, and they contain no analysis whatsoever. These two disclosures and should be disallowed as procedurally deficient, as well as untimely.

    **B.**    **PAYNE HARRISON: DAMAGES.**

An expert disclosure should be a "complete statement of opinions and the basis for those opinions," and should be "sufficiently detailed and complete to enable adequate preparation" by the opposing party. *Sharpe v. United States*, 230 F.R.D. 452, 458 (E.D. Va. 2005) (finding expert report inadequate). In contrast, the three-page disclosure for Mr. Harrison is devoid of factual support, economic analysis, and reasoned conclusions.

His proffered opinions are stated in five conclusory assertions that merely parrot Quill's prayer for damages. For example, he makes the bald assertion that "Plaintiff has experienced damages for lost earnings estimated at $135,000.00 based upon expected pre-orders, sales, and future potential sales" (Doc. 59-2, *Harrison Disclosure* at 2). A similar conclusory assertion is made for each other claimed element of damages, such as "Plaintiff has experienced damages from lost business or economic opportunities in excess of $250,000.00 directly attributable to the actions of defendant Rachelle Soto," without even identifying those "opportunities" or analyzing whether Quill would have been able to secure those opportunities and profit from them but for Soto's "actions." These gaps in analysis are significant because Mr. Harrison somehow concludes that the interruption of sales of just three books, from just three minor vendors, during just three

months, somehow adds up to more than three times total sales revenues from all books over the entire life of the company. This disclosure is beyond bad lawyering—it embodies bad faith.

Nor may Quill cure these deficiencies by "timely supplementation," as it promises it will do if Mr. Harrison forms further opinions or prepares new charts (Doc. 59-2, *Harrison Disclosure* at 3). Although a party "has a clear obligation to disclose and supplement" expert evidence in a timely manner, the duty to supplement "does not permit a party to make an end-run around the normal timetable for conducting discovery." *East West, LLC v. Rahman*, 1:11cv1380, 2012 U.S. Dist. LEXIS 133381, at *18 (E.D. Va. Sept. 17, 2012) (citation omitted). Thus, the courts distinguish between "true supplementation (*e.g.*, correcting inadvertent errors or omissions)" and "gamesmanship," that is, attempting to introduce altogether "new and improved" opinions in the guise of supplementation. *Id*. (citation omitted); *accord Disney Enterpr., Inc. v. Kappos*, 1:12cv687 (LMB/TRJ), 2013 U.S. Dist. LEXIS 17977, *14-15 (E.D. Va. Feb. 11, 2013). "To construe [Rule 26(e)] supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation." *Sharpe*, 230 F.R.D. at 462; *accord Campbell*, *supra*, 2012 U.S. App. LEXIS 391 at **7-8 (affirming district court's refusal to allow plaintiff to "cure" deficient expert disclosure through later supplementation). The untimely Harrison disclosure cannot be used as a mere placeholder, nor can its deficiencies be cured by later supplementation.

Nor are his opinions competent. Mr. Harrison's estimate of $135,000 in "lost sales" revenues from three books for three months, assumes that Quill would have sold 5,000 additional books per month for each title, at a sales price of $3.00 per download—a sales volume Quill never achieved in any month for any book (Exhibits A). Therefore, Mr. Harrison's assumptions are wholly unwarranted by the facts. Even if Mr. Harrison's disclosure were timely, and the disclosure

9

was not procedurally deficient, his opinions are based entirely on "unsupported and speculative assumptions" and should be excluded as incompetent. *Eastern Auto Distrib. v. Peugeot Motors of Am.*, 795 F.2d 329, 337-38 (4th Cir. 1986) (affirming exclusion of expert damages opinions as speculative). This is a fatal substantive deficiency in the Harrison disclosure.

