UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **QUILL INK BOOKS LIMITED,** )<br> )<br>**Plaintiff,** )<br> )<br> )<br>**v.** )<br> )<br>**RACHELLE SOTO,** )<br> )<br>**Defendant.** )<br> )<br> ) | Civil Action<br>No. 1:19-CV-476<br><br>May 1, 2020<br>1:00 p.m. |

***TRANSCRIPT OF MOTION HEARING PROCEEDINGS***
***(By videoconference)***
***BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,***
***UNITED STATES DISTRICT COURT MAGISTRATE JUDGE***

APPEARANCES:

    For the Plaintiff:     **John M. Bredehoft, Esq.**
    Kaufman & Canoles PC (Norfolk)
    150 West Main Street, Suite 2100
    PO Box 3037
    Norfolk, VA 23510
    (757) 624-3000
    Fax: 888-360-9092
    Email: Jmbredehoft@kaufcan.com

    For the Defendant:     **Craig Crandall Reilly, Esq.**
    Law Office of Craig C. Reilly
    111 Oronoco Street
    Alexandria, VA 22314
    703-549-5354
    Fax: 703-549-2604
    Email: Craig.reilly@ccreillylaw.com

    Court Reporter:     **Scott L. Wallace, RDR, RMR, CRR**
    Official Court Reporter
    United States District Court
    401 Courthouse Square
    Alexandria, VA  2231-5798
    703.549.4626
    Swallace.reporter@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1      <u>**AFTERNOON SESSION, MAY 1, 2020**</u>

2   (1:00 p.m.)

3      THE COURTROOM CLERK:  *Quill Books Limited versus Rachelle*

4   *Soto*, Case Number 19-CV-476.

5      Counsel, please note your appearances for the record.

6      MR. BREDEHOFT:  Good morning -- Good afternoon, Your

7   Honor.  John Bredehoft of Kaufman & Canoles for the plaintiff,

8   Quill, Inc.

9      THE COURT:  Good afternoon, Mr. Bredehoft.

10      MR. REILLY:  Good afternoon, Your Honor.  Craig Reilly

11   here for the defendant, Rachelle Soto.

12      THE COURT:  Good afternoon, Mr. Reilly.  I see that there

13   are other names on my script, although I don't have video of

14   them.  Do we also have other attorneys participating today?

15      MR. BREDEHOFT:  Yes, Your Honor, my co-counsel from

16   Oklahoma, Shawn Dellegar and Tynia Watson, and they are on by

17   audio.  Ms. Marquez has muted them, but they are listening in.

18      THE COURT:  That's fine, but you will be arguing today?

19      MR. BREDEHOFT:  Yes, I will, Your Honor.

20      THE COURT:  Very good.  Well, you are welcome from

21   Oklahoma, and I hope everything is safe and healthy down there.

22   You are welcome to participate by listening.  Let me make sure,

23   before we begin, that you can see and hear me and that you can

24   see and hear each other.  I can see both of you, and I can hear

25   both of you clearly.

1        MR. BREDEHOFT:  Thank you, Your Honor.  We can both see

2    and hear you.

3        MR. REILLY:  I'll confirm that as well.

4        THE COURT:  Very good.  Then I think we are ready to

5    proceed today.  This is defendant's motion to compel, and I've

6    received the briefs in this matter, the memorandum in support of

7    the motion, the opposition, and the reply brief from the

8    defendant.

9        We also have an ancillary matter, which I will address

10   afterwards, regarding the consent motion to seal, and then the

11   two pleadings that followed that, one by the plaintiff regarding

12   the conditional or quasi consent to clarify matters and then the

13   response filed by Mr. Reilly.

14       So, first let's address the motion to compel.  I've

15   reviewed the documents.  You don't need to repeat what is in the

16   pleadings.  I'm familiar with this case.  I remember the third

17   party matter, the Oklahoma case, was ongoing that I dealt with.

18   I know that matter has been resolved, although it's part of this

19   motion to compel as well in some ways.

20       Has there been any effort -- and I think I know the answer

21   to that -- to narrow or resolve these issues before this argument

22   today?

23       MR. REILLY:  No, Your Honor.  Other than the papers filed

24   with the court, we've received no communications from the

25   plaintiffs, and we moved to compel documents, interrogatory

1    answers and the privilege log.  I can report as follows:  We

2    don't have the privilege log.  We still have no reformatted

3    documents, although they promised to do that.  We still have no

4    unredacted documents, although they promised to do that.  We

5    still have no expert reports from the plaintiff, although they

6    were due April 13th.  And we still have no firm plans for

7    deposing Zuri Thompson, the sole principal, the sole employee,

8    guiding director of Quill whose deposition we noticed, but then

9    were asked to withdraw because they moved to quash it.  So we --

10   and then the pandemic broke out and all those plans went up in

11   the air.

12        So, nothing has advanced.  And if I can, Your Honor, I'll

13   go through the interrogatories one at a time by number briefly

14   discussing each, and with your preference, maybe for

15   Mr. Bredehoft to respond in line with the interrogatory or to

16   save his responses for the end if you prefer, but I'm prepared to

17   begin and proceed either way.

18        THE COURT:  I'm not sure we need to do that.  I appreciate

19   it, and maybe I will change my mind as we go forward, but as I

20   think you both know, and I think I'm not alone in this, when

21   there's a motion to compel involving multiple interrogatories and

22   multiple requests for production of documents, it really is

23   frustrating, from the Court's perspective, to have to go through

24   them seriatim one-by-one, as opposed to really looking at the

25   fundamental issue, which is whether or not the party who's been

1    requested to provide discovery responses has done so pursuant to

2    the local and federal rules and done so in good faith and

3    completely.  And if we can narrow the scope of the argument to

4    categories or issues rather than number-by-number, it might be a

5    more efficient way of resolving it.  Maybe that's not possible

6    here, but let me try to focus this argument by turning to

7    Mr. Bredehoft first.

8           I understand that the defendant is frustrated and has

9    articulated a series of ways in which the discovery that they've

10   received for interrogatories and requests for production of

11   documents are inadequate, so let me just start -- and then,

12   Mr. Reilly, we can go back, if you feel that I have given a short

13   trip or not addressed all of your concerns.

14          Mr. Bredehoft, let me start with what I think is one of

15   the central issues.  It goes back to when you were before me on

16   the third party matter.  It goes back to the very essence of the

17   Oklahoma case.  It is a very unusual and peculiar circumstance,

18   whether or not the identification of Zoey Ellis and her actual

19   identity is an appropriate area for discovery here.  So, let me

20   hear what you have to say.  I will tell you right at the outset

21   that whatever bilateral agreement Zoey Ellis may have with

22   counsel, to me, is not a persuasive argument as to what is

23   obligated to be turned over.  The question is whether it's a

24   valid request and falls within the realm of information that may

25   be relevant and lead to the admissibility of relevant evidence,

1    the resolution of the claims in this case.  So, beyond a desire

2    for privacy and whatever her arrangement was with counsel, tell

3    me what it is that should preclude the defendant from getting

4    access to that information.

5         MR. BREDEHOFT:  Thank you, Your Honor.  The essence of the

6    issue -- and I think this really is the essence of the whole

7    motion, because although I did not respond and -- My bad, I was

8    under quarantine and then everything hit.  It's my bad that I did

9    not respond in detail to some of the latter letters that were

10   sent, but I did say really the only thing that we're going to

11   have to argue about with regard to this motion is the identity of

12   Zoey Ellis, and it's not an agreement with counsel.

13        My client really has instructed me to treat the identity

14   of the author known as Zoey Ellis as a client confidence.  I can

15   disclose that if ordered to do so.  I'm certainly ready and

16   prepared to do that, but I'd like to try to persuade you not to

17   order me to do that.  And obviously, if you do, we'll abide by

18   whatever the Court says.  And here's one of the reasons that a

19   lot of these exhibits were filed with our opposition to the

20   motion to compel.

