UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| QUILL INK BOOKS LIMITED,<br>*Plaintiff*,<br><br>v.<br><br>RACHELLE SOTO *aka* Addison Cain,<br>*Defendant*. | ) ) ) ) ) ) ) ) ) | No. 1:19cv476-LO-MSN |

**BRIEF IN SUPPORT OF DEFENDANT'S <u>EMERGENCY</u> MOTION TO ENFORCE**

Defendant, Rachelle Soto a/k/a Addison Cain ("Soto"), files this emergency motion to enforce regarding the lack of compliance by Plaintiff, Quill Ink Books Ltd. ("Quill"), with the Court's May 1 order compelling Quill to answer interrogatories and produce documents (Doc. 57). As his parting gesture, on May 8, Quill's former counsel appears to have made an effort to comply with the May 1 order. ***Nonetheless, serious and seemingly <u>tactical</u> deficiencies remain***. The deficiencies are outlined in **Section II** below.

Moreover, and more alarmingly, Quill once again is resorting to ***extrajudicial means*** to litigate this dispute. On May 23, *The New York Times* published an online and print article ***based on interviews with Zoey Ellis, Gideon Lincecum, and Prof. Busse***, and ***quoting from emails produced by Soto in response to Quill's subpoena and Soto's deposition testimony***, presenting a distorted and entirely one-sided analysis of the facts and the legal issues, and emphasizing the "***message***" that Zoey Ellis wants the Court to "***send***" to Soto.[1] Zoey Ellis is happy to sit for an anonymous interview with the *NYT*, but refuses to be deposed in this case.

---

[1]  https://www.nytimes.com/2020/05/23/business/omegaverse-erotica-copyright.html. The journalist also contacted Soto's counsel, who declined to be interviewed because of the ongoing litigation, as noted in the article.

Similarly, in a recent interview posted online, Ms. Coale (formerly a bankruptcy lawyer) has been marketing her new niche practice representing "romance authors" by trumpeting her the litigation against Soto and her former publisher.[2]  Yet, like Zoey Ellis, Ms. Coale refuses to sit for a deposition in this action, instead serving an 84-page objection and threatening to sue Soto's counsel for harassment (Exhibit A [excerpt]).  Although Quill has belatedly identified Ms. Coale is an individual with plenary knowledge of the facts at issue (*Quill Revised Discovery Responses*, Exhibit E, at 6), Quill apparently has instructed Ms. Coale to duck behind a privilege assertion and stay out of range in Texas while she, too, takes pot-shots at Soto in the press.

Furthermore, Quill appears to be using the withdrawal of its counsel of record as a help-yourself continuance, in which to reformulate its case as well as litigate it in the press.  New counsel has not appeared, effectively stopping the case in its tracks.  Nonetheless, the other two law firms actively advising Quill, but not appearing—Margarita Coale (Texas) and Gideon Lincecum (Oklahoma)—are deliberately thwarting Soto's discovery efforts even as Quill advances new liability and damages theories in its revised discovery responses.  Plainly, they hope to exploit the indefinite pause created by Quill's firing of Kaufman & Canoles, P.C.

As explained in **Section I**, below, Quill continues to approach this litigation as a game, just as they did in Oklahoma.  Indeed, Quill is cynically using some of the same dubious tactics that Mr. Lincecum employed in Oklahoma—such as attempting to deputize Mr. Harrison and Mr. Thrasher as "corporate representatives" for Quill, who will be called as "fact" witnesses at trial to offer their opinions on damages and legal issues if they are excluded from testifying as "experts."  While the Court undoubtedly will not permit that, these cynical tactics force Soto to repeatedly overcome illegitimate obstacles at great expense and loss of time.

---

[2]  https://www.transformativeworks.org/otw-guest-post-margarita-coale/.

These cynical tactics have but one purpose: to punish Soto for a slight, which caused, at most, *de minimis* financial loss to Quill, and to inflict ever-mounting litigation expenses on Soto. Soto requests that the Court (i) award the $4,000 in fees Soto has requested, (ii) set a firm, short deadline for the appearance of new counsel of record, (iii)  preclude Quill from presenting any fact or expert evidence on damages, and (iv) compel immediate compliance with the Court's May 1 order on penalty of dismissal of Quill's DMCA claim should it fail to comply.