Furthermore, as support for his conclusory assertions, Mr. Harrison relies solely on the same eight pages of financial information that the Court has already ordered Quill to supplement with per-vendor sales information (Exhibit A). As the Court may determine from its own review of even the per-book/per-month sales information, Quill's damages estimate of "at least" $735,000 is the product of dubious intellectual alchemy, not sound economic analysis.

Moreover, the recently produced per-vendor statistics show that about ***90% of Quill's sales revenues for the "Zoey Ellis" books came through Amazon***, which did not take down any of the books (Exhibit B, QUILL 005227). The vendors who allegedly did take down Quill's books account for no more than ***6% of sales***. Moreover, during the three affected months when the DMCA notices were filed (April, May, and June 2018), sales dropped at those vendors by miniscule numbers—***less than $100 each month*** (*Id.*). In short, there is no factual basis for Quill's damages claims whatsoever—they are not merely speculative, they are ***pure fantasy***.

Accordingly, the Harrison disclosure is untimely, procedurally deficient, and substantively deficient. It should not be allowed.

    C.    **STEVEN THRASHER: LEGAL ISSUES.**

Like the Harrison disclosure, the three-page Thrasher disclosure is devoid of factual support, expert analysis, and reasoned conclusions. Instead, his opinions are stated as seven conclusory assertions, which he apparently plans to supplement. The Thrasher disclosure also is

a mere placeholder, and should be disallowed because it is untimely, facially deficient, and asserts only legal conclusions.

Significantly, Mr. Thrasher's opinions merely parrot Quill's substantive legal contentions and are stated as legal conclusions. For example, he opines that "Requirements for good-faith-based that DMCA Take Down Notices including [*sic*] that it must be filed with a good-faith belief that a copyrightable work has been infringed" (Doc. 59-2, *Thrasher Disclosure* at 2). In another, he makes the conclusory assertion that there are "no copyright violations" by Zoey Ellis' books (*Id.*, at 3). Similarly, he offers examples of what actions, in his opinion, "evidence bad faith" under the DMCA—which are yet more legal conclusions. A party cannot put a lawyer on the stand and have him offer his opinions about what a federal statute means and whether the statute has been violated. *See Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 365-68 (4th Cir. 1986) (trial court properly excluded a lawyer proffered to explain what federal securities statutes meant and that no violation occurred). Therefore, Mr. Thrasher's legal opinions should be excluded.

Finally, Mr. Thrasher also purports to opine that Ms. Soto lacks credibility because of her "inability to answer questions" at her deposition taken in the Oklahoma action (Doc. 59-2, *Thrasher Disclosure* at 3). An expert witness, even a trained psychiatrist, "may not testify to the credibility of a witness." *United States v. Cecil*, 836 F.2d 1431, 1441 (4th Cir. 1988). This is yet another flaw in the Thrasher disclosure.

Accordingly, the Thrasher disclosure should be excluded as untimely, procedurally deficient, and substantively incompetent.

### D. PROF. KRISTINA BUSSE: FAN FICTION ISSUES.

While Prof. Busse's untimely disclosure appears formally sufficient, it nonetheless is substantively deficient. This case is not about "fan fiction," a phenomenon in which a

commercially successful author's fans make non-commercial fair use of the author's works to create their own stories for private distribution or posting on fan-sites.

Significantly, Prof. Busse's analysis does not purport to make an analysis of infringement *vel non*; rather, she was asked "to read the six books in question and situate them within the genre categories and accompanying tropes of (Dark) Romance and Omegaverse in particular" (Doc. 59-2, *Busse Letter Report* at 1). Instead of applying an infringement analysis of intrinsic and extrinsic similarities, she purports to apply "Genre Theory," which she describes as "a theoretical approach that looks at the creation and use of genre in terms of production, dissemination, and reception as well as an interpretive tool" (*Id*.). Soto's counsel has found no case in which a court has approved "Genre Theory" as a tool for infringement analysis.