21        I didn't attend the hearing on the third party deposition.

22   I imposed on one of my partners to come up.  But he explained to

23   me that Your Honor was concerned, and I think it's a valid

24   concern, about the fact that Ms. Cain's real name was used in

25   Oklahoma, and I was concerned that the Court might be inclined to

1    give some false credence to using the real name of Ms. Cain and

2    using the real name of Zoey Ellis.  Ms. Cain's real name is

3    readily available.  The search term on the copyright register

4    that we used was not her real name, but it was, you know, Addison

5    Cain, and what comes up on the publicly available Internet

6    copyright register when you search for Addison Cain is Rachelle

7    Soto, and then there are hundreds, if not more than hundreds, of

8    photographs on her.

9         I did a search this morning for her latest book, and I

10   found a Website selling Addison Cain's latest book -- Addison

11   Cain never ceases to amaze -- author, Rachelle Soto.  And Zoey is

12   in a far different situation.  This is not her life's work.

13   She's a school teacher.  And revealing her actual name could have

14   serious repercussions.  One of the attachments that we provided

15   to the Court is an exchange between Addison Cain and one of her

16   fans.  And the fan says, I have to know, do all your friends and

17   family know you {indiscernible}?  Her response is, Yes, I'm 100

18   percent out and I'm proud.  And that's good, that's fine, that's

19   wonderful, but that's not Zoey Ellis; Zoey Ellis is

20   extraordinarily protective of her real identity.  So that's why

21   all of that information is there, to throw out the absence of a

22   false equivalence between two circumstances.

23        Now, do they need her real name?  Well, their initial

24   disclosures, I cannot -- because this is a client confidence; I

25   haven't been ordered to disclose it yet -- I cannot confirm this

1    is true, but their initial disclosures say that Zoey Ellis is

2    Zuri Thompson, who is the sole owner, sole director of Quill,

3    Inc.  That's the basis.  And I don't see how our identifying her

4    and making her self-identify her or making Quill, Inc. identify

5    her either adds to or detracts from Ms. Cain's ability to get

6    information from her.

7         Now, one of the claims that we tried to press that has

8    been dismissed and has been dismissed twice now, is that the

9    defamatory statements against Zoey are something that Quill, Inc.

10   has an interest in and can indicate by its information claim.

11   The Court disagreed with us, disagreed with us twice, because the

12   party here is Quill Inc.; the party is not Zoey Ellis.  And

13   that's right, she's never been a party, she's never attempted to

14   be a party, and that makes us different than the Oklahoma case.

15   We are, of course -- the Court said I want people named by their

16   real names, and she decided that it was so important to her that

17   she would even not be a party in this case.  But do they have the

18   ability to depose this person?  Sure.  They think they know who

19   she is.  They, in fact, said that that was something that was

20   disclosed somehow inadvertently, although I haven't found it in

21   the Oklahoma case.  I haven't received all of the pleadings in

22   the Oklahoma case; I wasn't involved in Oklahoma.

23         Is there a good reason for her to keep her name private?

24   Yes.  Is there a good reason for her to have her name disclosed?

25   No.  Although, as they say, I can't disclose it, because I've

1  been told it's a client confidence, unless, of course, the Court

2  orders me to do so, in which case we would, subject to the highly

3  confidential designation, attorneys' eyes only type of --

4      THE COURT:  Mr. Bredehoft, let me interrupt you for a

5  moment.  And I think I understand your argument.  Is there any

6  case law that you can point to that supports the notion that a

7  person who desires to maintain privacy while engaging in

8  litigation gives rise to the ability to withhold otherwise

9  discoverable information?  I understand your relevance argument.

10  I'm just asking whether or not your description of the efforts to

11  {indiscernible} you what legal significance they have in making a

12  discovery determination as to whether or not she should be

13  required to provide that information.

14      MR. BREDEHOFT:  I don't have any information with regard

15  to a person who is engaging in litigation on their own behalf,

16  but the Court, in dismissing twice all of the state law claims,

17  made crystal clear that this is not her engaging in litigation,

18  and that Quill has no right to recover based on torts that may

19  have been committed against her.

20      Other than that, I would say -- and I don't have a case on

21  it.  I looked for cases on it.  But other than that, I would say

22  it's a flat out Rule 26(c) issue.  Will disclosure of her name

23  subject her to embarrassment?

24      THE COURT:  And that is based on -- and correct me if I'm

25  wrong, that is based on an articulated concern that disclosing

1   that name means that her name will be somehow available and

2   she'll be subject to scorn or attacks or in some way, because

3   even if produced within the context of this litigation subject to

4   a protective order, that that information will be available to

5   the general public or to readers who are interested in the

6   subject matter; is that correct?

7       MR. BREDEHOFT:  She is extremely concerned about that.

8   Quill, Inc. is extremely concerned about that.  Zoey Ellis

9   herself assures me she'll be fired from her job if anyone at her

10   school finds out that she writes this type of material, and

11   that's our argument, Your Honor.

12       THE COURT:  Thank you.  Do you want to respond to that

13   now, Mr. Reilly, before we address the other issues?

14       MR. REILLY:  Certainly, Your Honor.  This is just a Rule

15   26(c) question.  The *Bernard* case, we cited that to the Court in

16   the papers we filed yesterday.  You have to weigh whether our

17   need for discovery outweighs the need that Mr. Bredehoft has

18   articulated for a limitation on our right to take discovery from

19   not a witness, the witness in the case, Zoey Ellis.  We have a

20   good guess -- this is not a guessing game, Your Honor.  If I were

21   to serve a deposition notice on Quill through Mr. Bredehoft, just

22   a final Rule 30(a)(1) deposition notice on Mr. Bredehoft for Zoey

23   Ellis, as he suggested in his opposition, would she appear in my

24   office for a deposition?  I can answer that question no.  I would

25   get a letter back from Mr. Bredehoft who would say, No, she's

1    in England, you have to serve her through the Hague, you have to

2    go over there and depose her, we're not going to do it by video

3    because that would be intrusive on her life and disrupt her

4    school schedule, and so we're not going to do it that way.  And

5    instead, instead of offering us Zoey Ellis for deposition who we

6    now can't get because I can't serve process on a pseudonym, he

7    says, We'll give you a corporate representative.  And I know they

8    did this in Oklahoma, too.  They didn't give us -- give the

9    Oklahoma litigants Zuri Thompson or any other person who worked

10   at Quill, whether there are any or not, or Zoey Ellis.  They used

11   their expert witness deputized as a 30(b)(6) and said she'll give

12   you the answers because we've told her the answers to the

13   questions you're likely to ask her.  We shouldn't be doing that,

14   Your Honor.  We should know this woman's identity so we can

15   either serve process on her or, unless Mr. Bredehoft is prepared

16   right now to tell you that, yes, she will appear for a deposition

17   in the United States on Rule 30(a)(1) notice served on Quill,

18   because she is their principal office -- author, therefore a

19   managing agent, and under our local rules she would be required

20   to come here for a deposition because her company filed the

21   lawsuit here and that implicates her rights.  Unless he's willing

22   to make that stipulation, I think you should compel the identity

23   of her.  We can keep it highly confidential.  It would be known

24   by counsel.  We could take other steps to ensure that it's not

25   told to the public.  There's no false equivalency here.  I'm not

1    trying to learn her name so we can dox her, out her the way they

2    doxed and outed Ms. Soto, including Ms. Soto's photographs, which

3    was all posted on the Internet under the --

4         THE COURT:  Let me stop you there, Mr. Reilly.  And I

5    didn't mean to interrupt Mr. Bredehoft, but we're going to talk

6    about the other motion after we finish this motion, so let's not

7    conflate the argument.  I understand your position.

8         I'm also not going to put Mr. Bredehoft on the spot to ask

9    him to commit to something that is not before the Court right now

10   anyhow, that's not appropriate, but I understand your position,

11   which is that you make an argument that the identity of Zoey

12   Ellis is relevant to your defense of these claims and to your

13   counterclaims and that there is no legal impediment or

14   justification for withholding her identification, and I asked

15   Mr. Bredehoft if he can identify any case law to support that

16   position; he cannot.  He is relying on Rule 26.  And I understand

17   that Ms. Ellis would prefer to be able to continue to litigate

18   this matter just as she chose to take that route in Oklahoma when

19   she was initially a plaintiff and then withdrew rather than

20   revealing her name.