Moreover, the Court may—indeed, should—consider immediately imposing stronger sanctions on Quill to vindicate the Court's authority, including sanction Quill's further deliberate abuse of discovery materials by publishing them extrajudicially, dismissal of Quill's DMCA claim, and holding Quill and its Oklahoma and Texas lawyers in contempt and precluding their participation in this action as counsel of record.

## I.   QUILL IS MANIPULATING THE SCHEDULE AND THE CIRCUMSTANCES TO THWART SOTO'S DISCOVERY, WHILE ADVANCING ITS OWN INTERESTS.

### A.   THE TACTICAL FIRING OF KAUFMAN & CANOLES, P.C.

The discovery cut-off is June 12.  Quill already has taken a help-yourself continuance of ten weeks by providing deficient discovery responses that were due in February, forcing Soto to move to compel.  That was deliberate—Quill is running out the clock.

Soto was already deposed for a full day in the Oklahoma case; Soto produced thousands of documents in response the Oklahoma subpoena and this action; Soto timely served her discovery responses; and Soto timely served a full and proper expert disclosure.  Soto has played by the rules every step of the way.  Quill has not.

Neither Quill, Zuri Thompson, Zoey Ellis, or Ms. Coale have been deposed; Quill still has not produced competent fact or expert evidence of its alleged damages; Quill apparently spoliated evidence; Quill did not search for or produce documents from Zoey Ellis' email and social media

accounts.  And now, by firing its lawyer during the last month of the discovery period, Quill has handcuffed Soto and precluded Soto from completing necessary discovery.  The Court must intervene—again—to prevent Quill's continuing efforts to pervert justice in this action.

At this critical juncture, Quill has fired its counsel and seeks to exploit the resulting pause in litigation to its advantage.  That is grossly unjust.

First, there can be no doubt that Quill's counsel was fired:

> There are material, fundamental, continuing, and irreconcilable differences between Quill Ink and its representatives, and the Firm, on the manner in which the case should be litigated.  While Quill Ink may not agree with the Firm about why these differences exist, ***Quill Ink nevertheless has advised the Firm that "new counsel is necessary."***

(Doc. 62, *Withdrawal Br.* at 3 (emphasis added)).  Where, then, is "new counsel"?  Nowhere to be seen for the past week.

The lack of counsel of record for Quill has effectively stopped the case in its tracks.  For example, Soto previously served a notice of deposition on Zuri Thompson, Quill's sole owner and director, with which Quill refused to comply and which Quill demanded be withdrawn or Quill would file an emergency motion to quash.  Quill contended that Soto could only depose a "corporate representative" of Quill's choosing pursuant to Rule 30(b)(6).  This is the same tactic Mr. Gideon employed in Oklahoma, when designating Prof. Busse as Quill's "corporate representative" on all issues, and Mr. Harrison as Quill's "corporate representative" on damages issues (Doc. 48-6, Exhibit G, *Hearing Tr.* at 20:21 – 23:20).

The pivotal colloquy between the Oklahoma District Judge and Mr. Lincecum regarding Quill's designation of Prof. Busse as a fact witness is remarkable:

> MR. LINCECUM:  She has been designated as a 30(b)(6) representative because she's the only person that's, quite frankly, stateside that has the knowledge and has read these books.  So we were looking at how to handle that situation such that if she's called as the 30(b)(6) witness, she's testifying as to facts.  If she's testifying as to an expert, she's -- can offer her opinion and guidance.

THE COURT:  Is she an owner?

MR. LINCECUM:  She is not.

THE COURT:  Is she an officer or an employee?

MR. LINCECUM:  No, Your Honor.

THE COURT:  She have any sort of contractual relationship where she gets paid other than being an expert witness?

MR. LINCECUM:  No, Your Honor.  She is just an individual that has knowledge of this information, that can offer and has informed herself of the facts related to this case sufficient to testify as a 30(b)(6) witness, if needed.

(*Id*. at 21:7 – 21:24).  To recap, Prof. Busse is not affiliated with Quill, but has been offered as a Rule 30(b)(6) deponent; she proffered an affidavit in Oklahoma as a "Rule 30(b)(6) designee" (Doc. 50-1), even though that Rule is limited to a designation for deposition testimony, not for trial or other testimony; and on Quill's final trial witness list, Prof. Busse was named as a fact and expert witness for Quill—but Quill did not name Zuri Thompson (Quill's sole owner and director) or Zoey Ellis (Quill's "principal author") as trial witnesses.