She then further limits the viability of her analysis by broadening the definition of "tropes": "Tropes are used here not in the meaning of rhetorical figures of speech but rather as a recurrent theme and conceptual narrative shorthand that often function as a subgenre" (*Id*.). By broadening the definition of "tropes," she effectively seizes more narrative territory that she can label as copyright-unprotectable "common" ground within the genre, which any other author may freely use.

Moreover, Prof. Busse's opinions admit too much, for when concluding that Soto's works are unprotectable by copyright law, she must also demean the authorial efforts of Zoey Ellis by relegating her works—which appear to be Zoey Ellis' serious literary effort for commercial success—to the ash heap of "common," insubstantial, undistinguished, and unprotectable "fan fiction." Prof. Busse's theory, therefore, diminishes the very works she was engaged to extol for their uniqueness.

Not only do Prof. Busse's opinions admit too much, she also analyzes both these dark romance trilogies as mere repetitions of "genre tropes"—as broadly defined by her—because the tropes themselves are unprotectable. Thus, Prof. Busse dismisses any similarities based on setting (both trilogies are set in Omegaverse), characters (Alphas and Omegas), plot (the central pairing of a male and female characters), or any other "common" Omegaverse tropes (like "scenting," "imprinting," "claiming," "knotting," and the like). Despite concluding that "both [series] contain a large number of similarities" (*Busse Letter*, Doc. 59-2, at 23 of 36), she dismisses all of them as merely the kind of similarities one would expect—indeed, that readers may demand—from Omegaverse fan fiction. That argument also admits too much.

To be sure, those genre tropes themselves, individually considered, may be unprotectable. Using an example from another more familiar genre, vampire stories, all would agree that the "common" genre trope of a vampire drinking human blood may be unprotectable. But each author's unique arrangement, depiction, and deployment of that "common" genre trope may be protectable—making Bram Stoker's *Dracula* and Anne Rice's *Interview with the Vampire* each unique. To reinforce this point, one need only examine famous literary and popular fiction works that also depend heavily on genre tropes.

In the romance genre, there is the "star-crossed lovers" trope. Under Prof. Busse's "Genre Theory" analysis, and employing her extraordinarily broadened definition of "tropes," neither Shakespeare's *Romeo and Juliet*, nor Erich Segal's *Love Story*, could be copyright protected because both are written in the "common" "star-crossed lovers" "genre trope." A literary theory that would diminish these works to mere "genre fiction" cannot be correct. Nor is it.

Only by ignoring all passages in both series that deploy the Alpha/Beta/Omega ("A/B/O") "genre tropes," and discounting any other similarities as "expected," can Prof. Busse conclude that

13

the trilogies are not substantially similar. In doing so, she fails to wrestle with the numerous and substantial similarities in dialogue, scenes, sequences of events, and other details that were created in Soto's work as her unique arrangement, depiction, deployment of A/B/O "genre tropes," which were then copied in Zoey Ellis' trilogy—including relating her *Myth of Omega* story in a trilogy of books with linking cliff-hanger endings, just as Soto had.

Importantly, Prof. Busse acknowledges that Zoey Ellis' *Myth of Omega* trilogy constitutes a **unitary literary work** (Doc. 59-2, *Busse Letter Report* at 1 (both series "encompass three books")). Indeed, books one and two of Zoey Ellis' *Myth of Omega* trilogy end in unresolved cliffhangers that lead directly to the opening of the next book in the series. Thus, Zoey Ellis herself intended that readers purchase and read all three books as one literary unit. The conclusion that Zoey Ellis' *Myth of Omega* trilogy is a single literary unit is shared by Soto's expert, and puts the lie to Quill's argument that accusations of infringement would have to be shown book-by-book. Therefore, a pre-publication DMCA take-down request against the third *Myth of Omega* book could be made in good faith because the three-book series, **as a whole**, infringed Soto's trilogy even if only based on the substantial similarities running rampant in the first two books.

Accordingly, Prof. Busse's has conducted the wrong analysis and so comes to the wrong conclusion, and her disclosure is substantively deficient as well as untimely.