21        I am going to rule on this now and require that Zoey Ellis

22   and her identity be disclosed.  I do not find there's a valid

23   basis under Rule 26, and I do not find there's any case law to

24   protect or withhold it.  I certainly understand and it is often

25   the case that litigants are very sensitive to matters which they

1   don't want other people in their community, other family members

2   to be aware of.  It's also true that that runs directly into and

3   in intention with the fact that the fact that if you choose to

4   come to court or if you're involved in a court proceeding, both

5   sides have to be able to collect sufficient information to

6   adequately defend or prosecute their claim, and here Mr. Reilly

7   and his client are entitled to get that information.

8         I am not going to assume that they are doing this in bad

9   faith.  There is no evidence to suggest that that is the case

10  before the Court.  And, as might be in the pleadings, they have

11  agreed to place her identity under the protective order and not

12  to share it outside of this litigation.  Of course, however this

13  litigation proceeds, that issue may have to be revisited,

14  depending on whether there's a trial or who's testifying, but for

15  purposes of discovery, they're entitled to that information, and

16  Ms. Ellis can be assured that the Court is requiring that that

17  information not be shared outside of the litigation.

18        So that issue is resolved, not only with regard to the

19  interrogatories that have to do with the identification of Zoey

20  Ellis, but, of course, any documents that have been requested

21  that reflect a communication between Zoey Ellis and Quill Books

22  or any documents between Zoey Ellis and any of the other

23  potential witnesses that would bear on the claim in this case

24  that you have under the Digital Millennium Copyright Act or the

25  counterclaims.        Is that ruling clear with regard to that

1    category or constellation of issues involving the true identity

2    of Zoey Ellis?

3          MR. BREDEHOFT:  Yes, I believe it is, Your Honor.

4          MR. REILLY:  It's clear from our perspective as well, Your

5    Honor.  Thank you.

6          THE COURT:  Thank you.  Then we've resolved one issue.

7    The next issue on my list is the 26(a)(1) list of potential

8    witnesses.  As I understand it and having reviewed it, it appears

9    to be 70 individuals.  The defendant has objected to the way in

10   which this information has been produced.

11         I have reviewed the information, and it appears to be

12   almost entirely boilerplate language describing the information

13   that each of these 70 witnesses has.  It is not true for all 70,

14   but I would say the overwhelming majority of them have the same

15   102 sentences, which really are entirely generic.  Simply saying

16   that they may possess information that's relevant to the claims,

17   without specifying what their knowledge is, how they obtained it,

18   whether they are likely to be used as a witness by the plaintiff.

19   And so the question is whether or not it's appropriate to provide

20   essentially large lists when the point, of course, of 26(a)(1)

21   disclosures is to identify those witnesses most likely to have

22   relevant information so that both sides can adequately prepare by

23   directing written discovery or selecting for deposition a limited

24   number of those people.

25         So, Mr. Reilly, I think I summarized your argument, but if

1   you have anything to add, you may do so, but my question is

2   really to Mr. Bredehoft as to whether or not he believes this is

3   an adequate way to read his obligations under 26(a)(1).

4        MR. BREDEHOFT:  I believe it's not only adequate, but

5   required, although there are consequences for doing it this way.

6   Many of the individuals who are listed there are people that we

7   believe have some knowledge of either the claim or the

8   counterclaim because they appear in online social media

9   commenting on the case, supporting my client, supporting the

10  family.

11       I thought we had actually resolved this issue prior to the

12  filing of the memorandum because our initial disclosures looked

13  exactly the same with one exception of the name.  And what we

14  said, and I thought that it was acceptable, is we have what you

15  have; if we find out more, we'll give it to you; and if we don't

16  find out more, we realize that we're not going to be able to call

17  those witnesses.  But it would be irresponsible not to -- people

18  who have made social media statements on the case or on the issue

19  of plagiarism or on the issue of the appropriateness of the DMCA.

20  There's been a lot of online commentary here.  We don't know who

21  most of those people are, but they're individuals with knowledge

22  about the facts of the case.  Unless we come up with their actual

23  names, their addresses, information sufficient to serve process

24  upon them and a better description of what they know, we fully

25  realize we will never be able to get them in as witnesses, and

1    that's the whole purpose of Rule 37(c).

2         THE COURT:  And how is it possible that you listed those

3    70 individuals which might include various fans of this genre of

4    literature who are located in all different parts of the world

5    and they're simply posting comments, but you left off Zoey

6    Thompson who is the single shareholder or owner of the plaintiff

7    itself?

8         MR. BREDEHOFT:  Stupid error, and it was also a stupid

9    error, as Mr. Reilly pointed out, that we also left out Quill,

10   Inc.'s outside counsel who is, in fact, the very basis of the

11   counterclaim.  But the interrogatories themselves were signed and

12   certified by Zuri Thompson who said in her certification, I have

13   knowledge of the information contained in the interrogatories.

14   Should she also be on the witness list?  Yeah, but --

15        THE COURT:  But let me ask you this:  Of the 70 people

16   that you've listed, if you identify 60 or 65 of them as simply

17   people on the Internet who have made a comment about the subject

18   matter that is at issue in this litigation, are there five or ten

19   who are actual witnesses with knowledge that you have

20   interviewed, spoken to, and intend to call as witnesses in this

21   case?

22        MR. BREDEHOFT:  Yes.

23        THE COURT:  Have you identified those five or ten

24   specifically so that Mr. Reilly knows who those people are as

25   opposed to the woman living in Peoria, Illinois who read one of

1    these books and decided she had a strong view that she wanted to

2    share with the world?

3         MR. BREDEHOFT:  Well, no, and that's a different question,

4    Your Honor.  And I'm sure if I ask Mr. Reilly, give me a list of

5    witnesses you're going to call, I think that's an

6    objectionable --

7         THE COURT:  Well, no, let me stop you there,

8    Mr. Bredehoft.  My question is quite specific.  I began by

9    saying, I've looked at your 26(a)(1) list and it's cut and paste

10   with regard to the vast majority of people.  26(a)(1) requires an

11   identification of witnesses, information regarding their contact

12   information, if you have it, and then why they are relevant to

13   the case.

14        So, with regard to those five or ten witnesses that you

15   may or may not call or rely upon at trial, presumably you would

16   not be cutting and pasting the same totally generic information

17   as you would to describe the woman in Peoria, Illinois who simply

18   read something on a blog.