Soto was not going to accept Quill's bogus Rule 30(b)(6) designation of Prof. Busse; however, the COVID-19 pandemic then disrupted Soto's attempt to negotiate a deposition of Zuri Thompson.  Now, without counsel of record for Quill, Soto cannot even serve a new notice of deposition her or a Rule 30(b)(6) notice for Quill (Exhibits B & C).  Similarly, Quill's charade that Zoey Ellis is a very private, non-party witness who should not be deposed, or if she were deposed must be deposed in England under the Hague provisions, collapses now that the truth about her is known (Exhibit E, Interrog. No. 4).  Suffice it to say, Zoey Ellis works ***in-house*** at Quill as its "principal author" and has a virtual identity with Quill, making her a managing agent for discovery purposes.  However, her deposition notice (Exhibit D) cannot be served, either.

Quill's affronts to the Court and the Court's management of the case, its disobedience of Court orders, its disregard of the Court's admonition given in 2019 subpoena action about the impropriety of using litigation materials for "extrajudicial purposes,"[3] and its trampling upon the integrity of the litigation procedures are beyond the pale.  Now, by firing its counsel of record, Quill has again helped itself to a continuance in the litigation and again thwarted Soto's discovery efforts, even while Quill actively litigates its case in the press.  Having crossed yet another line drawn by the Court, Quill's intractable misconduct invites the sternest of all sanctions.

### B.    MR. HARRISON AND MR. THRASHER ARE NOT "FACT" WITNESSES.

Although Mr. Harrison and Mr. Thrasher were initially identified solely as "expert" witnesses (Doc. 44-3, *Quill Discovery Responses* at 2, 6), in Quill's revised responses, they are now identified as "expert" or "fact" witnesses (Exhibit E, Interrog. No. 2 at 4, 9-10).  Neither works for or has any other relationship with Quill; neither participated in any of the events at issue; and neither has any first-hand knowledge of any fact issue in the case.  Indeed, Quill's description of Harrison's expected testimony about the "facts" confirms that it will be the same conclusory assertions about damages proffered in his proposed expert disclosures (*e.g.*, *Id.* at 27 ("If Harrison Payne [*sic*] testifies as a lay witness … [he] will discuss the magnum [*sic*] of damages attributable to this element in a manner consistent with the business documents appended to that report and otherwise produced in discovery.")).  Quill describes Mr. Thrasher's "scope of knowledge" as

---

[3] *See Quill Ink Books Limited, et al. v. ABCD Graphics and Design Inc., et al.*, No. 1:19-mc-00013 (E.D. Va. Aug. 16, 2019) (Doc. 17, *Transcript* at 20:25 – 21:10) ("I find that the protective order agreed to by counsel during the depositions was appropriate, ***especially in light of what the Court can only conclude was the intentional misuse of discovery materials by Quill Books or the former plaintiff, Zoey Ellis***.  It is unclear how those things were posted, but they were clearly used outside of the context of the litigation in order to have an impact – a negative impact on perceived competitors, and the Court can only conclude that the effort to gather this information would be used if permitted for that purpose.") (emphasis added).

"reflected in proposed expert report, incorporated by reference," and unspecified "other matters." (*Id*. at 10).  Quill is still playing games.

This is another abusive tactic that Quill has tried before.  In Oklahoma, Quill proffered Harrison as a fact witness:  "We also have Payne Harrison (phonetic), who is our other 30(b)(6) witness who is testifying as to the facts relating to the damages, the finances of what the losses have been" (Doc. 48-6, Exhibit G, *Hearing Tr*. at 21:25 – 22:2).  To be clear, no Rule 30(b)(6) deposition of Quill was taken in Oklahoma (*Id*. at 24, 29).  In other words, Quill was proposing to designate Harrison as a "Rule 30(b)(6)" fact witness *for trial*.

Now, once again, Quill is asking the Court to go "through the looking-glass" to enter some phantasmagorical forum that allows these bizarre and fanciful procedures, such as allowing a party to "designate" individuals who have no first-hand knowledge as "fact" witnesses for trial.