\* \* \*

For all these reasons, the Court should disallow the three untimely expert disclosures proposed by Quill.

### III. THE *SOUTHERN STATES* FACTORS SUPPORT EXCLUSION.

If a party fails to make timely expert disclosures, the Court must look at several factors before exercising its discretion to strike the belated disclosures. *See Southern States Rack &*

*Fixture v. Sherman-Williams Co.*, 318 F.3d 592, 595-99 (4th Cir. 2003). The five factors guiding the Court's discretion when determining whether to exclude expert testimony are: (1) surprise to the other party, (2) the other party's ability to cure any surprise, (3) any disruption of trial that might occur, (4) the explanation for the late disclosure, and (5) the importance of the expert testimony to a fair decision on the merits. *See id.; see also Disney Enterpr.*, supra, at *16-17 (excluding late supplemental opinions); *Rambus, Inc. v. Infineon Tech. A.G.*, 145 F. Supp. 2d 721 (E.D. Va. 2001) (subsequent history omitted). None of the factors supports Quill.

*Surprise:* The only expert disclosed in the Oklahoma action, and then just barely, was Prof. Busse. Soto's counsel had to search for Prof. Busse's letter in the Oklahoma judicial record themselves, because it was not included in Quill's earlier discovery responses. Even then, Prof. Busse's opinions are not an analysis of infringement *vel non*, and if she were allowed to supplement her opinions, then Soto will be surprised by those belated opinions. To be sure, Soto timely served her expert disclosure on the issue of infringement as part of her good faith defense, but Soto would need to supplement that report to respond in detail to Prof. Busse's opinions.

Moreover, Soto is completely surprised by both Mr. Harrison's and Mr. Thrasher's opinions, who were not identified as experts in the Oklahoma litigation. And since their disclosures are wholly conclusory, there would more surprises to come, were the Court to allow either or both to supplement their facially deficient disclosures.

Accordingly, Soto has been surprised by all three untimely disclosures.

*Ability to Cure:* As its sole argument on cure, Quill suggests that there is "ample time" for Soto to depose Quill's experts to learn their opinions in detail (Doc. 60, *Quill Br*. at 4). That argument is meritless.

An "expert report should be written in a manner that reflects the testimony the expert is expected to give at trial." *Sharpe*, 230 F.R.D. at 458. The failure to make a complete and timely disclosure in an expert report necessarily "prejudice[s] defendants in their ability to defend against the [expert's] accusations in a timely manner." *Carr*, 453 F.3d. at 605. Quill's disclosures are both untimely and deficient. That prejudice is not cured, as Quill suggests, by having "ample time" and "plenty of opportunity" to depose Quill's experts (Doc. 60, *Quill Br*. at 4). Rather, as the rules make clear, an expert's deposition "*shall not be conducted* until after the report is provided." *Carr*, 453 F.3d. at 605 (emphasis in original). As in *Carr*, Soto should not have to "ferret out" information at a deposition that should have been disclosed. *Id*. Instead, as in *Carr*, the appropriate remedy for failure to make complete and timely expert disclosures is preclusion.

***Disruption:*** While there is no trial date yet, that is not a license to disrupt and prolong the discovery schedule, which perforce delays the trial. As noted above, in a case like this one, "which turns upon expert testimony," a party's failure to provide "these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." *Carr*, 453 F.3d at 604 (citations omitted). Even a delay of five days may warrant exclusion, particularly when the disclosures also are deficient and would need supplementation to become adequate. *Campbell*, *supra*. Such a ruling obtains here, too.

Moreover, the Court may consider pretrial disruption where, as here, a party has "acted in bad faith by both their noncompliance and their haphazard compliance" with discovery obligations and orders. *Mut. Federal Sav. & Loan v. Richards & Associates*, 872 F.2d 88, 93 (4th Cir. 1989) (affirming Rule 37 sanction of default based on defendant's discovery misconduct). Quill's conduct likewise can be described as "bad faith," and its compliance may be fairly characterized as "haphazard." And, as in *Mutual Federal*, Quill should suffer consequences.