19        MR. BREDEHOFT:  That's right, that's absolutely --

20        THE COURT:  But you have not done that.

21        MR. BREDEHOFT:  Well, I differ, Your Honor, with the view

22   that we haven't done that.  There are several witnesses -- and

23   I'm looking through our interrogatory responses now -- who are

24   identified with more detail.  I think the boilerplate is correct

25   for the first six witnesses.  And with respect to the folks that

```
1   then follow, they are the witnesses who received the DMCA

2   takedown notice.  And it's not until Page 7 of Document 44-3,

3   which is our Exhibit 7, that we start looking at individuals that

4   we really don't know and we really have not interviewed, and

5   there you're getting more and more generic, although there are

6   individuals such as Golden Angel who is identified on Page 5

7   where it identifies her as having knowledge of a particular blog

8   post that's extensively quoted by Ms. Cain.  Ms. Busse shares

9   information given to her by Ms. Cain.  Ms. Busse shares screen

10  shots, conversations, documents.  The witness above that,

11  Jennifer Benye, is essentially saying -- those are not just the

12  boilerplate.  The boilerplate gets in where we're listing people

13  who commented on this, and {indiscernible} happens to everybody.

14         THE COURT:  I think I've gotten enough.  Mr. Reilly, what

15  is it that you're asking the Court for given Mr. Bredehoft

16  correcting the failure to include Zuri Thompson on there and now

17  describing the first several pages as being the witnesses who

18  have potential specific knowledge and then the remaining list as

19  being people that have simply been identified from comments?

20  What is it that you're looking for that you believe you're

21  entitled to that you do not have from that 26(a)(1) list in light

22  of Mr. Bredehoft's representations?

23         MR. REILLY:  We identified two of them, which is Zoey

24  Thompson, what is her state of knowledge, and Ms. Coale and what

25  is her state of knowledge.
```

```
 1        Now, for Zuri Thompson, to say she knows everything may or

 2   may not be correct.  She signed the interrogatories representing

 3   that the company, including two of the assistants of counsel,

 4   verifies that the answers are correct and complete.  We need to

 5   know her state of knowledge and what things she would be counting

 6   on because they otherwise haven't excluded her.  But I think for

 7   the witnesses who they really think boils down to the five or ten

 8   who are important, we should have individualized specifications

 9   of their knowledge rather than a generic statement plus a

10   sentence.  I mean, they can't use the same generic statement and

11   then add a sentence, this person made multiple blog posts and

12   that's all.

13        So, if they wanted to have 70 people, they can describe in

14   detail 70 people with knowledge, and they can say that, for

15   example, Loki Renard from Angora, New Zealand doesn't just have

16   knowledge of the claims, the defense's issues,

17   blah-blah-blah-blah-blah-blah-blah, but made a post on March

18   17th, 2016 regarding whatever.  If they think they have that

19   level of knowledge as reasons to include these witnesses, they

20   should write it out; otherwise, they should leave them off, and

21   that's our position.  Point your Honor to an answer verifying

22   what knowledge people have, if they have it, or verifying exactly

23   why they think they're listed here, which would be, for example,

24   they made a blog posting {indiscernible}.

25        MR. BREDEHOFT:  Your Honor, I'm sorry, I don't disagree,
```

```
1    but the Loki Bernard is a bad example because that one does say
2    "made multiple posts regarding such knowledge."  If the
3    interrogatory had been, Tell us who you think has -- who the most
4    important people are, that would have been different, but the
5    interrogatory was, the answer in good faith, was to identify each
6    person with any knowledge of any of the allegations complained of
7    anywhere in the amended complaint or the answer or the
8    counterclaim.
9         THE COURT:  Mr. Bredehoft, I'm going to stop you there.
10        MR. BREDEHOFT:  Okay.
11        THE COURT:  This is the type of hyperlegalistic argument
12   that I don't see that often, and, frankly, I'm surprised to be
13   seeing from you in a case with two very distinguished, very
14   experienced lawyers.  That's just gamesmanship.  That's all it
15   is.  And if you felt like the interrogatory was overly broad
16   because it said "any" and "every" and used words like that, as
17   opposed to a phrase like "most importantly," which, frankly, I'm
18   sure Mr. Reilly would immediately say, the last thing I want to
19   do is use words like "most important" and then discover that your
20   definition or interpretation of "most important" does not comport
21   with his, and therefore we have a motion to compel due to a
22   dispute about the vagueness of the words "most important".
23        It simply is not the kind of lawyering that this Court
24   sees and expects, and I'm surprised.  I am going to grant the
25   motion with regard to the 70 witnesses, and I'm going to require
```

```
 1   supplementation consistent with the local rules and the federal
 2   rules and 26(a)(1).  And you mentioned Mr. Loki Renard who was
 3   picked by Mr. Reilly as an example, and it said, "Made multiple
 4   posts regarding such knowledge," but that provides no detail as
 5   to when those posts were made or what they might have to do with.
 6   So, to try and determine whether or not Mr. Renard and you
 7   possess any information that's actually worth pursuing or that
 8   you might be relying upon, it's not possible to glean that from
 9   your answer.
10        So, to the extent that you're identifying the entire
11   universe of people that you've come across who may have knowledge
12   about this case and a single blog post from New Zealand on March
13   3rd, 2018, then put it in there.  It's one sentence and it allows
14   both sides to understand whether this is a marginal person or
15   whether this is a personal who has significant information.  And
16   I don't think that it should have required the Court to explain
17   that.  It's a disservice to your client and to the litigation
18   process to have an argument like that.
19        So, I'm going to require that you supplement.  And with
20   regard to witnesses that you may be relying upon, you have to
21   give enough information so that the other side understands why
22   they are important witnesses.  If they are people that, out of an
23   abundance of caution, you believe may have some information
24   because they read something and decided to react to it like
25   people do in the Style section of the *Washington Post* comment
```

1    section, then make it clear that that's what their level of

2    knowledge is.  Is my ruling clear?

3          MR. BREDEHOFT:  It's not only clear, Your Honor, it's a

4    fair reading.  I just wish to say it was not gamesmanship.  I am

5    working with clients in London.  I am working with counsel in

6    Oklahoma.  I am working with a lawyer in Texas.  I'm asking them

7    these questions, and they're sending me the answers.  I was

8    {indiscernible} with --

9          THE COURT:  I appreciate that, and I understand, but that

10   is correct, you are the one coming to court.  You know what this

11   Court expects.  It may be that there are different expectations

12   or understandings in England or in Oklahoma or elsewhere, but

13   part of your job as counsel is to press upon them the consequence

14   of not fully understanding what the rules require and what this

15   Court in particular requires.

16         MR. BREDEHOFT:  I understand completely, Your Honor.

17         THE COURT:  Mr. Reilly, is there anything else I need to

18   address with respect to the 70 witnesses identified under

19   26(a)(1)?

20         MR. REILLY:  No, Your Honor.  Thank you.

21         THE COURT:  Thank you.  That resolves that issue.  Perhaps

22   we can move more quickly through the concern about Rule 33(b) and

23   the fact that, at least when the motion was filed, defendant

24   believed that there was no adequate coordination of identifying

25   documents in lieu of interrogatory answers that specifically, as

1   I understand it, identified Bates numbers and matched them up

2   with what was responsive to which interrogatory answer.  That's

3   the way I understand the argument.  Let me ask Mr. Reilly if that

4   is the essence of that part of the motion to compel.

5        Mr. Reilly, is that correct?

6        MR. REILLY:  Yes, Your Honor, it is.  I'm getting a visual

7   that my Internet connection is unstable, and your question got

8   interrupted by that series of interruptions, but, yes, you

9   summarized that, yes, sir.

10       THE COURT:  Mr. Bredehoft, I don't want to really even

11  hear an explanation of why it was not done originally, but unless

12  you have something compelling that causes me to misunderstand the

13  objection, it is a fundamental requirement, if you are going to

14  invoke 33(b), that you specifically identify the documents

15  clearly and by Bates number and coordinate that with the

16  interrogatory responses so that a receiving party doesn't have to

17  guess which documents are responsive to which requests.

18       So, if that has not been done, and I understand based on

19  the motion that it has not, it must be done immediately.  Is

20  there anything that you wish to say to impact my ruling?

21       MR. BREDEHOFT:  I agree with your ruling.  We have done

22  that in our responsive brief to the extent that we have been able

23  to do so.  I understand -- and by category, by interrogatory, by

24  Bates number.  If there are other --

25       THE COURT:  If it's been done, then you've met that

1    requirement.  I'll deal with the timing of this.  So if it's

2    inadequate, I'm going to give you a limited period of time to fix

3    it.  If you've begun that process, good, but I am granting the

4    motion in this regard.

5         I also want to be very clear that if there are

6    interrogatories in which you are producing documents, you also

7    must specify if no such documents exist.

8         Again, so the receiving party is not guessing as to

9    whether or not they've missed it.  There's an affirmative

10   statement that documents 1 through 20 are responsive to

11   interrogatory 3.  With regard to interrogatory 5, there are no

12   such documents that are responsive to this data board.  That way

13   there is no question.  Obviously, if there is an answer that can

14   be provided but there are no documents, the answer must be

15   provided.  33(d) is a way of avoiding providing a narrative

16   answer because the documents speak for themselves.  If no such

17   document exists, you must specify that it doesn't exist and then

18   answer the question as best you can, even if that answer is,

19   "There is no information to respond to this interrogatory," and

20   then you must live with the consequences of not being able to

21   answer that interrogatory.

22        MR. BREDEHOFT:  Understood and agreed 100 percent, Your

23   Honor.

24        THE COURT:  Thank you.  Mr. Reilly, is there anything else

25   that I need to do to address that issue?

 1       MR. REILLY:  No, Your Honor.  Thank you very much.

 2       THE COURT:  Based on my notes, that addresses the universe

 3   of problems that have not been resolved with regard to the

 4   interrogatories.  Let me take this opportunity to specify any

 5   area of interrogatories that I have not ruled on or addressed

 6   through my rulings so far.