Despite the apparent contrition and professional embarrassment expressed by Quill's Virginia counsel at the May 1 hearing prior to his withdrawal (Doc. 69, *Hearing Tr*. at 40:25 – 41:11), Quill's Oklahoma and Texas lawyers continue to play games, disobey the rules, and try to scam the system.  The Court should put a stop to that.

As Soto has previously argued, the Court should exclude Harrison's and Thrasher's proposed expert evidence (Doc. 64).  Now, the Court should exclude them as fact witnesses, as well, because Quill is attempting a transparent end-run around the expert disclosure rules.

## II.     QUILL'S REVISED RESPONSES ARE DEFICIENT, REFLECTING OBVIOUS BAD FAITH TACTICS, AS WELL AS DISOBEDIENCE OF THE MAY 1 ORDER.

Despite its counsel of record's inviting the Court to enter an order compelling Quill to respond to discovery (*e.g*., Doc. 69, Hearing Tr. at 41:8-11), Quill and its Oklahoma and Texas lawyers had other ideas.  Not only did they spend their energy on self-promotion and litigating in the press, they tactically omitted important documents and falsely claimed to have produced others.

Moreover, they backtracked on concessions earlier made and have attempted to re-assert baseless contentions that they had previously withdrawn for lack of evidence.  This has forced Soto to play Whack-a-Mole, as in an arcade.  In an arcade, a Whack-a-Mole game costs a quarter; in litigation, it costs tens of thousands of dollars to repeatedly beat back each contention that pops up.

### A.   DAMAGES EVIDENCE IS UTTERLY LACKING.

Despite suing for $735,000 in damages and telling the *NYT* that Quill is "seeking $1.25 million in damages," Quill has ***no proof of damages whatsoever***, let alone seven-figure damages.

In its revised answer to Interrogatory No. 17 (*see* Exhibit E), Quill again makes the same conclusory assertions of damages totally $735,000, which it contends are substantiated in just two documents, identified in its responses to Interrogatories Nos. 17(g) and 4.  Soto has already filed both those documents under seal as Exhibits A and B in connection with her opposition to Quill's motion for leave to serve late expert reports (Doc. 64-1 & 64-2; sealed versions Doc. 65).  Those documents disprove Quill's damages contentions, not support them.  Moreover, the only substantive addition to Quill's responses is to falsely claim that additional information about its damages is contained in Harrison's expert report, which contains nothing of the sort.  Even in these revised answers, Quill offers no facts, just additional falsehoods and conclusory assertions.

***Lost Sales:***  Quill seeks $135,000 in lost sales—that is, $15,000 per month, per book, for three months, April, May, and June 2018 (Exhibit E, Interrog. No. 17(a)(1)).  That would be 5,000 additional units sold per month at $3.00 per download.  As the Court can see on sealed Doc. 64-2, more than 99% of Quill's sales were through Amazon in those months, as well as in the months before and after.  Amazon never took down any of the Zoey Ellis books.  Apparently, only three vendors responded to the takedown notices, Apple, Kobo, and Draft2digital.  For one book, *Crave to Capture*, the sales on Apple went from

in July 2018.  If the Court assumes that

was "normal," and that all lost sales are due to Soto's alleged wrongdoing, then the total

of lost sales for that book during those three months totaled                                    —

*not* 15,000 books at $3.00 each, for a total of $45,000.  The other vendors who took down these

books, Kobo and Draft2Digital, sold even fewer books per month than Apple.  Quill's contention

is so far-fetched that one must conclude that the answer is deliberately false.

Despite alleging that there were "multiple inquiries" from its readers seeking to buy these

books during the takedown period (Doc. 27, *First Amd. Cmplt*. ¶ 56), Quill has confirmed that the

*only inquiry* about purchasing these books was made in a single message, from a single reader,

seeking a single copy, of a single book (Exhibit E, Interrog. No. 11 identifying QUILL 004769).

Quill should immediately retract its false allegation of "multiple inquiries."

Finally, Quill offers no evidence of lost "pre-sales," which in this industry is easily tracked

data Quill should have in its business records.  The absence of "pre-sale" data from April, May,

and June 2018 is telling:  There were no "pre-sales," and this answer is deliberately false.