Case 1:19-cv-00476-LO-MSN Document 64 Filed 05/18/20 Page 17 of 19 PageID# 1149

Furthermore, prolonging the litigation serves Quill's ulterior motive of punishing a rival author, Soto, and inflicting litigation expenses. When viewed in this way, allowing Quill's untimely expert disclosures would not only excuse the indifference Quill and its counsel have shown to the Court's scheduling order, but far advance Quill's ulterior motives. The Court should not do Quill's improper bidding.

***Explanation for Delay:*** As shown above, Quill's excuses are wrong or false, and otherwise legally inadequate. Quill simply blames its own lawyers' "inadvertence"—but that is Quill's problem, and Soto should not be asked to solve it by having the litigation schedule disrupted and prolonged.

***Importance:*** It may be that Quill's case will collapse if these expert disclosures are disallowed. That should give the Court no pause when considering whether to exclude them. First, if Quill strenuously argues the purported importance these expert disclosures, that serves to underscore the ***inexcusable neglect*** of Quill and its counsel to have diligently complied with the schedule as ordered by the Court. Indeed, Quill would be contradicting itself were it to argue, on the one hand, that these disclosures should be allowed because they may have case-dispositive importance, and yet, on the other hand, argue that they were somehow "inadvertently" overlooked by its counsel through "excusable neglect." Second, and significantly, even case-dispositive evidence may be excluded if it has not been disclosed on the schedule ordered by the Court. *Rabb*, 769 F.2d at 999-1000 (affirming order excluding case-dispositive evidence that was not timely disclosed under the scheduling order and granting summary judgment to defendant). Therefore, the purported importance of these disclosures does not justify allowing them out of time.

Finally, if the Court were to allow any or all these disclosures, then the pretrial schedule would have to be substantially extended beyond June 12, the current cut-off. First, the Court would

have to order Quill to serve complete, supplemental disclosures. Second, the Court would have to allow Soto time to retain experts to rebut the Harrison and Thrasher opinions, and to supplement her infringement expert's disclosure to rebut Prof. Busse's opinions. Third, additional time to schedule expert depositions would be required. And fourth, the Court would need to allow sufficient additional time for *Daubert* motions and dispositive motions. In short, Quill's delay comes at critical juncture in the action, and allowing adequate time to Soto would nearly double the discovery period originally allowed and substantially—and unfairly—multiply Soto's litigation expenses in a case that may yield, at most, substantially less than $1,000 in damages to Quill.

## CONCLUSION

For the reasons argued above, the Court should deny Quill's motion for an extension of time to serve expert disclosures.

May 18, 2020

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com
*Counsel for Defendant*

*Of Counsel for Defendant:*
Shawn M. Dellegar, OBA # 20973
Crowe & Dunlevy, P.C.
321 South Boston Avenue, Sutie 500
Tulsa, Oklahoma 74103
T: (918) 592-9800
E: shawn.dellegar@crowedunlevy.com
*Counsel for Defendant (Pro Hac Vice)*

> Tynia A. Watson, OBA # 30765
> Crowe & Dunlevy, P.C.
> 324 N. Robinson Ave., Suite 100
> Oklahoma City, Oklahoma 73102
> T: (405) 235-7500
> E: tynia.watson@crowedunlevy.com
> *Counsel for Defendant (Pro Hac Vice)*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically provide notice to all counsel of record.

> /s/ Craig C. Reilly
> Craig C. Reilly (VSB # 20942)
> 111 Oronoco Street
> Alexandria, Virginia 22314
> T: (703) 549-5354
> F: (703) 549-5355
> E: craig.reilly@ccreillylaw.com
> *Counsel for Defendant*