 7       MR. REILLY:  There are a couple which I think illuminate

 8   the problem that we still have, notwithstanding the requirement

 9   that they make a proper Rule 33(d) response and provide a

10   narrative answer.  For example, in response to interrogatory

11   number 4, we were asking which book sales were interrupted by the

12   DMCA notices.  We wanted to know whether it was all books Quill

13   publishes, all Zoey Ellis's books that Quill publishes, or only

14   the Zoey Ellis trilogy that was a target of the DMCA notices.

15       In their opposition at 15 to 16 on interrogatory number 3,

16   they said, "Paynes' demand for additional documentation or

17   information regarding other authors published by Quill is

18   unnecessary as Quill has never stated it was seeking recovery for

19   other authors' works or that other authors' works were negatively

20   impacted."  I felt very confident that that cabined the issue for

21   us in this case, and there is an opposition at Page 17 discussing

22   their response to interrogatory number 12 which also pertains to

23   some of the damages information, that say this:  "The harm to

24   Quill goes beyond the interruption of the sales of the three

25   books.  Quill would have undoubtedly earned more revenues across

```
 1   all of its publications than it actually did had Payne either
 2   filed falsified DMCA takedown notices or continued to publicly
 3   harass Quill and Zoey Ellis."  Which is it?  I think they need to
 4   specify which books, which authors, which dates.  This also is --
 5   the problem we have with their responses on -- the other damages
 6   one, which would be 12 in particular, we asked for this
 7   information because we understand there are multiple online
 8   vendors of these books.  You can go to several different sites to
 9   download a Kindle version of these books, which is principally
10   the way they're sold.  Very few, and I'm talking dozens, a
11   handful, were actually sold as paperback books.  Most of them are
12   online downloads.  There are a couple of principle vendors,
13   Amazon being the biggest one, which never took down any of these
14   books.  And then there is Barnes & Noble, which apparently only
15   sold a few.  Kobo.
16        THE COURT:  Mr. Reilly, let me stop you.  I understand the
17   issue.  What is it specifically you're asking the Court to rule
18   on right now?  I hear that what you want is specific information
19   with regard to how they calculate damages, and you've identified
20   a couple of different ways in which you want answers to help you
21   understand that; one is identifying specific books, and the other
22   is identifying particular ways in which the books are sold; is
23   that correct?
24        MR. REILLY:  Yes, Your Honor.  The information would be
25   the books at issue, whether it's the three or all three --
```

```
1          THE COURT:  Or --

2          MR. REILLY:  So, it would be unit sales per month, per

3     book, per vendor.  We did not get per vendor, we only got per

4     unit, the unit sales per book per month.

5          Now, one of their answers to 12, Your Honor, was, "It's in

6     the expert reports that we served in Oklahoma."  There was no

7     expert on damages in Oklahoma, and there was no expert report on

8     damages in Oklahoma.  They also said, "It's in the document

9     production that we gave you; we gave you the Oklahoma damages

10    report."  It's not there.  In Oklahoma they identify a man named

11    Payne Harrison who they identify in interrogatory number 2 as one

12    of their experts.  They identify him in Oklahoma as a Rule

13    30(b)(6) witness.  He doesn't work for them.  He never worked for

14    them.  He simply -- they could have plucked him out of a phone

15    book.  He never testified.  He never gave any damages.

16         THE COURT:  Mr. Reilly, I understand, and I understand

17    this issue, but I need you to remain focused on what you're

18    asking the Court to rule on here.  I'm about to turn to

19    Mr. Bredehoft.  I think I understand.  I'm going to give you one

20    final chance, if there's anything else that you need to

21    articulate.

22         MR. REILLY:  We do need more detailed information per

23    book, per vendor, per month.

24         THE COURT:  Mr. Bredehoft, is there some objection -- I

25    would guess that there isn't -- in providing specific, detailed
```

1     information to allow them to understand how you're calculating

2     damages here?

3          MR. BREDEHOFT:  It would be very much appreciated by me

4     personally, Your Honor, if you would order us to provide that.

5          THE COURT:  Very good.  I am granting the motion

6     specifically with regard to the interrogatory that goes directly

7     to damages.  I am requiring that the plaintiff provide

8     information about the specific books that are identified as the

9     basis for damages, which books they are, who the authors are, the

10    number of units sold per month and by vendor.  So it is the

11    books, the authors of those books, the numbers sold broken out by

12    month and sold in whatever form, by vendor, whether it's through

13    Amazon, whether it's Kindle, whether it's hardback.  That way

14    both sides understand what it is that the plaintiff is claiming

15    was lost here, and we can go from there.

16         There's nothing before me right now about expert

17    witnesses.  I understand that Mr. Reilly is sharing that

18    information simply to provide context as to what his level of

19    confusion is here.  As I understand it, the date for disclosing

20    experts has passed and no expert reports were disclosed.  Is that

21    correct?

22         MR. REILLY:  One expert report was provided with the

23    initial complaint, and that person was identified as an expert in

24    the interrogatories.  That's what we have so far.

25         THE COURT:  But to answer my question, no expert report

1    was disclosed pursuant to the 16(b) order on April 13th, which I

2    believe was the date {indiscernible}?

3         MR. REILLY:  That is correct, Your Honor.

4         THE COURT:  I'm not ruling, so -- I understand.  Okay.

5    With that ruling, have we addressed the issues that are

6    outstanding in the motion to compel with regard to

7    interrogatories?

8         MR. REILLY:  If I could, just one more category, Your

9    Honor, and it covers exhibit -- interrogatories 8 and 9 --

10   actually two more -- and 13 and 14.  They claimed $250,000 in

11   damages, injury to their reputation because vendors will not deal

12   with them anymore because of these DMCA notices.  We asked them

13   to identify those vendors and to produce all the documents that

14   they deny, asked them for further information about the refusal

15   to deal -- that's 13 and 14 -- and the only one they identified

16   was the voice artist.  They produced a couple of documents from

17   the voice artist, but they said that's not relevant and we're not

18   pursuing it on that basis.

19        I need to know whether there is other -- there are other

20   vendors who have refused to deal with them specifically because

21   of the DMCA notices which they claim are wrongful and any

22   documents that they have about that.  They claim numerous

23   vendors, but they only identified the one voice artist, and they

24   --

25        THE COURT:  That's fine.  I understand.  And what I'm

1    going to do is I'm going to specify, just as I required under the

2    33(d) issue, that you identify specifically if there is no

3    further information or if this is the entire universe of

4    information with regard to 8, 9, 13 and 14 regarding injury to

5    reputation and vendors or others who have refused to deal with

6    Quill because of the DMCA.  If there is nothing else, you must

7    simply specify in your supplemental interrogatories that that is

8    the entire universe of information that is responsive to 8, 9, 13

9    and 14.  Is that clear?

10         MR. BREDEHOFT:  It's clear, Your Honor, and again, I would

11   appreciate an order to that effect.

12         THE COURT:  Thank you.

13         MR. REILLY:  And also, Your Honor, and I won't belabor the

14   point, but if we could get supplemental answers conforming with

15   your orders and rulings today with respect to all the other

16   ones -- this would be 11, 15 and 18 and 17, because they answered

17   that by saying, "Look at the expert report," and then there was

18   no expert report from Okla --

19         THE COURT:  I understand, I understand, and I'm making

20   this ruling with regard to all interrogatories.  Supplement them

21   within seven days.  Specify whether there is nothing else there,

22   whether there's additional information, or whether or not what

23   has already been provided is the total universe of information on

24   an interrogatory-by-interrogatory basis.

25         You also, Mr. Reilly, I believe eviscerated my original

1    plan to not go through these interrogatory-by-interrogatory.

2        MR. REILLY:  My apologies, Your Honor.  I'll know better

3    next time.

4        THE COURT:  Well, I don't know.  Maybe I'll know better

5    not to try to shortcut the discussion.

6        With regard to the request for production of documents, I

7    suppose in deference to my failed attempt to streamline this, if

8    you want to, Mr. Reilly, identify them number-by-number, you can,

9    or we can go down the categories as I have made my list.