***Reputational Harm and Lost Business Opportunities:***  In its revised discovery responses,

Quill seeks $250,000 for reputational harm and another $250,000 in lost business opportunities

due to its having been foreclosed from the "lucrative" audiobook market because a voice artist

refused to work with Quill (Exhibit E, Interrog. No. 6, 8 & 17(a)(2) & (3)).  This is an about-face

from Quill's original position on this topic.  When opposing Soto's motion to compel more

information about the audiobook vendors, Quill argued as follows:  "***The … voice talent and***

***corresponding audio production company were not included as individuals with knowledge of***

***the Amended Complaint or Counterclaim because*** <u>***they do not have discoverable information***</u>;

they merely chose not to work with Quill in light of Cain's smear campaign against Quill and Zoey

Ellis across several social media platforms, but especially postings made in the weeks prior to the termination of these engagements." (Doc. 48, *Quill Br. Opp.* at 16-17 (emphasis added)). Thus, Quill previously argued that ***none*** of the $250,000 in reputational damages and ***none*** of the $250,000 in lost business opportunities were based on the audiobook vendors' refusal to deal, and so they "had no discoverable information." Now, in the revised answer, Quill attributes ***all*** $500,000 in these damages to the voice talent and audiobook vendor's refusal to deal with Quill. That is not a good faith response. It also comes late in the day, all but foreclosing Soto's ability to locate these vendors and test Quill's new assertions in discovery before the June 12 cut-off.

Significantly, this revised contention is baseless on its face. Quill produced no documentary support for its claim of $500,000 in damages, such as production contracts, pre-publication sales orders, and the like. Moreover, to give the Court an idea of the order-of-magnitude of audiobook sales of dark romance Omegaverse fiction, the audiobook vendor refunded the entire advance payment made by Quill as it sought to enter the "lucrative" audiobook market—***$100***. In no world—fact or fantasy—does a $100 fee open the door to earning $500,000 in profit in just a few short months. And again, doing the math, and assuming $3.00 per audiobook download, that means Quill would have sold over 166,666 audiobooks in a few months, which far exceeds the total number of units of all books it has sold in its four-year existence. This response is deficient and deliberately false.

***Business Interruption:*** Quill seeks $100,000 for interruption of its operations, which Quill ***falsely*** claims "are detailed in the proposed expert report of Payne Harrison and the documentary attachments to that report" (Exhibit E, Interrog. No. 17(a)(4)). There is no such "detail" in the Harrison disclosure. Nor does Quill explain how these damages are calculated. Quill's own financial records (Doc. 64-1) show that its annual operational expenses, other than the hefty legal

fees it shells out for Ms. Coale and Mr. Lincecum, are trivial—which is one of the benefits of online publishing.  This answer is deficient and deliberately false.

In short, Quill's revised damages responses are just as deficient as the original responses and contain even more falsehoods and even grosser exaggerations.  In Oklahoma, the District Judge ordered Quill to supplement its damages discovery, but it did not.  In this action, the Court ordered Quill to supplement it damages discovery, but it did not.  Now, as a sanction for disobeying the May 1 order, the Court should preclude Quill from presenting fact and expert evidence of damages.

### B.   FACEBOOK COMMUNICATIONS BETWEEN ZOEY ELLIS OR ZURI THOMPSON AND ADDISON CAIN.

After Soto published her trilogy under the pseudonym Addison Cain, she received Facebook messages from Zoey Ellis (*e.g.*, Exhibit F SOTO 001105 [redacted to shield Soto's image]).  Although Soto has produced such messages, Quill has not.  These were sought in Request Nos. 5 and 20.  In its revised responses, Quill said that "there are few or no direct communications (*e.g.*, e-mails, letters) responsive to this request," or that there was "only one," which was produced (Exhibit E, Request Nos. 5 & 20).  That response is wholly inadequate.

In this Facebook message sent in February 2018, just after Zoey Ellis debuted the first book of her *Myth of Omega* trilogy, Zoey Ellis made a Facebook "friend" request to Addison Cain, stating, *inter alia*,

> You're one of my favourite writers/authors and I LOVE your writing.
>
> Born To Be Bound and Dark Side of the Sun are my favorites and I'm really looking forward to your future releases

(Exhibit F).  The book *Born to Be Bound* is one of the books in Soto's trilogy that Zoey Ellis allegedly infringed.  Despite the obvious relevance of these posts, Quill produced none of them.