10       MR. REILLY:  Your Honor, with respect to the document

11   production, our first point would be we had specified a

12   searchable format so that they would not have to make a Rule 34

13   response that said the documents responsive to number 1 are 1, 2,

14   3; documents number 2 are 3, 4, 5, that sort of a response, which

15   they didn't make anyway.  They didn't produce it as it's kept in

16   the ordinary course of business; they produced four compressed

17   PDF files.  They jumbled together everything they could find.

18       We had asked them to, and they said they were going to

19   reproduce their production, to the extent feasible, and I'll come

20   back to that in a second, as single-paged zip files with

21   concordance merged files.  Fine.

22       The other portion of the document production that they

23   made was sending back to us the documents that Ms. Soto produced

24   to them pursuant to the subpoena and some documents produced by

25   Blushing Books in Oklahoma, but not all of them, it appears.

1      So, I'm betwixt and between because I couldn't search

2  effectively and make determinations that I had those documents

3  produced for all the document requests that we made.  Nor was I

4  provided with any guidepost that responds to what was served.

5      So, it's more of a -- they just gave us prior documents

6  and said it's in there somewhere.

7      THE COURT:  I understand.  Mr. Bredehoft, is there any

8  argument you wish to make as to why the plaintiff should not be

9  required to produce the documents in conformity with the ESI

10  protocol that was agreed to and adopted by the Court, which would

11  require them being produced in a searchable format and in the

12  normal course that they were kept?  And it appears that they were

13  produced in a manner that was not consistent with the 16(b)

14  order.  Am I misunderstanding the situation?

15      MR. BREDEHOFT:  For the documents that were produced back

16  to the defendant, they were produced as what we have.  With

17  respect to documents that were produced to us in Oklahoma that

18  were not produced here, I have not heard that before, and I will

19  get to the bottom of it before I go to bed tonight.

20      With respect to the searchable format, we have given them

21  in the format in which they were kept.  Some are screen shots,

22  some are printouts.  That's what we have.  I have again tasked

23  folks to convert them into TIFF formats with the expectation that

24  they would have been produced that way when our brief was due.

25  That has not occurred.  I have been told, though I cannot tell

1   the Court -- I think this has something to do with the reduction

2   in personnel due to the Corona virus.  It should have been done

3   before that.  We are committed to producing everything in a TIFF

4   format.  I had been told it would have been finished by now.  It

5   isn't.  I appreciate the Court ordering us to produce it in that

6   format within seven days.

7        THE COURT:  Well, I will, and of course it is appropriate

8   to require that it be produced in the format that the parties

9   agreed to and the Court adopted.  It should not require the

10  defendant to have to ask for something that was already agreed

11  to.  And I do understand and accept the challenges that remote

12  working may make it more difficult for paralegals or others in

13  your office to get this done, but I think, as you recognize, it

14  is not an excuse or justification, and they're going to have to

15  find a way to get it done and produced within seven days.  It's

16  substantially overdue.

17       MR. BREDEHOFT:  There's no excuse or justification, Your

18  Honor, and I'm embarrassed beyond words.

19       THE COURT:  I understand, and I accept your

20  representation.  What I want to be clear on, though, is that

21  whatever the paralegals or those in your IT department are tasked

22  with, it's consistent with the agreement that you reached and was

23  adopted by the Court.

24       So, to the extent there's any confusion over whether it's

25  concordance merged files or TIFFs or whatever it may be, you need

1   to make sure there's been sufficient communication with

2   Mr. Reilly so that you are both on the same page.  I'm not going

3   to do a wholesale revision of whether or not your ESI protocol

4   was the best one that you could have come up with, but whatever

5   it was is what you must be held to.  I don't think, and I'll give

6   you a chance to respond, Mr. Reilly, that if you're returning

7   documents that Ms. Soto provided in the other litigation, that

8   you need to further break them up or scan them or do anything

9   else with them.  They can be given back to Ms. Soto in this

10  litigation just as they were received by your client in the

11  Oklahoma litigation.  I'm not quite sure why that burden should

12  be placed on you, Mr. Reilly.  Do you disagree?

13       MR. REILLY:  No, I agree with that point, Your Honor, and

14  let me make two more.  The documents produced to them in Oklahoma

15  from Blushing Books or the documents that Ms. Soto produced

16  pursuant to their subpoena, we will accept those back in the form

17  in which they were produced.

18       Our production was single-page or single-document PDFs,

19  and we got, instead of compressed PDFs -- but that's less of an

20  issue for us here.

21       Just a point of clarification.  The parties did not

22  present to the Court an ESI protocol for the Court to incorporate

23  in the Rule 16(b).  I will make that clarification, and hasten to

24  make sure that the Court, if the Court considers it important.

25  What happened here is we specified it in our request, they did

1    not object to it, and that under the rules, then, converts it to

2    the form that they must use or provide it in.

3         THE COURT:  I understand.  Was there no -- was there no

4    discussion in the 26(f) report submitted to the Court regarding

5    the ESI?  I understand there was not a separate ESI protocol, and

6    that's not uncommon, but I would say the Court would be remiss if

7    there was no discussion of the format in which discovery would be

8    turned over.  And I don't have it before me.  I could look it up,

9    but that would --

10        MR. REILLY:  I don't think in the level of detail that

11   would have specified, for example, TIFF with concordance files,

12   which is why each side was free to and both sides have served

13   their discovery requests with their preferred format specified in

14   the instruction.

15        THE COURT:  I understand.

16        MR. REILLY:  We agreed.  I don't want to undue that.

17        THE COURT:  Yeah, I'm just looking at the 26(f) report,

18   and it says, "The form in which documents will be produced will

19   be governed by Rule 34(b)(2)(E).  If necessary, the parties will

20   meet and confer and develop a protocol to govern production of

21   ESI."

22        Well -- and that's fine.  That's not inappropriate, and

23   the way in which the documents must be produced must be

24   consistent with the way in which the request was made, unless an

25   objection has been lodged.  That may be a practice point for the

1    future that, in the absence of a separate ESI protocol, it may be

2    prudent to have a little bit more detail about the format in

3    which both sides are going to be producing documents, rather than

4    leaving it to this point, but that's dicta.

5        Okay.  The next subject that I have which is related and,

6    perhaps, relevant, as your IT people addressed, the formatting

7    issue, is redaction.  If there are redactions, you know, there

8    must be a way in which the other side can understand why

9    redactions have been made, and, if they believe they are

10   inappropriate, have a way to challenge them.

11       So, perhaps I'll start with you, Mr. Bredehoft, to explain

12   why there are extensive redactions or redactions that you and

13   Mr. Reilly have not been able to sort out so that he can

14   understand and make sure he is not missing issues and relevant

15   information that would otherwise be required to be disclosed.

16       MR. BREDEHOFT:  I do not disagree with Mr. Reilly.  The

17   materials were provided to us.  The client and the client's

18   outside counsel informed me that the vast majority of the

19   redactions were used to protect the identity of Zoey Ellis, which

20   is now a moot point.

21       I was also informed that a handful of them protected the

22   attorney-client privilege, and I've asked that that be included

23   on the privilege log as it's being prepared by outside counsel

24   for the past two months.