Obviously, Quill is clinging to the fiction that Zoey Ellis is a third-party, and Quill has not searched for and not produced any documents from Zoey Ellis' personal email and social media accounts. However, Quill now admits that Zoey Ellis works in-house at Quill and has a near identity with it (Exhibit E, Interrog. No. 4). Thus, Zoey Ellis' documents, emails, social media postings and messages, and the like are within Quill's possession, custody, or control. *See Herbst v. Able*, 63 F.R.D. 135, 138 (S.D.N.Y. 1972) (finding possession, custody, or control and ordering corporate defendant to gather and produce documents from its "non-defendant employees"). Quill must search for and produce Zoey Ellis' documents generally, and these in particular.

First, these messages are relevant. In Soto's infringement analysis, for example, one of the elements that she must show is that Zoey Ellis had "access" to Soto's works directly or through an intermediary. *Towler v. Sayles*, 76 F.3d 579, 581-82 (4th Cir. 1996). In this message, Zoey Ellis admits reading at least one book of Soto's trilogy, and indicates her admiration of "Addison Cain's" work ("I LOVE your writing."). Thus, the message establishes "access" and, because Zoey Ellis had not written Omegaverse fiction before, it also tends to show it is more probable than not that when writing her first Omegaverse novel, Zoey Ellis imitated or copied from an author greatly she admired. Thus, these messages are relevant.

Second, it is of no moment that Soto may have her own version of the same message. Under the Rules, the Court may order the responding party to produce relevant documents even when the requesting party has its own counterpart copy. *Weiner v. Bache Halsey Stuart, Inc.*, 76 F.R.D. 624, 625-26 (S.D. Fla. 1977). That ruling applies here.

Accordingly, Quill should be ordered to search for and produce these messages and should be required to search for and produce Zoey Ellis' personal emails, social media, and other

documents that may be responsive to any other request.  Quill cannot continue to treat Zoey Ellis as a third-party.

### C.  ZOEY ELLIS' COMMUNICATIONS WITH QUILL.

Quill adamantly and repeatedly insisted that Zoey Ellis was a third-party witness, whose identity—and even whose testimony—was irrelevant.  As recently as its brief in opposition to the Soto's motion to compel, Quill insisted that Zoey Ellis was unconnected to Quill:

(Doc. 48, *Quill Br. Opp*. at     ).  Given Quill's revised answer to Interrogatory No. 4 (Exhibit E), the Court should be shocked by the ***brazen falsity*** of Quill's contention that Soto had

Had the Court accepted Quill's arguments and continued to shield Zoey Ellis' identity— as Quill demanded—Quill would have succeeded in committing a fraud on the Court.

However, prior to receiving the revised answer, Soto had no choice but to frame her discovery requests as if Zoey Ellis, the author, were unconnected to Quill, the publisher.  Thus, in Request No. 4 and Interrogatory No. 10, Soto sought Quill's communications with Zoey Ellis' about her own books, Soto's books, and other relevant topics.  With respect to Zoey Ellis' own books, Soto expected to receive the usual back and forth between publisher and author—that is, the submission of a draft manuscript, editorial comments, revised drafts, acceptance of the work for publication, terms for compensating the author, and the like.

In response to Interrogatory No. 10, however, Quill states "There are no such communications between Quill and Zoey Ellis."  And in response to Request No. 4, Quill states that "There are no such documents or communications between Quill and Zoey Ellis."  Now we know why—because Zoey Ellis works in-house at Quill.

Although Quill's responses to Soto's requests, as framed, may be "true," it was Quill's repeated lying about Zoey Ellis' lack of connection to Quill that caused Soto to frame those requests in that manner.   Perversely, Quill's "true" answers perpetuate Quill's blatant misrepresentations about Zoey Ellis.   Given Quill's deliberate and tactical misdirection, Soto requests that the Court order Quill to produce electronic versions of Zoey Ellis' original manuscript for each book of her trilogy, as well as all edited and revised versions, comments from advanced readers and editors, and the final version used for publication, ***with metadata***.

When writing her books, Zoey Ellis admits that she uses "advanced readers" (readers of preliminary drafts who provide comments and proposed edits) and an "editor."  In fact, in a blog post, she states that prior to publication of the second book in her *Myth of Omega* trilogy, she had to complete "Rounds of editing between me and my amazing editor," and to submit that book to her "advanced readers."[4]  Based on Quill's false narrative that Zoey Ellis was unconnected to it, Soto assumed that advanced readers and editing were functions that her publisher, Quill, provided or performed.   Thus, Soto asked for, and expected to receive, Zoey Ellis' pre-publication communications with Quill, which ordinarily would have included advanced readers' and editor's comments, drafts, and edits.   Instead, Quill produced nothing.