25       THE COURT:  I will require that those redactions be

```
 1    removed.  It is both consistent with my ruling regarding the

 2    identity of Zoey Ellis -- but to the extent there are redactions

 3    for any other purpose, unless they are for attorney-client

 4    privilege, they must be turned over in unredacted form, and

 5    certainly, and I will say this, they must be turned over to you

 6    in an unredacted form so that you can make an independent

 7    judgment as to whether or not there's a basis for doing so.  And

 8    of course, if there is, then they have to be included on the

 9    privilege log.

10          So I'm granting the motion requiring that unredacted

11    versions be provided within seven days, the time to turn over

12    these documents in their newly formatted manner, and we'll get to

13    the attorney-client privilege issue.  But to the extent you

14    review these in unredacted form and conclude there's a valid

15    attorney-client privilege to assert, you may, of course, redact

16    that portion of the documents that you believe must be redacted

17    to protect the privilege, but those redactions must be clearly

18    listed on a privilege log, and we can talk about what goes into

19    that so that Mr. Reilly has an opportunity to properly challenge

20    it.

21          MR. BREDEHOFT:  Thank you for that correction, Your Honor.

22    I appreciate it.

23          THE COURT:  Thank you.  So those are the next two

24    categories, and perhaps we're actually getting to the end of this

25    matter.
```

```
 1          The third category I have is the Zoey Ellis documents.

 2     I've already ruled on that, which is that they must be produced,

 3     and the fourth was the need for a privilege log, and, of course,

 4     Mr. Bredehoft, you've already articulated that you agree that one

 5     needs to be produced.  And I'm going to require that it be

 6     produced by next Friday.  If there's any question about the

 7     format -- there shouldn't be, and let me make clear that they

 8     should be able to identify the author, the recipient, the basis

 9     of the privilege, whether it's attorney-client privilege or

10     whether it's work product, the date, the manner in which it was

11     transmitted, and the content, to the extent they can be revealed,

12     in order to give enough information for Mr. Reilly to determine

13     whether it's a valid privilege or one which he wishes to

14     challenge.

15          Anything else that I need to address, Mr. Bredehoft or

16     Mr. Reilly, with regard to the content of the privilege log?

17          MR. REILLY:  Your Honor, if I may, we had also asked for

18     the documents that they have, communications with Ms. Coale.

19          They said, Well, she's our lawyer.  Fine.  Please produce

20     the retainer agreements, because there's a dispute -- or the

21     engagement agreements, because there's a dispute as to when she

22     became the lawyer and when she began to be able to cloak her

23     communications with them as attorney-client privilege.

24          Now, we're getting differing information from Quill from

25     this motion than we are getting from Ms. Coale and the objections
```

1    that she served on us last night for the Rule 45 subpoena that we

2    served on her.

3          Apparently, she did not become counsel, corporate counsel,

4    whatever that means, to Quill until 20 -- some time in 2018.  So

5    we think we should be getting the documents from her that Quill

6    has with her prior to her engagement.

7          They said, Well, you know, she's a lawyer in Texas, which

8    I think she's a lawyer in Texas who is working with Mr. Bredehoft

9    on preparing this case and also the outside counsel who is

10   preparing the privilege log.  This would be Ms. Coale.

11         If they could produce the engagement agreements she has

12   with Quill, which are not privileged -- we cited that in our

13   papers -- it would at least give us a starting date for when she

14   may have been wearing her lawyer hat in her communications with

15   Quill and allow us to test them, particular items on the

16   privilege log itself.

17         MR. BREDEHOFT:  If I may, Your Honor, I agree with

18   Mr. Reilly 100 percent.  Retainer agreements are not privileged,

19   except in some contingency cases where the contingency language

20   varied based on the {indiscernible} valuation.  It doesn't have

21   anything to do with this.  And I would appreciate the Court

22   ordering the production of the retainer agreements.

23         THE COURT:  I will.  It's an appropriately appropriate

24   request, and it is not privileged.  Let me also be clear.  You

25   know, whether there is outside counsel involved or whether

1    there's local counsel involved, when Ms. Coale may have been

2    retained or when she may not have been retained, the obligation,

3    Mr. Bredehoft, falls on you --

4          MR. BREDEHOFT:  -- I understand, Your Honor --

5          THE COURT:  -- to make sure that the privilege log is

6    accurate and complete.  And so, again, the Court is not going to

7    interfere with your internal relationship with the client or

8    other counsel, but to the extent Ms. Coale was involved in that

9    process and one of the questions is to what extent Ms. Coale's

10   correspondence may be relevant to this litigation and can be

11   protected from being turned over, or, to the contrary, cannot be

12   in good faith and must be turned over, that is a determination

13   that you as lead counsel will have to make after collecting that

14   information and making sure, to the best of your ability, that it

15   is entirely accurate, so that Mr. Reilly can conclude that it has

16   been done correctly and that he has received what he's entitled

17   to, and also that he does not waste his own time or the Court's

18   time in seeking to get documents that aren't privileged.

19         On the other hand, if the privilege has not been

20   appropriately invoked, he needs to have a mechanism for getting

21   the Court to review that.  But in the first instance, that

22   responsibility falls on you, and perhaps we can avoid further

23   discovery litigation about that issue, which is always

24   challenging and messy and, you know, nobody should want.

25         MR. BREDEHOFT:  I understand exactly, Your Honor.  I agree

1   with you.  No one else is responsible.  I'm the person who signed

2   the pleadings.  I hate -- I hate arguing about discovery.  It is

3   a failure of counsel, and I don't do it.

4          THE COURT:  Well --

5          MR. BREDEHOFT:  No, I do --

6          THE COURT:  Well, sometimes we can't avoid it, and it

7   gives us all a job, so --

8          MR. BREDEHOFT:  {Indiscernible}, but I hate when we need

9   the intervention of the Court to resolve.  And I think revealing

10  Zoey's real name is an example of that.  Other parts of this,

11  though, I appreciate your ordering what you've ordered.

12         THE COURT:  Is there anything else that I need to address

13  with regard to this motion to compel?  According to my notes, I

14  have addressed the outstanding substantive issues.  The final

15  issue is whether or not it is appropriate to assess costs and

16  fees in this matter.  But before I get there, is there anything

17  about my ruling that is unclear or that I need to further

18  elaborate on or specify?

19         MR. REILLY:  Not from the defendant's perspective, Your

20  Honor.  Thank you.

21         MR. BREDEHOFT:  Nor from the plaintiff's, Your Honor.

22         THE COURT:  And I will require that the documents and

23  supplementary interrogatories be produced by noon next Friday, so

24  in seven days by noon.

25         You've articulated that you hate discovery disputes.

1    Strong words.  I understand.  I find requests for these very

2    challenging, and this is a Court that is very reluctant to impose

3    fees.  There are often times when good lawyers vigorously

4    representing their clients take different positions.  Somebody

5    loses, somebody wins, and everybody should pay their own fees.

6    In fact, that is generally how I view discovery disputes.

7          This is a frustrating and challenging case because I do

8    find that many of the positions taken here have not been

9    justified pursuant to Rule 37 and that imposing fees and costs is

10   something that the Court may fairly do.

11         I also find that Mr. Reilly's request for a small portion

12   of those fees of $4,000 is generous, because I am sure that he

13   has invested far more time in dealing with this matter.

14         What I'm going to do is hold in abeyance my ruling on the

15   assessment of fees and costs until next Friday, because I believe

16   that should provide an added incentive to fully comply with my

17   rulings today.  I am not saying that I won't impose fees and

18   costs if the interrogatories and document productions aren't

19   fully and completely made, but I'm holding in abeyance my

20   decision.  And I can tell you, and I direct you to tell your

21   client, that failure to comply fully with the Court's ruling

22   today by next Friday will result in the assessment of costs and

23   fees for today's hearing and for any future hearings that are

24   related to this failure to abide by this Court's ruling.

25         So, to the extent that provides an added incentive for

1    complying with discovery, I hope it will serve that purpose.

2         Mr. Reilly, I'll ask you to be patient on not getting a

3    resolution on that matter at this time.

4         MR. REILLY:  Understood, Your Honor.  Thank you.

5         THE COURT:  Thank you.  Now the motion to seal.  I

6    received a consent motion, and when I receive a consent motion I

7    accept the representations that are included in it, and I

8    understood it to not be objected to in placing the requested

9    documents, exhibits, under seal.  And if I'm correct, Mr. Reilly,

10   did I read in your responsive pleading that there was one exhibit

11   that was not referenced; is that correct?

12        MR. REILLY:  Yes.  I failed to include Exhibit F, which

13   also has a photograph of Ms. Soto.  I apologize for that.  We had

14   asked for all, A threw F, to be at least temporarily sealed and

15   that access turned off.  They consented to that but put in the

16   qualification that I felt was {indiscernible} foolish to simply

17   ask for the ones where we have the photographs and the other

18   personal identifying information, and I crossed off one too many

19   on my list and left off Exhibit F.

20        THE COURT:  I understand that, and I'll address that.

21   That's just a housekeeping matter, and I will include Exhibit F

22   for the same reasons that I endorsed the order in the first

23   place, which is that the parties agreed that this information, at

24   least for the time being, should be placed under seal.

25        I am not sure that there's a lot to be gained by further

1    discussion of this matter.  It really reflects what is

2    fundamentally the challenge in this case, which it appears

3    involves a desire to address extrajudicial issues, which is not

4    an appropriate way to engage in litigation.