In general, prior drafts of documents are discoverable and often reveal details not apparent in the final draft.  *Cf. In re Hoechst Celanese Corp.*, 584 N.Y.S.2d 805, 806 (N.Y. App. 1992)

---

[4]  *E.g.*, https://www.zoeyellis.com/2018/02/28/progress-update-crave-to-capture/.

(affirming order compelling production of all documents relating to "drafting" leading up to the final version of insurance form at issue).   Zoey Ellis' original and edited manuscripts, communications with her advanced readers, and communications with her "amazing editor" may reveal how closely Zoey Ellis' manuscripts originally tracked Soto's works, and how edits may have been used to try to disguise any copying.

Accordingly, Soto requests that the Court order Quill to produce advanced readers' and editor's comments, drafts, and edits for each of the books in Zoey Ellis' *Myth of Omega* trilogy, as well as the metadata for each document.

### D.   REDACTED DOCUMENTS.

In its original document production, Quill produced a lot of redacted pages, including emails in which the sender or recipient's name had been redacted (in almost all instances, that appeared to be either Zoey Ellis' or Zuri Thompson's name).   The Court ordered Quill to produce unredacted versions.   Quill has produced unredacted versions of many of those documents and also provided a chart explaining that other redacted documents it produced were from the Oklahoma litigation and many of the redactions had been made by others (*e.g.*, Blushing Books) who had produced them (Exhibit G).   However, on the chart, Quill also asserted, without further explanation, that unredacted versions of numerous documents created by Zoey Ellis or Ms. Coale were "missing" or that others had been "permanently altered when created" (*Id.*, highlighted entries).   That is insufficient.

A party has an obligation to preserve evidence once litigation is foreseen—particularly the plaintiff.   *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.").   As explained in

*Silvesti*, the Court may inquire into instances of missing or altered evidence and impose sanctions, including dismissal, if spoliation has occurred. *Id*. at 590-94. That being so, Quill cannot now rest on its bland assertions that certain originals are "missing" or that others were "permanently altered," when all these documents were created during the period when Quill, advised by Ms. Coale, was contemplating suing Soto and Blushing Books.[5]

Accordingly, Soto requests that the Court order Quill (and Ms. Coale) to explain why these documents are "missing" or why and how they were "permanently altered."

### E.     ZOEY ELLIS' COMMUNICATIONS WITH "NORA ASH."

One of the issues in this case is whether Quill and others, including "Nora Ash," "set up and used additional fake online accounts to continuously make false reports to Facebook about Cain's advertisements, causing Cain's Facebook advertisements for her books to be removed numerous times from at least March 2018 until October 2018" (Doc. 36, *Soto Counterclaim* ¶ 37). Quill denies this allegation (Doc. 37, *Quill Answer to Counterclaim* ¶ 37). Soto asked for "All communications between Quill and … Nora Ash regarding the Myth of Omega series or the Alpha's Claim series." (Exhibit E, Interrog. No. 24). To which Quill responded, in pertinent part: "[T]here are no such communications between Quill and Nora Ash." (*Id*.). Yet, this answer appears to be based on Quill's false distinction that Zoey Ellis is unconnected to Quill, and that Quill does not need to search for or produce Zoey Ellis' emails or social media communications.

As shown above, Quill must search for and produce responsive documents created or maintained by Zoey Ellis. "Nora Ash," another pseudonymous Omegaverse author, is one of Zoey

---

[5] According to Quill's privilege log, Quill and Zoey Ellis retained Ms. Coale in March 2018, started taking legal action against Soto and Blushing Books in June 2018, and discussed litigation against Soto and Blushing Books with Mr. Lincecum no later than early July 2018.

Ellis' allies and supporters.  It is inconceivable that Zoey Ellis and "Nora Ash" have had no communications.

Accordingly, the Court should order Quill to search for and produce documents responsive to Request No. 24, including searching Zoey Ellis' emails and social media communications, or explain under oath why they do not exist.