5         And let me just say, I appreciate that neither counsel

6    before me here today would knowingly do that, I do not believe,

7    but just as I said in other contexts in this hearing, counsel of

8    record are ultimately responsible for the actions of their

9    clients.  There's nothing about the documents submitted that make

10   me think that Ms. Soto has engaged in any inappropriate behavior

11   or that those exhibits reflect any misuse of the litigation

12   process on her part.

13        I am deeply concerned that there may be multiple

14   motivations on the part of plaintiff, not plaintiff's counsel but

15   plaintiff, in encouraging the use and dissemination of

16   information in ways that are not relevant to a litigation or

17   appropriate for the Court to be used in that manner.  I'm going

18   to keep these matters under seal for the time being.  To the

19   extent there's an argument later on that they must be revealed at

20   a trial or at some other stage of litigation, I will deal with

21   that at that time.  So this is not a permanent sealing from now

22   until the end of time, it is simply to remain under seal for

23   purposes of this motion through discovery.

24        I remember well the third party litigation when this issue

25   came up and the fact that this arose in Oklahoma.  And I'm also

1    aware of the argument that was made at that time that some of

2    those documents in Oklahoma were not under seal and were not

3    subject to a protective order and therefore there was nothing

4    illegal or improper about creating a Website and posting them and

5    telling your fan base about this thing that's going on.  It is,

6    nonetheless, deeply troubling.  If there are legal claims that

7    lawyers wish to pursue in the context of the rules of this court,

8    so be it.  If people, though, are trying to use the discovery

9    process or litigation in order to disseminate information over

10   the Internet for the purpose of harassing or abusing or, you

11   know, doing things that apparently are frequently done in other

12   contexts, I can tell you that, at least, you know, this Judge

13   will make a very, very big deal of that and that sanctions are

14   within the power of the Court, and the Court will not hesitate to

15   impose them if it concludes that the courts have been manipulated

16   in inappropriate ways.

17        Is there anything else that I need to address with regard

18   to that issue?

19        MR. BREDEHOFT:  Only this, Your Honor.  Our original

20   consent to the sealing motion was through the Court's disposition

21   of the motion to compel.  The only reason for those materials

22   being put before the Court was, as I indicated earlier, to show

23   that the fact that Ms. Cain's identity became public was not

24   equivalent to Zoey.  The Court's ruled on that.  We have no

25   reason to believe that it's appropriate to keep them on the

1    public file.  It's all stuff on the Internet.  That gives me a

2    bit of a pause {indiscernible} stuff from the Internet, but we

3    consent now to the sealing of documents, including the additional

4    document that Mr. Reilly mentioned.

5          THE COURT:  Thank you.

6          MR. REILLY:  So that will be Exhibits A through F, Your

7    Honor, which I appreciate your including the one I failed to --

8    and then with respect to Exhibit B, they made a point that these

9    objections were made and {indiscernible} were actions of my

10   client, which we argue is hearsay, but in any event, that was

11   offered only for the purposes of this Court's ruling, and it did

12   not feature in this Court's ruling, and I think it can be sealed

13   for good cause because in that objection --

14         THE COURT:  Well, you had another author whose identity

15   was revealed.  I will {indiscernible} grant that motion and seal

16   that information.

17         MR. BREDEHOFT:  Yes.  Your Honor, when we initially

18   consented, Mr. Reilly asked us to consent to a sealing these as

19   well, and we did, and that didn't show up in the motion, but we

20   consented to that.

21         THE COURT:  I understand.

22         MR. BREDEHOFT:  Perhaps, then, it would also be good to

23   seal our interrogatory responses that Mr. Reilly filed as an

24   attachment to his motion because those do provide the names of

25   not only the individuals who responded to the subpoena but also

1    who were known to us, the real names of several individuals.

2    That was filed, as is appropriate, as a motion to compel.  You

3    file the other side's discovery responses, but that was otherwise

4    not on the public record, and perhaps filing [sic] those

5    discovery responses might also be appropriate.

6         THE COURT:  Well, why don't the two of you submit a

7    consent motion or consent order that specifically identifies the

8    portions, without going into a wholesale sealing of everything.

9    I would rather that you specifically identify or even substitute

10   with redactions so that we can have as much transparency as

11   possible, but seal those things which really the public does not

12   need to have access to and there are valid --

13        MR. BREDEHOFT:  We will do that, Your Honor.  It's four

14   pages, and we'll get that done.

15        THE COURT:  That's fine.

16        MR. REILLY:  That sounds like a practical solution, Your

17   Honor, and we'll work with Mr. Bredehoft to get that done

18   promptly.

19        THE COURT:  Thank you.  It's my intention to issue a

20   simple order that grants the motion for the reasons stated in

21   open court.  I'm always hesitant, especially with something with

22   this many parts, to try to list all of the different rulings I

23   have made and potentially have a disconnect between what I said

24   here during the hearing and what I put into my written order, so

25   I hope that my rulings are clear and that a motion -- an order

1   granting the motion for the reasons stated, with all of the

2   limitations and caveats that we have discussed, gives you all

3   enough guidance; otherwise, it creates a different set of

4   problems at my expense.

5        MR. BREDEHOFT:  The Court has been very clear.  I have

6   taken notes.  I will send a précis of what I believe the Court

7   has ruled to Mr. Reilly by Monday morning.  He can add the things

8   that I forgot because I inevitably will have forgot something.

9        THE COURT:  Thank you.  Let me end this by saying, you

10  know, now more than ever, given the challenges that we face, I

11  think it is worthwhile, even for lawyers who make their living in

12  litigation which requires some degree of disagreement, to think

13  carefully about how they represent their clients' interests most

14  effectively, and clearly there's a lot of bad blood here, but I

15  have certainly spent a lot of time reading these pleadings asking

16  myself, why are these litigants investing so much effort in this

17  litigation?  Surely there could be a better way to resolve these

18  differences and move forward.  I'm not an expert in this area of

19  literature, but I would guess that there is enough room for

20  everybody in the world for people who are interested in reading

21  this material, and it just strikes me that multiple court cases

22  involving parties in different parts of the world simply is not

23  the best way to pursue either the creative or business goals of

24  the parties here.

25       So, to the extent that you're engaged in any settlement

1    discussions, I encourage you to continue.  If you believe that

2    the court can somehow be of assistance, we can certainly talk

3    about that and set up a time for a video settlement conference or

4    telephone conference, and I'm happy to do it, but I encourage you

5    to think seriously about that, given the history of this case and

6    the amount of time we've had to devote to this today.

7         MR. BREDEHOFT:  We appreciate that, Your Honor.  We thank

8    you for your time, and we hope, and I'm sure Mr. Reilly joins

9    with this hope because we both read all six of the books, we hope

10   you never become fully conversed in this degree of literature.

11        THE COURT:  Well, no judgments about the content of the

12   literature.  I hope that you all stay safe and healthy.  I have

13   found this process of using Zoom today to be very effective.

14   Although I always prefer to be in the courtroom, I have been able

15   to see and hear you and follow the discussions very well, and I

16   hope that that has been your experience, too.  These are amongst

17   the first Zoom oral arguments we've had on civil matters.  So,

18   you know, certainly provide any feedback that you think is

19   appropriate as we go forward since it may be some time that we'll

20   be using some version of this.

21        MR. REILLY:  Your Honor, I think this worked out very

22   well, and I really do appreciate your staff having done a trial

23   run with us this morning to eliminate the bugs so that

24   Mr. Bredehoft and I could both smoothly make a presentation to

25   the Court for your consideration and rulings.  So thank you.

1        THE COURT:  Thank you, and I'm grateful to them as well.

2   They did a great job.  I'll talk to you all soon.  Have a good

3   weekend.

4        (Proceedings adjourned at 2:25 p.m.)

5                    **C E R T I F I C A T E**

6

7                    I, Scott L. Wallace, RDR-CRR, certify that
            the foregoing is a correct transcript from the FTR
8           recorded proceedings held in the above-entitled matter.

9

10      /s/ Scott L. Wallace                5/11/20
        ----------------------------        ----------------
11      **Scott L. Wallace, RDR, CRR               Date**
           **Official Court Reporter**

12

13

14

15

16

17

18

19

20

21

22

23

24

25