### F.   COMMUNICATIONS THROUGH THE OMEGAVERSE LITIGATION WEBSITE.

Quill admits it "created and maintains" the omegaverselitigation.com website (Doc. 37, *Quill Answer to Counterclaim* ¶ 51).  That website is still up and active.  On that website, there is a Contact webpage, inviting interested individuals to sign up for updates and otherwise communicate with Quill.  There was a lot of interest in the site:  for example, the webpage "Addison Cain to be deposed in Virginia" (which attached the subpoena issued to "Rachelle Soto a/k/a Addison Cain") has received "1,670 views."[6]  Because that website is so avidly followed, Soto asked Quill to produce, *inter alia*, copies of "postings" and other communications with third-parties regarding that website (Exhibit E, Interrog. No. 22 and Request No. 19).  In response, Quill said there were none that were "non-privileged."

As Quill intended, thousands of interested individuals visited that website and viewed the webpages where Quill waged its "extrajudicial" war against Soto.  Again, it is inconceivable that none of those thousands of visitors contacted Quill or sought to sign up for updates.  In these circumstances, "records which are normally kept in the business of the party … are presumed to exist, absent a sworn denial."  *E.g.*, *Norman v. Young*, 422 F.2d 470, 473 (10th Cir. 1970).  Accordingly, Soto requests that the Court order Quill to produce the postings, communications,

---

[6]   https://www.omegaverselitigation.com/post/addison-cain-to-be-deposed-in-virginia  (visited May 24, 2020).

and contacts from third-party visitors to the omegaverselitigation.com website, or explain in a detailed and sworn denial why there are none.

***

Quill's revised responses are still grossly deficient—and the deficiencies are tactical. Rather than disclose that it has no proof on pivotal issues, Quill continues to spout smokescreens, throw up barriers, and recycle previously discarded contentions.  This is games-playing, and the Court again must intercede to stop it.  The discovery cut-off is June 12, but Quill continues to thwart Soto's efforts to discover the factual bases of Quill's contentions.  For this, Quill should be sanctioned.

## III.    THE COURT SHOULD GRANT THE PENDING CONSENT SEALING MOTION.

At the conclusion of the May 1 hearing, the Court directed the parties to submit a consent motion to seal and proposed order consistent with the Court's rulings (Doc. 56, *Minute Entry*, May 1, 2020) (Motion to Seal # 51—"Granted – consent order to be submitted").  The parties filed that consent motion and proposed sealing order on May 4 (Doc. 58).  However, to date, the consent order does not appear to have been entered.  Soto respectfully requests that the consent order be entered and that the follow up actions specified in the consent order be implemented.

## CONCLUSION

For the reasons argued above and in the underlying motion to compel, Soto requests that this motion to enforce be granted.  Soto requests that the Court (i) award the $4,000 in fees Soto has requested, (ii) set a firm, short deadline for the appearance of new counsel of record, (iii) preclude Quill from presenting any fact or expert evidence on damages, and (iv) compel immediate compliance with the Court's May 1 order on penalty of dismissal of Quill's DMCA claim should it fail to comply.

Moreover, Soto respectfully submits that the Court should consider immediately imposing stronger sanctions on Quill to vindicate the Court's authority, including sanctioning Quill's further deliberate abuse of discovery materials by publishing them extrajudicially, dismissal of Quill's DMCA claim, and holding Quill and its Oklahoma and Texas lawyers in contempt and precluding those lawyers from participation in this action as counsel of record.

Respectfully submitted,

May 26, 2020

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com
*Counsel for Defendant*

*Of Counsel for Defendant:*
Shawn M. Dellegar, OBA # 20973
Crowe & Dunlevy, P.C.
321 South Boston Avenue, Sutie 500
Tulsa, Oklahoma 74103
T: (918) 592-9800
E: shawn.dellegar@crowedunlevy.com
*Counsel for Defendant (Pro Hac Vice)*

Tynia A. Watson, OBA # 30765
Crowe & Dunlevy, P.C.
324 N. Robinson Ave., Suite 100
Oklahoma City, Oklahoma 73102
T: (405) 235-7500
E: tynia.watson@crowedunlevy.com
*Counsel for Defendant (Pro Hac Vice)*

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically provide notice to all counsel of record, and emailed copies to Plaintiff's outside counsel, Ms. Coale and Mr. Lincecum, even though they have not appeared.

/s/ Craig C. Reilly
Craig C. Reilly (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com
*Counsel for Defendant*